UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MATTHEW ROPPOLO, DA-NA ALLEN, JOHNNY COOK, and VICTOR VALDEZ on behalf of themselves and others similarly situated, | § § § § § | |
| *Plaintiffs,* | § § § | |
| v. | § § | Civil Action No. 2:19-cv-262 |
| LANNETTE LINTHICUM, in her official capacity as the medical director of the TEXAS DEPARTMENT OF CRIMINAL JUSTICE, and PHILIP KEISER, CYNTHIA JUMPER, RODNEY BURROW, F. PARKER HUDSON III, ERIN WYRICK, JOHN BURRUSS, PRESTON JOHNSON, JR., and DEE BUDGEWATER, in their official capacities as the members of the CORRECTIONAL MANAGED HEALTH CARE COMMITTEE, and OWEN MURRAY, in his official capacity as the director of the UNIVERSITY OF TEXAS MEDICAL BRANCH CORRECTIONAL MANAGED CARE program, | § § § § § § § § § § § § § § § § § § | |
| *Defendants.* | § | |

## PLAINTIFFS' THIRD AMENDED CLASS ACTION COMPLAINT

Plaintiffs Matthew Roppolo, Da-Na Allen, Johnny Cook, and Victor Valdez bring this 42 U.S.C. § 1983 and Americans with Disabilities Act/Rehabilitation Act class action suit for injunctive and declaratory relief against the members of the Correctional Managed Health Care Committee, the Texas Department of Criminal Justice, and the University of Texas Medical Branch to stop Defendants from intentionally treating patients with Hepatitis C incorrectly, as Defendants callously deny Plaintiffs and thousands of others similarly situated to them correct medical treatment while they are imprisoned by the State of Texas.

## I.      Parties

A. *Plaintiffs*

1.  Matthew Roppolo is a prisoner of the Texas Department of Criminal Justice. He is imprisoned at the TDCJ McConnell Unit located in Bee County, Texas, and is chronically infected with the Hepatitis C virus.

2.  Da-Na Allen is also a prisoner of the Texas Department of Criminal Justice. He is imprisoned at the TDCJ McConnell Unit located in Bee County, Texas, and is chronically infected with the Hepatitis C virus.

3.  Johnny Cook is also a prisoner of the Texas Department of Criminal Justice, and incarcerated at the McConnell Unit in Bee County, Texas. Mr. Cook is chronically infected with the Hepatitis C virus.

4.  Victor Valdez is also a prisoner of the Texas Department of Criminal Justice, and incarcerated at the McConnell Unit in Bee County, Texas. Mr. Valdez is chronically infected with the Hepatitis C virus.

5.  Mr. Roppolo, Mr. Allen, Mr. Cook, and Mr. Valdez have been, and Mr. Allen, Mr. Cook, and Mr. Valdez currently are being, intentionally mistreated by TDCJ and the medical provider for the McConnell Unit, the University of Texas Medical Branch, because of policies promulgated by TDCJ and the Correctional Managed Healthcare Committee.

B. *Defendants*

6.  Defendants are members of the Correctional Managed Healthcare Committee (CMHCC), and the medical director of the University of Texas Medical Branch, which provides medical treatment to inmates in the Texas Department of Criminal Justice, including Mr. Roppolo and Mr. Allen. CMHCC makes policies governing the medical treatment of prisoners in TDCJ custody,

including the policies regarding treatment for Hepatitis C. Each of the below individual Defendants are sued in their official capacities for injunctive and declaratory relief only.

7.   Lannette Linthicum is the director of TDCJ's Health Services Division. As such, she is also a voting member of CMHCC. She is a medical doctor. She is sued in both official capacities – as the TDCJ medical director and as a member of the CMHCC. She resides in Huntsville, Texas. She has been served.

8.   Owen Murray is the director of the University of Texas Medical Branch's Correctional Managed Care division, which provides medical treatment to TDCJ inmates in the eastern half of the state, including at the McConnell Unit where Mr. Roppolo and Mr. Allen reside. He is a medical doctor. He resides in Galveston, Texas, and has been served.

9.   Philip Keiser is the representative of UTMB on the CMHCC. He is a medical doctor. He resides in Galveston, Texas, and has been served.

10. Cynthia Jumper is the representative of Texas Tech University Health Science Center on the CMHCC. She is a medical doctor. She resides in Lubbock, Texas, and has been served.

11. Rodney Burrow is a member of the CMHCC. He is a medical doctor. He resides in Mt. Pleasant, Texas, and has been served.

12. F. Parker Hudson, III is a member of the CMHCC. He is a medical doctor. He resides in Austin, Texas, and has been served.

13. Erin Wyrick is a member of the CMHCC. She is a licensed professional counselor. She resides in Amarillo, Texas, and has been served.

14. John Burruss is a member of the CMHCC. He is a psychiatrist. He resides in Dallas, Texas, and has been served.

15. Preston Johnson, Jr. is a member of the CMHCC. He resides in Sugar Land, Texas, and has been served.

16. Dee Budgewater is a member of the CMHCC. She resides in Austin, Texas, and has been served.

17. The Texas Department of Criminal Justice is the state prison system, an agency of the State of Texas. At all relevant times, it operated the McConnell Unit, a public facility with programs and services prisoners with disabilities were otherwise qualified for. TDCJ is a recipient of federal funds. TDCJ has been served.

18. The University of Texas Medical Branch is a component of the University of Texas system located in Galveston, Texas. UTMB's high-ranking policymakers reside and work in Galveston. Through UTMB's Correctional Managed Care program, UTMB partners with TDCJ to provide health care to 80 percent of TDCJ prisoners, including Mr. Roppolo, Mr. Allen, Mr. Cook, Mr. Valdez, and the other prisoners at the McConnell Unit. UTMB is a recipient of federal funds. UTMB has been served.

19. Upon information and belief, CMHCC receives federal funds.

## II.  Jurisdiction and Venue

20. As this case is brought pursuant to 42 U.S.C. §§ 1983 & 1988, the Americans with Disabilities Act (42 U.S.C. § 12101) and the Rehabilitation Act (29 U.S.C. § 701), this Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3).

21. This Court has general personal jurisdiction over Defendants as Defendants reside and/or are employed within the Southern District of Texas.

22. Venue is proper in the Corpus Christi Division as relevant events occurred within Bee County, Texas, which is located within this Division.

### III.   Factual Background

A.   *The Hepatitis C Virus Attacks and Destroys the Liver*

23. The Hepatitis C virus is a chronic infectious disease that, once contracted, can last a person's entire life. If untreated, it can damage patients' livers, and, ultimately, can be fatal.

24. Hepatitis C can be spread through bodily fluids, including blood, semen, and vaginal fluid.

25. Hepatitis C attacks the liver. The liver is an essential organ, which, among many other critical functions, processes nutrients, filters toxins from the blood, prevents disease, and facilitates necessary metabolic processes in the body.

26. A healthy liver is critical to the operation of several major bodily functions, including the digestive system, endocrine system, immune system, and circulatory system.

27. Infection with Hepatitis C also impairs other bodily systems, such as reproduction, due to its method of transmission. All people infected with Hepatitis C can infect others.

28. All patients who are diagnosed with Hepatitis C cannot donate blood or organs, and should avoid taking certain medications (like NSAIDs) which can accumulate in the liver and accelerate liver damage. Upon information and belief, UTMB physicians advise all patients suffering from Hepatitis C to avoid (or substantially limit) their use of NSAIDs.

29. Hepatitis C is more contagious than other blood-borne pathogens (like HIV), such that doctors will suggest that patients avoid sharing toothbrushes or razors.

30. All Hepatitis C patients should avoid alcohol, and consume no more than one or two drinks per day.

31. Other lifestyle changes are recommended for all Hepatitis C patients, such as exercise, weight loss, and ensuring adequate food and water intake.

32. Hepatitis C causes inflammation of the liver, that, if untreated, causes physical and mental pain, liver scarring, diminished liver function, liver failure, and liver cancer, as well as adverse effects on other organ systems. For patients with liver failure, the only remaining option is a liver transplant.

33. Liver transplants are painful, carry significant risks of complications, and are nearly impossible for prisoners to obtain. Liver transplants carry significantly higher risk than treatment with direct-acting antiviral (DAA) drugs, and are extremely expensive (costing, according to CMHCC, over $200,000 per patient).

34. Hepatitis C is the leading cause of cirrhosis of the liver (scarring of liver tissue), and liver cancer.

35. Cirrhosis of the liver can cause symptoms such as swelling, increased likelihood of bruising, jaundice, itching, nausea, and problems with concentration and memory.

36. Even before Hepatitis C causes liver fibrosis, however, the infection itself and associated inflammation of the liver causes substantial extrahepatic symptoms (symptoms impacting organs other than the liver) in a significant number of patients, including autoimmune disorders, diabetes, hematologic diseases including lymphoma, kidney disease, and skin conditions.

37. In 2013, the Hepatitis C virus killed more people than sixty other infectious diseases combined – including HIV/AIDS, pneumococcal disease, and tuberculosis.

38. In TDCJ, Hepatitis C is the third leading cause of death. Most TDCJ prisoners who die of complications from liver disease are infected with Hepatitis C.

39. Each day without treatment of Hepatitis C increases the likelihood of developing cirrhosis, fibrosis, liver cancer, the need for a liver transplant, complications from the disease, and death from liver failure.

40. As such, Hepatitis C infection causes serious health effects and poses ongoing significant health risks.

41. Hepatitis C is a serious medical need, and requires treatment.

42. In the vast majority of cases, however, Hepatitis C can be cured with correct treatment.

43. Incredibly, Defendants denied the correct treatment to Mr. Roppolo for years, and still deliberately deny the correct treatment to Mr. Allen, Mr. Cook, and Mr. Valdez, as well as thousands of other TDCJ prisoners like them.

44. Defendants denied the correct treatment to Mr. Roppolo for years (including even under the incorrect standard for beginning treatment set in their own policies, as described below), and only began providing him with DAA treatment _after_ this case was originally filed, _after_ Plaintiff's Motion for Class Certification was filed, and _after_ substantial media exposure regarding this issue, including in the _Houston Chronicle_. Though Mr. Roppolo began receiving proper treatment, Defendants still have yet to provide him the entire required course of treatment, and even after being cured he will be at risk of reinfection.

B.    _Numerous TDCJ Prisoners Suffer from Hepatitis C_

45. The prevalence of Hepatitis C in prison systems is much higher than in the general population. It is estimated between 16% and 41% of prisoners in the United States suffer from chronic Hepatitis C infection.

46. Indeed, hepatologists recognize that incarceration itself is a significant risk factor for contracting Hepatitis C.

47. In testimony to a committee of the Texas Legislature in March of 2014, Dr. Murray testified that approximately 30% of TDCJ prisoners suffer from chronic Hepatitis C infection.

48. As TDCJ has a total prisoner population of approximately 145,000 people, Dr. Murray's testimony means that approximately 29,000 TDCJ prisoners are chronically infected with Hepatitis C.

49. More recently, a June 2018 CMHCC presentation estimated that over 18,000 TDCJ inmates have been diagnosed with chronic Hepatitis C.

50. If the high-end of the national estimates are correct, however, TDCJ may have as many as approximately 59,000 prisoners chronically infected with Hepatitis C.

51. Defendants' medical providers likely under-diagnose Hepatitis C due to the inadequate screening mechanisms described below.

C.     The Standard of Care for Hepatitis C Infections

52. For many years, there was no truly effective treatment for Hepatitis C. Until recently, the standard of care was treatment with interferon and ribavirin medications, which had very low cure rates, and carried significant side effects which prevented many patients from completing the treatment.

53. Beginning in or around 2011, however, new direct action antiviral (DAA) drugs came to market, and were approved by the Food and Drug Administration for the treatment of Hepatitis C. All CMHCC members were aware of these new, highly effective, treatments.

54. Additional, highly-effective all-oral DAA regimens were approved by the FDA and came to market in 2013 and 2014.

55. Unlike the old, ineffective treatments, DAA drugs have cure rates well over 90%, and little to no side effects. Due to the extreme effectiveness of DAA drugs, no competent physician prescribes the old interferon and ribavirin treatments any longer. Upon information and belief, the

8

interferon and ribavirin treatments are no longer provided to any TDCJ prisoners due to their ineffectiveness and the theoretical availability of DAA drugs.

56. DAA drugs are now the standard of care for treatment of Hepatitis C.

57. There is universal agreement among competent physicians that DAA drugs are the only appropriate treatment for Hepatitis C.

58. There is a robust and substantial consensus that DAA drugs are the only appropriate treatment for Hepatitis C.

59. DAA drugs are the only effective treatment for Hepatitis C. No other treatment or monitoring actually effectively addresses the disease, or slows its progress. No other currently utilized treatment has any possibility of success to cure the disease.

60. There is no good-faith disagreement between competent physicians regarding whether chronic Hepatitis C patients should be treated with DAA drugs.

61. Virtually no other medications are contraindicated to DAA drugs.

62. The effectiveness of DAA drugs has led to skyrocketing cure rates of Hepatitis C infection among people who are not incarcerated.

63. Even the Defendants admit that DAA drugs are now the standard of care in treating Hepatitis C.

64. In fact, Dr. Murray, while testifying before the Texas Legislature in 2014, admitted that DAA treatments were "excellent drugs" that "ha[ve] become the standard of care."

65. Any competent doctor practicing medicine in 2019 would acknowledge as much, just as Dr. Murray testified in 2014.

66. At CMHCC meetings, the robust consensus regarding the standard of care for Hepatitis C treatment is regularly discussed, and the CMHCC members are well aware that the universal

agreement is that the community standard of care for treatment of Hepatitis C requires treatment of all people diagnosed with chronic Hepatitis C with DAA drugs.

67. At a CMHCC meeting in 2013, Dr. Harold Berenzweig, a former CMHCC member, confirmed as much telling the committee members that new DAA treatments were "the standard of care for treatment of patients."

68. At the same CMHCC meeting, then-TTUHSC representative, Dr. Denise DeShields concurred, and also told committee members that DAA treatment was the "community standard of care."

69. Likewise, Dr. Linthicum told her fellow CMHCC members that it was the committee's responsibility "as physicians" to "do the right thing by our patients. We practice medicine consistent with the public safety and welfare and if there is a national guideline that sets the standard of care, that's what we do. ... We have to, as physicians, do the right thing."

70. She further commented, "I have an ethical obligation to practice medicine in this state consistent with the public safety and welfare and so I think we go forward with a policy that meets the standard of care," and to do otherwise would be practicing "substandard medicine."

71. Dr. Linthicum then told the committee that if it did not approve DAA drug treatments, it would risk the wrath of "a federal judge."

72. In other words, Dr. Linthicum – and the rest of the CMHCC – knows that Defendants are deliberately indifferent to inmates' serious medical needs when the prison system deliberately refuses to treat chronic Hepatitis C patients with DAA drugs, and that failing to provide DAA treatments amounts to intentionally treating inmates with chronic Hepatitis C incorrectly.

73. At a CMHCC meeting in 2015, the committee members were expressly told that national guidelines now require that "*everyone* who contracts the disease [be] treated" with DAA drugs.

Case 2:19-cv-00262   Document 32-1   Filed on 01/08/20 in TXSD   Page 11 of 28

74. Yet the Defendants continue to intentionally treat Hepatitis C patients incorrectly, by ignoring these universally-accepted treatment guidelines, and rationing care rather than treating every chronic Hepatitis C patient in TDCJ custody (as the standard of care requires).

75. In fact, Defendants ration care for patients exclusively due to the cost of DAA drugs, and not for any medical reason.

76. Yet TDCJ officials know they need to provide incarcerated patients the same standard of care patients would receive in the community.

77. In fact, Dr. Linthicum has testified that "there's not a different standard of care in prison versus the community," that "TDCJ does, in fact, operate [its healthcare system] to community standards," and that "we operate our healthcare system according to community standards of care and national standards of care."

78. Likewise, in other litigation, UTMB's corporate representative, Dr. Glenda Adams, testified that UTMB is obligated to follow and "meet community standards of care" when serving its prisoner patients, and that UTMB providers should be held to the same standards as providers in the community.

79. But this is not true for treatment of Hepatitis C. Instead, TDCJ, UTMB, and CMHCC purposely expose Hepatitis C patients with a serious medical need to a substantial risk of serious harm and ignore the universally-accepted standards of care, and thus are intentionally treating patients incorrectly.

80. TDCJ, UTMB, and CMHCC also violate the standard of care with respect to diagnostic testing to determine the presence of a chronic HCV infection. The universally-accepted standard of care in this regard is to first perform an antibody test to determine if a person has been exposed to the HCV virus. However, a person with a positive antibody test may not have a chronic infection

– some small number of patients naturally clear the virus. Therefore, to determine whether a person has chronic infection, a viral load test, or "PCR test," must be performed to determine the presence and amount of the virus in the blood. The viral load test should be performed as soon as possible after the antibody test shows positive, as it is important for the patient's health to determine immediately whether the person has a chronic HCV infection and, if so, to begin treatment.

81. TDCJ, UTMB, and CMHCC violate the universally-accepted standard of care with respect to diagnostic testing for HCV infection because, on information and belief, they frequently fail to do viral load testing immediately after a positive antibody test, and instead delay many months before performing viral load testing on an inmate with a positive antibody test. This policy delays diagnosis of chronic HCV infection, delays necessary treatment, and subjects inmates to health risks described above. By denying inmates this diagnostic testing, TDCJ, UTMB, and CMHCC are intentionally treating patients incorrectly.

82. HCV patients do not experience a uniform linear progression of the disease – in some patients, the disease will worsen and progress rapidly, and thus delays in diagnosis and/or treatment pose substantial health risks. Though the disease progress is not uniform in all patients, all chronic Hepatitis C patients are at substantial risk of serious harm from cirrhosis, liver cancer, and/or the extrahepatic symptoms described herein.

C.    *CMHCC, TDCJ and UTMB Policies Deny Required Hepatitis C Treatments to TDCJ Prisoners*

83. Though the universally-accepted standard of care for Hepatitis C requires treatment of all patients with DAA drugs, CMHCC, TDCJ, and UTMB policies intentionally deny this safe and extremely effective treatment to TDCJ prisoners – even though DAA drug treatment is the only

12

currently effective treatment with any possibility of success. Thus, CMHCC, TDCJ, and UTMB policies are designed to intentionally treat Hepatitis C patients incorrectly.

84. Instead of complying with the universally-accepted standard of care, CMHCC, TDCJ, and UTMB policies only allow TDCJ prisoners to be considered for DAA treatment after testing demonstrates they are already suffering from damage to their liver.

85. The AST to platelet ratio index (APRI) uses blood testing in lieu of a biopsy or ultrasound as an indirect measure of scarring of the liver.

86. According to CMHCC, TDCJ, and UTMB's policies, only prisoners with an APRI of over 0.5 will even be considered for treatment of Hepatitis C (including DAA treatment). Liver fibrosis is ranked on the METAVIR scale ranging from F0, indicating no fibrosis, to F4, indicating cirrhosis. An APRI score of .5 correlates with a METAVIR level of F2. Thus, Defendants' policy requires a patient to suffer *some* liver damage before being considered for treatment.

87. The universally-accepted community standard of care, however, requires *all* patients with Hepatitis C, regardless of APRI or METAVIR score, be provided DAA drugs, as DAA drug therapy is the only currently available treatment with any possibility of success. Thus, Defendants' policies purposefully treat Hepatitis C patients incorrectly, and actually provide <u>no treatment</u> to class members.

88. APRI scores alone are not sufficiently sensitive, moreover, to rule out significant liver disease. In fact, using an APRI score of 0.5 as a threshold for treatment will fail to identify 19% of patients with significant liver fibrosis.

89. Likewise, even when a patient has a sufficiently high APRI score, CMHCC, TDCJ, and UTMB's policies still do not mandate treatment – just a referral to another doctor, who consistently fails to provide treatment with DAA drugs in direct violation of the community standards of care.

This also violates the standard of care, as all patients, and certainly those whose liver has already been damaged, require treatment with DAA drugs.

90. Defendants' policy is essentially "wait and see" if the patient will eventually be released from prison, suffer significant liver damage, or die before treatment can no longer be delayed. No competent physician would choose to simply monitor the progress of a disease like Hepatitis C rather than treat it with a universally-accepted cure.

91. Thus, numerous TDCJ prisoners, including Mr. Allen, Mr. Cook, and Mr. Valdez (and for years Mr. Roppolo), are intentionally denied DAA treatment for Hepatitis C, in violation of the universally-accepted standard of care, due to CMHCC's policies.

92. No competent physician would simply monitor the progress of a chronic, potentially deadly, life altering disease like Hepatitis C when a universally-accepted, highly-effective cure like DAA drugs was available.

93. These policies ration care to inmate patients entirely for non-medical reasons. The only reason all chronic Hepatitis C patients in TDCJ custody are not treated with DAA drugs is the cost of the medications. There is no medical basis for the rationing of medication this way as DAA drugs are extremely effective and the only treatment currently available which can actually cure Hepatitis C.

94. Defendants, acting as the CMHCC, voted unanimously to approve this treatment policy that intentionally denies correct care to inmates like Mr. Allen, Mr. Cook, Mr. Valdez, and thousands of others, and intentionally denied correct care to Mr. Roppolo for many years.

D. *CMHCC and UTMB Policies Denied DAA Treatment to Plaintiff Matthew Roppolo for Many Years, with Treatment Provided Only After This Case and Plaintiffs' Motion for Class Certification was Filed.*

95. Plaintiff Matthew Roppolo is imprisoned at the McConnell Unit, in Beeville, Texas.

96. UTMB, Dr. Murray's agency, provides medical care to prisoners at the McConnell Unit, pursuant to its contract with TDCJ.

97. Mr. Roppolo was diagnosed with Hepatitis C in the 1990s. His APRI score has been elevated for years, and was in excess of 0.7 on testing done intermittently from late 2016 to early 2018. His APRI was above 0.5 on his most recent available test done in September 2018.

98. Mr. Roppolo's APRI scores indicate, in reasonable probability, that he suffers from liver fibrosis (scarring).

99. Mr. Roppolo attempted Interferon treatment for his Hepatitis C in 2015, but was unable to tolerate it.

100.    Starting in 2017, Mr. Roppolo specifically requested DAA treatment from prison medical staff, but was denied treatment at that time and for years, until after this case was filed.

101.    When Mr. Roppolo filed Step 1 and Step 2 grievances seeking care, the responses indicated that he would merely continue to be monitored. That was almost two years ago.

102.    Mr. Roppolo does not have any medical conditions that would contraindicate treatment with DAA drugs.

103.    Mr. Roppolo's medical records, during visits in 2018, note the following with respect to Hepatitis C: "the nature of the infection and the course of the disease was discussed with the patient including the possibility of developing liver cirrhosis and subsequent liver cancer."

104.    Despite medical staff recognizing and counseling Mr. Roppolo regarding the grave health risks posed by his Hepatitis C infection, Defendants deliberately withheld DAA treatment from him for years, in known violation of the standard of care.

105.    At the time the Original Complaint in this case was filed, on September 11, 2019, Defendants were still not providing Mr. Roppolo with DAA treatment.

106.     Only after this case was filed, after significant press coverage including in the *Houston Chronicle*, and after Plaintiff's Motion for Class Certification was filed, did Defendants begin providing Mr. Roppolo with DAA treatment, which, upon information and belief, began only or about October 30, 2019.

107.     Mr. Roppolo's treatment with DAA drugs is currently ongoing, and has not been completed.

108.     Mr. Roppolo has exhausted all administrative remedies.

109.     Mr. Roppolo's "projected release date" is December 1, 2045.

110.     Thus, solely due to CMHCC, TDCJ, and UTMB's policies, Defendants intentionally treated Mr. Roppolo incorrectly for years by denying him DAA treatment required by the standard of care, and by doing so acted with deliberate indifference to his serious medical needs, and intentionally created a substantial risk of serious harm to his health.

E.     *CMHCC and UTMB Policies Deny DAA Treatment to Plaintiff Da-Na Allen*

111.     Plaintiff Da-Na Allen is imprisoned at the McConnell Unit, in Beeville, Texas.

112.     UTMB, Dr. Murray's agency, provides medical care to prisoners at the McConnell Unit, pursuant to its contract with TDCJ.

113.     Mr. Allen was diagnosed with Hepatitis C in 2008. His APRI score has been elevated for years. His APRI was 0.278 on his most recent available test done in January 2019.

114.     Starting as early as 2017, Mr. Allen has specifically requested DAA treatment from prison medical staff, but has not been treated.

115.     When Mr. Allen filed Step 1 and Step 2 grievances seeking care, the responses indicated that he would merely continue to be monitored.

16

116.     Mr. Allen does not have any medical conditions that would contraindicate treatment with DAA drugs.

117.     Despite the health risks posed by his Hepatitis C infection, Defendants have deliberately withheld DAA treatment from Mr. Allen, in known violation of the universally-accepted standard of care. Defendants' policies intentionally cause Mr. Allen to receive incorrect treatment for his Hepatitis C, in violation of the standard of care. Defendants' policies are deliberately indifferent to Mr. Allen's serious medical condition, and will require him to suffer significant liver damage before he receives DAA treatment for his Hepatitis C.

118.     Mr. Allen has exhausted all administrative remedies.

119.     Mr. Allen's "projected release date" is March 7, 2044.

120.     Thus, solely due to CMHCC, TDCJ, and UTMB's policies, Defendants intentionally treat Mr. Allen incorrectly by denying him DAA treatment required by the universally-accepted standard of care, and by doing so act with deliberate indifference to his serious medical needs, and intentionally create a substantial risk of serious harm to his health.

E.     *CMHCC and UTMB Policies Deny DAA Treatment to Plaintiff Johnny Cook*

121.     Plaintiff Johnny Cook is imprisoned at the McConnell Unit in Beeville, Texas.

122.     UTMB, Dr. Murray's agency, provides medical care to prisoners at the McConnell Unit, pursuant to its contract with TDCJ.

123.     Mr. Cook was diagnosed with Hepatitis C in the 1990s. His APRI score has been elevated for years. His APRI was 0.293 on his most recent available test done in August 2019.

124.     Starting as early as 2018, Mr. Cook has specifically requested DAA treatment from prison medical staff, but he still has not been treated.

125.     When Mr. Cook filed Step 1 and Step 2 grievances seeking care, the responses indicated that he would merely continue to be monitored, allowing his liver to be further damaged as he awaits treatment.

126.     Mr. Cook does not have any medical conditions that would contraindicate treatment with DAA drugs.

127.     During visits in 2012, one of Mr. Cook's providers "discussed long term risks associated w/ chronic [Hepatitis C] infection including liver failure, cirrhosis and [liver cancer]."

128.     Mr. Cook's medical records also note that he has had substantially impairing symptoms of chronic HCV infection starting as early as 2006, including loss of appetite, fatigue, nausea, depression, dizziness, and abdominal pain.

129.     Despite medical staff recognizing and counseling Mr. Cook regarding his symptoms and the grave health risks posed by his Hepatitis C infection, Defendants have deliberately withheld DAA treatment from Mr. Cook, in known violation of the universally-accepted standard of care. Defendants' policies intentionally cause Mr. Cook to receive incorrect treatment for his Hepatitis C, in violation of the universally-accepted standard of care. Defendants' policies are deliberately indifferent to Mr. Cook's serious medical condition, and will require him to suffer significant liver damage before he receives DAA treatment for his Hepatitis C.

130.     Mr. Cook has exhausted all administrative remedies.

131.     Mr. Cook is serving a life sentence.

132.     Thus, solely due to CMHCC, TDCJ, and UTMB's policies, Defendants intentionally treat Mr. Cook incorrectly by denying him DAA treatment required by the universally-accepted standard of care, and by doing so act with deliberate indifference to his serious medical needs, and intentionally create a substantial risk of serious harm to his health.

F.    *CMHCC and UTMB Policies Deny DAA Treatment to Mr. Valdez*

133.    Plaintiff Victor Valdez is imprisoned at the McConnell Unit in Beeville, Texas.

134.    UTMB, Dr. Murray's agency, provides medical care to prisoners at the McConnell Unit, pursuant to its contract with TDCJ.

135.    Mr. Valdez was diagnosed with Hepatitis C in 2011. His APRI score has been elevated for years. His APRI was 0.648 on his most recent available test done in May 2019, and has been as high as 0.857 while in TDCJ custody.

136.    Mr. Valdez's APRI scores indicate, in reasonable probability, that he suffers from a significant level of liver fibrosis (scarring).

137.    In reasonable medical certainty, due to his level of liver fibrosis, Mr. Valdez has an increased risk of developing hepatocellular carcinoma.

138.    Starting as early as 2014, Mr. Valdez has specifically requested DAA treatment from prison medical staff but he still has not been treated.

139.    When Mr. Valdez filed Step 1 and Step 2 grievances seeking care, the responses indicated that he is not a candidate for DAA treatment and would merely continue to be monitored.

140.    However, in medical record notes from 2016 and 2017, the prison medical provider noted that Mr. Valdez "meets criteria" for DAA treatment.

141.    Mr. Valdez does not have any medical conditions that would contraindicate treatment with DAA drugs.

142.    Mr. Valdez's medical records, during visits in 2017, note the following with respect to Hepatitis C: "The nature of the infection and the course of the disease was discussed with the patient including the possibility of developing liver cirrhosis and subsequent liver cancer."

143.     Mr. Valdez's medical records also note that he has substantial symptoms of chronic HCV infection, including fatigue. Mr. Valdez also suffers other substantial extrahepatic symptoms, including pain on his right side, easy bruising, persistent itching, periodic nausea, and depression.

144.     Despite medical staff recognizing and counseling Mr. Valdez regarding his symptoms and the grave health risks posed by his Hepatitis C infection, Defendants have deliberately withheld DAA treatment from Mr. Valdez, in known violation of the universally-accepted standard of care. Defendants' policies intentionally cause Mr. Valdez to receive incorrect treatment for his Hepatitis C, in violation of the universally-accepted standard of care. Defendants' policies are deliberately indifferent to Mr. Valdez's serious medical condition, and will require him to suffer significant liver damage before he receives DAA treatment for his Hepatitis C.

145.     Mr. Valdez has exhausted all administrative remedies.

146.     Mr. Valdez's "projected release date" is September 17, 2046.

147.     Thus, solely due to CMHCC, TDCJ, and UTMB's policies, Defendants intentionally treat Mr. Valdez incorrectly by denying him DAA treatment required by the universally-accepted standard of care, and by doing so act with deliberate indifference to his serious medical needs, and intentionally create a substantial risk of serious harm to his health.

## IV.   <u>Causes of Action</u>

*A.      42 U.S.C. § 1983 – Cruel and Unusual Punishment*

148.      Defendants, acting jointly as the CMHCC, TDCJ, and UTMB, violate the Eighth Amendment rights of prisoners like Mr. Roppolo, Mr. Cook, Mr. Valdez, and Mr. Allen by denying them treatment with DAA drugs for Hepatitis C.

149.      The Eighth Amendment's protections against cruel and unusual punishment require that prison officials provide medical treatment to inmates when prisoners suffer from serious medical needs.

150.      The Eighth Amendment also prohibits prison physicians from intentionally treating patients incorrectly. Defendants intentionally provide patients with Hepatitis C incorrect medical treatment by rationing care and denying treatment to prisoners who should be treated according to the universally-accepted standard of care.

151.      Untreated Hepatitis C is a serious medical need that places Mr. Roppolo, Mr. Allen, Mr. Cook, Mr. Valdez, and thousands like them at a substantial risk of serious health effects. In fact, Defendants' policies require Mr. Roppolo, Mr. Allen, Mr. Cook, Mr. Valdez, and numerous other patients to suffer liver scarring and the ongoing risk of serious extrahepatic symptoms before UTMB or TTUHSC doctors will even consider treating him.

152.      Indeed, even after APRI test values indicated that Mr. Roppolo and Mr. Valdez suffered from significant liver scarring, and after medical staff counseled them on the grave health risks of their HCV infection, Defendants still refused for many years to provide Mr. Roppolo with the universally-accepted DAA drugs, and still continue to deny the safe and effective drugs to Mr. Valdez.

153.     Likewise, Defendants are still intentionally treating Mr. Allen, Mr. Cook, and thousands of other patients incorrectly, and will require thousands of patients like Mr. Allen and Mr. Cook to suffer liver damage before providing them with the correct treatment required by the standard of care.

154.     Defendants, through the policies of CMHCC, TDCJ, and UTMB, are deliberately indifferent to Mr. Roppolo, Mr. Allen, Mr. Cook, Mr. Valdez, and thousands of others' serious medical needs, in violation of the Eighth Amendment (as secured against the States through the Fourteenth Amendment).

*B. ADA and Rehabilitation Act (as to TDCJ and UTMB only)*

155.     Defendants intentionally discriminate against prisoners, like Mr. Roppolo, Mr. Allen, Mr. Cook, and Mr. Valdez, who suffer from Hepatitis C by intentionally denying them the reasonable accommodation of universally-accepted necessary medical treatment.

156.     Failing to provide reasonable accommodations is illegal discrimination under the Acts, entitling a plaintiff to injunctive and declaratory relief.

157.     Title II of the ADA and the Rehabilitation Act require public entities, like TDCJ, and UTMB, to reasonably accommodate people with disabilities in all programs and services for which people with disabilities are otherwise qualified. Because failing to provide medical care to inmates also violates the Eighth Amendment, TDCJ, and UTMB's immunity from suit is waived by Congress' power to enforce the Fourteenth Amendment.

158.     The Rehabilitation Act also requires federal funds recipients to reasonably accommodate persons with disabilities in their programs and services. As TDCJ, and UTMB are each federal funds recipients, their sovereign immunity from suit is waived by Congress' spending power under the Rehabilitation Act.

159.     The McConnell Unit and dozens of other TDCJ prisons where class members reside are facilities, and their operation comprises a program and service, for ADA and Rehabilitation Act purposes.

160.     Medical treatment is a program or service that TDCJ, and UTMB provide to prisoners for purposes of the ADA and Rehabilitation Act.

161.     Mr. Roppolo, Mr. Allen, Mr. Cook and Mr. Valdez are qualified individuals with a disability under the meaning of both the ADA and the Rehabilitation Act. As with numerous other Hepatitis C patients, Mr. Roppolo's, Mr. Allen's, Mr. Cook's, and Mr. Valdez's Hepatitis C substantially impairs the operation of their digestive, endocrine, circulatory, reproductive, and immune systems, and the liver is a major bodily organ substantially impaired by Hepatitis C infection.

162.     TDCJ and UTMB know that Mr. Roppolo, Mr. Allen, and thousands of others suffering from Hepatitis C are qualified individuals with a disability. TDCJ and UTMB know that individuals with Hepatitis C require treatment with DAA drugs, but deny this reasonable accommodation to Mr. Allen, Mr. Cook, Mr. Valdez, and numerous other patients, and denied it for many years to Mr. Roppolo.

## V.  Class Action

163.     Pursuant to Federal Rule of Civil Procedure 23(b)(2), Plaintiffs seek to certify a class defined as: "All current and future prisoners in TDCJ custody who have been diagnosed, or who will be diagnosed, with chronic Hepatitis C and who are not already being treated with direct acting antiviral medications."

23

Case 2:19-cv-00262   Document 32-1   Filed on 01/08/20 in TXSD   Page 24 of 28

164.    Upon information and belief, Defendants have the ability to identify all such similarly situated class members, though medical and other existing records in Defendants' possession.

165.    The proposed class satisfies the requirements of Rule 23(a):

a. *Numerosity*: The class is so numerous that joinder of all members is impracticable. According to Defendants' estimates, the class is composed of *at least* 18,000 patients.

b. *Commonality*: There are questions of law and fact common to the class, including, but not limited to:

    i. Whether Hepatitis C is a serious medical need?

    ii. Whether Defendants' policy results in Hepatitis C patients being intentionally treated incorrectly?

    iii. Whether Defendants' policy and practice of not providing Hepatitis C treatment to all class members constituted deliberate indifference to a serious medical need, in violation of the Eighth Amendment?

    iv. Whether treatment with DAA medications is the standard of care for treatment of Hepatitis C?

    v. Whether an intentional decision to not provide treatment in accord with the standard of care intentionally denies patients correct medical treatment?

    vi. Whether chronic Hepatitis C infection is a disability for purposes of the ADA and Rehabilitation Act?

    vii. Whether providing DAA treatment for Hepatitis C is a reasonable accommodation under the ADA and Rehabilitation Act?

      viii.  Whether Defendants are intentionally discriminating against Hepatitis C patients by denying them treatment with DAA medications?

c.  *Typicality*: The claims or defenses of the class representatives, Mr. Roppolo, Mr. Cook, Mr. Valdez, and Mr. Allen, are typical of the claims or defenses of the remainder of the class. The class representatives have been diagnosed with chronic Hepatitis C, but have been intentionally treated incorrectly by Defendants, and suffer from the same type of complications and substantial risk of harm that the remainder of the class members suffer from. Mr. Roppolo's experience and claims prior the start of his treatment with DAAs were typical of the class members, and were typical at the time this case was filed as his treatment did not begin until after this litigation commenced.

d.  *Adequacy*: The class representatives and class counsel will fairly and adequately protect the interests of the class. The class representatives are committed to obtaining declaratory and injunctive relief that will benefit themselves as well as the class by ending Defendants' unconstitutional policies and practices. Mr. Roppolo is willing to continue to serve as a class representative to pursue this case to obtain DAA treatment for other class members to the extent the law allows. The class representatives' interests are consistent with, and not antagonistic to, the interests of the class. The class representatives have a strong personal interest in the outcome of this case, and have no conflicts with other class members. Mr. Roppolo, Mr. Allen, Mr. Cook, Mr. Valdez and the class are represented by experienced counsel who have extensive experience in civil rights litigation against the Defendants. Class counsel has been hailed by this Court as "experienced in class

action litigation and civil rights work," and "highly skilled" in light of "extraordinary results" class counsel obtained for another class of TDCJ prisoners.

166.     The requirements of Rule 23(b)(2) are satisfied, as the party opposing the class has acted and refused to act on grounds generally applicable to the class so that final declaratory and injunctive relief would be appropriate for the class as a whole. Only injunctive relief will end the policy and practice of intentionally treating patients chronically infected with Hepatitis C incorrectly.

## VI. Injunctive and Declaratory Relief

167.     Mr. Roppolo, Mr. Allen, Mr. Cook, Mr. Valdez, and the putative class seek injunctive and declaratory relief pursuant to 42 U.S.C. § 1983, the ADA, and the Rehabilitation Act against Defendants, to require TDCJ, UTMB, and the CMHCC end its policies which deliberately treat chronic HCV patients incorrectly and to provide the class members the medical treatment they need and the universally-accepted standard of care requires.

168.     Without permanent injunctive relief, Defendants will continue to deny Mr. Roppolo, Mr. Allen, Mr. Cook, Mr. Valdez and other class members necessary medical treatment, disregard the medical standard of care as well as federal and state law mandates, and endanger the life and health of the class.

169.     Mr. Roppolo, Mr. Allen, Mr. Cook, Mr. Valdez, and the class have no plain, adequate, or complete remedy at law to address the wrongs described herein.

170.     Mr. Roppolo, Mr. Allen, Mr. Cook, Mr. Valdez, and the class ask that the Court enjoin Defendants to require Defendants to end their dangerous, discriminatory and unconstiutional practices, and provide them with DAA drug treatment for their chronic Hepatitis C.

171.     Mr. Roppolo, Mr. Allen, Mr. Cook, Mr. Valdez, and the class do not seek damages in this action (other than costs and attorneys' fees).

## VI. Attorneys' Fees

172.     Pursuant to 42 U.S.C. § 1988, and 42 U.S.C. § 12205, Mr. Roppolo, Mr. Allen, Mr. Cook, Mr. Valdez and the class are entitled to recover attorneys' fees, litigation expenses (including expert witness fees), and court costs should they become prevailing parties.

## VII. Prayer for Relief

Therefore, Plaintiffs respectfully request that the Court award the following relief:

A.     Certify the class of TDCJ prisoners chronically infected with Hepatitis C who are not receiving treatment with DAA drugs;

B.     Remedy ongoing violations of the law and the Constitution by granting declaratory and injunctive relief, as set out in this complaint, on behalf of Mr. Roppolo, Mr. Allen, Mr. Cook, Mr. Valdez, and the class;

C.     Permanently enjoin Defendants' dangerous, discriminatory, and unconstitutional policies concerning HCV and to require them to provide Mr. Roppolo, Mr. Allen, Mr. Cook, Mr. Valdez, and the class with a complete course of DAA drug treatments and opt-out HCV testing for all TDCJ inmates in accordance with the standard of care;

D.     Find that Plaintiffs are the prevailing party in this case, and award them attorneys' fees, court costs, expert costs, and litigation expenses;

E.     Grant such other and further relief as appears reasonable and just, to which Mr. Roppolo, Mr. Allen, Mr. Cook, Mr. Valdez, and the class may be entitled.

Date: January 8, 2020.

Respectfully submitted,

Edwards Law
The Haehnel Building
1101 East 11th Street
Austin, Texas 78702
      Tel.   512-623-7727
      Fax.  512-623-7729

By     /s/ Jeff Edwards
JEFF EDWARDS
State Bar No. 24014406
Attorney-in-Charge
Scott Medlock
State Bar No. 24044783
Michael Singley
State Bar No. 00794642
David James
State Bar No. 24092572
Federal ID No. 2496580

PLAINTIFFS' ATTORNEYS

## CERTIFICATE OF SERVICE

By my signature below, I certify that a true and correct copy of the foregoing legal instrument has been served on all counsel of record through the Court's electronic filing system.

/s/ Jeff Edwards
Jeff Edwards