UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MATTHEW ROPPOLO, DA-NA ALLEN, JOHNNY COOK, and VICTOR VALDEZ on behalf of themselves and others similarly situated, | § § § § § | |
| | § | |
| *Plaintiffs,* | § § | Civil Action No. |
| v. | § § | 2:19-cv-262 |
| LANNETTE LINTHICUM, in her official capacity as the medical director of the TEXAS DEPARTMENT OF CRIMINAL JUSTICE, and PHILIP KEISER, CYNTHIA JUMPER, RODNEY BURROW, F. PARKER HUDSON III, ERIN WYRICK, JOHN BURRUSS, PRESTON JOHNSON, JR., and DEE BUDGEWATER, in their official capacities as the members of the CORRECTIONAL MANAGED HEALTH CARE COMMITTEE, and OWEN MURRAY, in his official capacity as the director of the UNIVERSITY OF TEXAS MEDICAL BRANCH CORRECTIONAL MANAGED CARE program, | § § § § § § § § § § § § § § § § | |
| *Defendants*. | § | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS**

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Abu-Jamal v. Wetzel*, 3:16-CV-2000, 2017 WL 34700 (M.D. Pa. Jan. 3, 2017).................... 14, 20

*Allah v. Thomas*, 679 Fed. Appx. 216 (3rd Cir. 2017)................................................................ 20

*Allard v. Baldwin*, 779 F.3d 768 (8th Cir. 2015) ...................................................................... 14

*Allen v. Johnson, 194 Fed. Appx. 204 (5th Cir. 2006)* ............................................................. 19

*Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013)......................................................................... 35

*Ashcroft v. Iqbal, 556 U.S. 662 (2009)* ...................................................................................... 7

*Ballard v. Jackson St. Univ.*, 62 F.Supp.3d 549 (S.D. Miss. 2014)............................................ 6

*Barfield v. Semple*, 3:18-cv-1198, 2019 WL 3680331 (D. Ct. Aug. 6, 2019) ...................... 14, 16

*Barrie v. Nueces Cnty. Dist. Attorney's Office*, 753 Fed. Appx. 260 (5th Cir. 2018) ................. 34

*Bender v. Regier*, 385 F.3d 1133 (8th Cir. 2004) ......................................................................... 9

*Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448 (5th Cir. 2005)......................................... 21

*Bernier v. Trump*, 242 F.Supp.3d 31 (D. D.C. 2017) ................................................................ 20

*Blayne v. Flattery, 180 Fed. Appx. 510 (5th Cir. 2006)* ........................................................... 14

*Booth v. Galveston Cnty., Tex.*, No. 3:18-CV-00104, 2019 WL 1129492 (S.D. Tex. Mar. 12, 2019) ....................................................................................................................................... 35

*Buffkin v. Hooks*, No. 1:18-CV-502, 2019 WL 1282785 (M.D. N.C. Mar. 20, 2019) ............... 37

*Burling v. Jones*, No. H-16-0868, 2017 WL 384364 (S.D. Tex. Jan. 24, 2017) ........................ 19

*Cain v. City of New Orleans*, 281 F.Supp.3d 624 (E.D. La. 2017)............................................. 36

*Carlucci v. Chapa*, 884 F.3d 534 (5th Cir. 2018) ........................................................................ 9

*Chimenti v. Pa. Dep't of Corr.*, No. 15-3333, 2017 WL 3394605 (E.D. Pa. Aug. 8, 2017)............
............................................................................................................................... 15, 17, 19, 20

*Colwell v. Bannister*, 763 F.3d 1060 (9th Cir. 2014)........................................................... 10, 20

*Crow v. Mbugua*, No. H-17-1923, 2018 WL 5847410 (S.D. Tex. Nov. 8, 2018) ........................ 18

*Cunningham v. Sessions*, No. 9:16-cv-1292, 2017 WL 2377838 (D. S.C. May 31, 2017) .......... 20

*Daniel v. Ferguson*, 839 F.2d 124 (5th Cir. 1988) ........................................................................ 7

*Darby v. Pasadena Police Dept.*, 939 F.3d 311 (5th Cir. 1991)............................................ 34, 38

*De'Lonta v. Angelone*, 330 F.3d 630 (4th Cir. 2003) .................................................................... 11

*Delano-Pyle v. Victoria Cnty., Tex.*, 302 F.3d 567 (5th Cir. 2002)................................................ 30

*Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752 (5th Cir. 2001) ......................................... 16

*Easter v. Powell*, 467 F.3d 459 (5th Cir. 2006) ...................................................................... 9, 16

*Erickson v. Pardus*, 551 U.S. 89 (2007) ........................................................................................ 6

*Espinoza v. Tex. Dep't of Public Safety*, 148 F.App'x 224 (5th Cir. 2005)................................... 21

*Estate of Henson v. Krajca*, 440 Fed. Appx. 341 (5th Cir. 2011)................................................ 16

*Estelle v. Gamble, 429 U.S. 97 (1976)*......................................................................... 8, 9, 11, 17

*Ex Parte Young*, 209 U.S. 123 (1908) ........................................................................................ 30

*Fontenot v. McCraw*, 777 F.3d 741 (5th Cir. 2015) ..................................................................... 35

*Friends of the Earth, Inc. v. Laidlaw Env. Servs., Inc.*, 528 U.S. 167 (2000) ............................. 36

*Gates v. Cook*, 376 F.3d 323 (5th Cir. 2004)............................................................................... 31

*Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464 (7th Cir. 2001) ............................. 32

*Gibson v. Collier*, 920 F.3d 212 (5th Cir. 2019).......................................................................... 12

*Gobert v. Caldwell*, 463 F.3d 339 (5th Cir. 2006)....................................................................... 13

*Green v. Mansour*, 474 U.S. 64 (1985)........................................................................................ 30

*Grumbles v. Livingston*, 706 Fed. Appx. 818 (5th Cir. 2017) ...................................................... 19

*Grumbles v. Livingston*, No. 4:14-cv-03610, (S.D. Tex.)............................................................. 19

*Harris v. Hegmann*, 198 F.3d 153 (5th Cir. 1999) ...................................................................... 16

*Harrison v. Barkley*, 219 F.3d 132 (2nd Cir. 2000) ................................................................. 13, 14

*Henderson v. Tanner*, No. 15-0804, 2017 WL 1017927 (M.D. La. Feb. 16, 2017) ..................... 20

*Hendrix v. Aschberger*, 689 Fed. Appx. 250 (5th Cir. 2017) ......................................................... 18

*Hinojosa v. Livingston*, 994 F.Supp.2d 840 (S.D. Tex. 2014) ....................................................... 28

*Hoffer v. Inch*, 382 F.Supp.3d 1288 (N.D. Fla. 2019) ............................................................. 9, 20

*Hood v. Collier*, No. 3:18-0295, 2019 WL 3412440 (S.D. Tex. July 29, 2019) ........................ 18

*Jackson v. McIntosh*, 90 F.3d 330 (9th Cir. 1996) ....................................................................... 15

*Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667 (7th Cir. 2012) .......................................................... 27

*Jin Choi v. University of Texas Health Science Center*, 633 Fed. Appx. 214 (5th Cir. 2015) ...... 29

*Johnson v. Doughty*, 433 F.3d 1001 (7th Cir. 2006) .................................................................... 15

*Johnson v. Treen*, 759 F.2d 1236 (5th Cir. 1985) ................................................................. 11, 16

*Jones v. Tex. Dep't of Crim. Justice*, 880 F.3d 756 (5th Cir. 2018) ............................................. 14

*K.P. v. LeBlanc*, 729 F.3d 427 (5th Cir. 2013) ....................................................................... 31, 33

*Lightbourn v. County of El Paso, Tex.*, 118 F.3d 421 (5th Cir. 1997) .......................................... 21

*Lovelace v. Clarke*, No. 2:19cv75, 2019 WL 3728265 (E.D. Va. Aug. 7, 2019) ....... 10, 16, 18, 20

*Mabry v. Hometown Bank, N.A.*, 276 F.R.D. 196 (S.D. Tex. 2011) ............................................. 36

*Malley v. TDCJ-ID*, No. 6:06-cv-507, 2007 WL 9747586 (E.D. Tex. Sept. 18, 2007) ............... 32

*Mann v. Ohio Dep't of Rehab. & Corr.*, 2:18-cv-01565, 2019 WL 2617471 (S.D. Ohio June 26, 2019) ..................................................................................................................................... 9, 20

*Marshall v. LeBlanc*, No. 18-13569, 2019 WL 2090844 (E.D. La. Mar. 6, 2019) ..................... 19

*Martone v. Livingston*, No. 4:13-CV-3253 (S.D. Tex. May 19, 2019) ........................................ 28

*McCarty v. Zapata Cnty., Tex.*, 243 Fed. Appx. 792 (5th Cir. 2007) ........................................... 19

*McCollum v. Livingston*, No. 4:14-CV-3253, WL 608665 (S.D. Tex. May 19, 2019) .......... 25, 28

*McCoy v. Tex. Dep't of Crim. Justice*, No. C-05-370, 2006 WL 2331055 (S.D. Tex. Aug. 9, 2006) ........................................................................................................................ 25, 28

*McKinney v. Corr. Managed Health Care Advisory Committee*, No. 2:04-cv-0173, 2005 WL 550347 (N.D. Tex. Mar. 9, 2005) ........................................................................ 34

*Melton v. Dallas Area Rapid Transit*, 391 F.3d 669 (5th Cir. 2004)................................ 28

*Miller v. Tex. Tech Univ. Health Sci. Ctr.*, 421 F.3d 342 (5th Cir. 2005) ............................ 21, 24

*Mitchell v. Williams*, No. 6:15-cv-93, 2016 WL 723038 (S.D. Ga. Feb. 22, 2016) .............. 24, 29

*Moore v. Wetzel*, 1:18-cv-1523, 2019 WL 1397405 (M.D. Pa. March 6, 2019) ................... 10, 20

*Morrison v. Walker*, 704 Fed. Appx. 369 (5th Cir. 2017) ............................................... 7

*Murphy v. Hunt*, 455 U.S. 478 (1982) ......................................................................... 36

*O'Neil v. Tex. Dep't of Crim. Justice*, 804 F.Supp.2d 532 (N.D. Tex. Apr. 7, 2011) ................ 28

*Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001) ...................................................... 31, 33

*Olmstead v. Zimring*, 527 U.S. 581 (1999)................................................................. 36

*Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272 (5th Cir. 2005)..................................... 21

*Pace v. Bogalusa City School Bd.*, 403 F.3d 272 (2005)............................................ 21

*Patrick v. Wal-Mart, Inc.-Store No. 155*, 681 F.3d 614 (5th Cir. 2012)........................ 7

*Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206 (1998) ..................... 24, 27

*Postawko v. Mo. Dep't of Corr.*, 2:16-cv-04219, 2017 WL 1968317 (W.D. Mo. May 11, 2017). 9

*Riggleman v. Clarke*, No. 5:17-cv-00063, 2019 WL 1867451, (W.D. Va. Apr. 25, 2019).......... 20

*Rivera v. Lawson*, No. 2:18-cv-19, 2019 WL 4602957 (S.D. Tex. Apr. 12, 2019)................... 18

*Roberts v. Wilson*, No. 3:15-cv-1607, 2017 WL 8727155 (M.D. Pa. Sept. 27, 2017) ............... 20

*Roe v. Elyea*, 631 F.3d 843 (7th Cir. 2011) ...................................................... 9, 15, 17

*Roe v. Wade*, 410 U.S. 113 (1973)............................................................................. 36

*Roy v. Lawson*, No. 2:17-cv-9, 2018 WL 1054198 (S.D. Tex. Feb. 26, 2018) ......................... 18

*Stafford v. Carter*, No. 1:17-cv-00289, 2018 WL 4361639 (S.D. Ind. 2018) .................. 9, 15, 17

*Test Master Educ. Servs., Inc. v. Singh*, 428 F.3d 559 (5th Cir. 2005)........................................... 6

*Thomas v. City of Galveston*, 800 F.Supp.2d 826 (S.D. Tex. 2011)............................................. 38

*Trigo v. Tex. Dep't of Crim. Justice-Institutional Div. Officials*, 225 Fed. Appx. 211 (5th Cir. 2007) ............................................................................................................................. 9, 10

*Trop v. Dulles*, 356 U.S. 86 (1958)............................................................................................. 8

*U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388 (1980) ............................................................ 36

*U.S. v. Georgia*, 546 U.S. 151 (2006)............................................................................. 21, 24, 28

*United States ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375 (5th Cir. 2003) 38

*Vasquez v. Morgan*, No. H-18-3978, 2019 WL 2393428 (S.D. Tex. June 6, 2019).................... 18

*Washington v. Wash. Dep't of Corr.*, No. 3:17-cv-5728, 2018 WL 1867134 (W.D. Wash. Feb. 2, 2018) ............................................................................................................................... 20

Webb v. Livingston, No. 4:14-cv-03302, (TXSD Nov. 18, 2014) .............................................. 21

*Whiting v. Kelly*, 255 Fed. Appx. 896 (5th Cir. 2007) ................................................................ 19

*Williams v. Vincent*, 508 F.2d 5412 (2nd Cir. 1974)................................................................... 15

*Williamson v. Tucker*, 645 F.2d 404 (5th Cir. 1981) .................................................................... 7

*Workman v. Atencio*, No. 1:16-cv-00309, 2018 WL 4496628 (D. Idaho, Sept. 19, 2018)............ 9

*Yarls v. Bunton*, 905 F.3d 905 (5th Cir. 2018)........................................................................... 36

*Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030 (5th Cir. 1981) ......................................... 35

## STATUTES

42 U.S.C § 1983................................................................................................................. 20

42 U.S.C. § 12102.............................................................................................................. 22

Americans with Disabilities Act Amendments Act of 2008, Pub. L. No. 110-325 (Sept. 25, 2008) ........................................................................................................................... 21, 22

Fed. R. Civ. Proc. 15(a) ................................................................................................ 38

Tex. Gov't Code § 501.133 ........................................................................................... 32

Tex. Gov't Code § 501.146 ........................................................................................... 32

Tex. Gov't Code § 501.147 ........................................................................................... 32

Tex. Gov't Code § 501.148 ............................................................................... 3, 31, 32

## REGULATIONS

28 C.F.R. § 35.130 ........................................................................................................ 25

29 C.F.R. § 1630.2 .................................................................................................. 22, 23

## <u>TABLE OF CONTENTS</u>

I.    SUMMARY OF THE RESPONSE ........................................................................ 1

II.   FACTUAL BACKGROUND: DEFENDANTS DENY THEIR PATIENTS
NECESSARY CARE ............................................................................................. 2

III.  STANDARD OF REVIEW ................................................................................. 6

IV.   ARGUMENT AND AUTHORITIES ................................................................. 8

  A.  PLAINTIFFS STATE A CLAIM FOR VIOLATIONS OF THE EIGHTH AMENDMENT ............... 8

  B.  PLAINTIFFS STATE A CLAIM FOR VIOLATIONS OF THE AMERICANS WITH DISABILITIES
  ACT AND REHABILITATION ACT ............................................................................. 20

    1.  *The ADA and Rehab Act Abrogate TDCJ and UTMB's Sovereign Immunity* ......... 20

    2.  *Plaintiffs State a Claim for Violations of the ADA and Rehabilitation Act* .............. 21

  C.  THE MEMBERS OF THE CORRECTIONAL MANAGED HEALTH CARE COMMITTEE, IN
  THEIR OFFICIAL CAPACITIES, ARE THE APPROPRIATE PARTIES .................................... 30

  D.  PLAINTIFF ROPPOLO'S CLAIMS ARE NOT MOOT ............................................ 35

V.    IN THE ALTERNATIVE, LEAVE TO AMEND SHOULD BE GRANTED ............. 38

VI.   CONCLUSION ................................................................................................. 39

Plaintiffs' complaint plausibly alleges the Defendants' policies and practices violate Plaintiffs' constitutional and statutory rights to receive the only available treatment for their serious medical need – extremely effective direct acting antiviral (DAA) medications that cure Hepatitis C. Thus, the Court should deny Defendants' motion to dismiss Plaintiffs' claims. In the alternative, the Court should grant the Plaintiffs leave to amend to correct any identified deficiencies.

I.    SUMMARY OF THE RESPONSE

Defendants' motion should be denied for three reasons:

First, the Third Amended Complaint (Doc. 35) plainly alleges violations of the Eighth Amendment – the Defendants' polices and practices prohibit prison doctors from providing the only available treatment for patients suffering from Hepatitis C. Defendants' policies and practices prohibit the vast majority of patients diagnosed with Hepatitis C from receiving the universally-accepted medical treatment. Moreover, even after patients have suffered significant liver damage to qualify for potential treatment under the terms of the policy, Defendants still refuse to actually provide the treatment to the vast majority of patients. This is not a case where the patients would simply prefer a different course of treatment, or where reasonable doctors could disagree on what to prescribe. Here, Defendants' policy denies thousands of patients the *only* treatment that all physicians agree cures the disease, and ration the treatment purely due to costs, and require doctors to delay providing treatment until after patients start suffering demonstrable liver damage.

Second, the Third Amended Complaint alleges that Defendants' policies and practices deny patients the medical care necessary to treat their disability. There is only one class of medications that Defendants prohibit doctors from prescribing – the drugs necessary to treat Hepatitis C. This is akin to a policy prohibiting the prison from purchasing insulin for diabetics, or anti-retroviral drugs for patients disabled by HIV. Because this policy only denies care to

1

patients with a specific disability – Hepatitis C – the policy illegally discriminates against the patients in violation of the Americans with Disabilities Act and Rehabilitation Act.

Third, the individual members of the Correctional Managed Health Care Committee, in their official capacities, are appropriate defendants to grant injunctive relief in this suit. The CMHCC makes policies regarding medical care for Texas prisoners. The CMHCC policy regarding Hepatitis C prohibits patients from receiving the universally-accepted care until after liver damage occurs. Thus, these policymakers are the parties who must be enjoined to stop the unconstitutional and discriminatory practices, and to provide relief to the class of patients. Likewise, the medical directors for the providers themselves – Dr. Owen Murray of Defendants University of Texas Medical Branch, and Dr. Lannette Linthicum of the Texas Department of Criminal Justice – further ration the necessary treatments solely due to costs, and are the appropriate parties for any other necessary injunctive relief.

## II.   FACTUAL BACKGROUND: DEFENDANTS DENY THEIR PATIENTS NECESSARY CARE.

Defendants' policy and practice of rationing necessary medication that cures the disease solely due to cost denies Plaintiffs and the putative class medication there is universal medical agreement they need – the undisputed only effective treatment available for Hepatitis C – and discriminates against them due to their disabilities.

When this putative class action lawsuit was filed, Mr. Roppolo, Mr. Allen, Mr. Cook, and Mr. Valdez were each patients chronically infected with the Hepatitis C virus (HCV) and imprisoned by the State of Texas in Texas Department of Criminal Justice (TDCJ) prisons. Doc. 35, Plaintiffs' Third Amended Complaint, ¶¶ 1-4. Though Defendants began treating Mr. Roppolo's condition shortly after the lawsuit was filed – after refusing to do so for years – Mr. Allen, Mr. Cook, and Mr. Valdez are still denied necessary medication.

Defendants are the members of the Correctional Managed Health Care Committee (CMHCC), a board that makes the TDCJ policies related to health care – including the policies that deny medically necessary treatment to the Plaintiffs and the putative class. Doc. 35, ¶ 6. *See also* TEX. GOV'T CODE § 501.148. Plaintiffs also sued Dr. Lannette Linthicum, the TDCJ medical director, and Dr. Owen Murray, the director of the University of Texas Medical Branch Correctional Managed Care division (UTMB), the policymaking officials for Defendants TDCJ and UTMB, the agencies actually responsible for providing, or in this case denying, treatment to the Plaintiffs and the putative class. Doc. 35, ¶¶ 7-8.[1]

Hepatitis C is the leading cause of cirrhosis and liver cancer, and is the third leading cause of death in Texas prisons. Doc. 35, ¶¶ 34 & 38. Hepatitis C is a chronic viral infection and potentially fatal disease that, when untreated, progressively damages patients' livers. Doc. 35, ¶ 23. Hepatitis C, like HIV, is spread through bodily fluids, including blood, semen, and vaginal fluid, and can be spread through unprotected sex. Doc. 35, ¶¶ 24 & 27. The disease attacks the liver, a major vital organ that is necessary for the healthy function of the digestive system, endocrine system, immune system, and circulatory system. Doc. 35, ¶ 26. Patients diagnosed with Hepatitis C should make certain lifestyle changes, like avoiding certain medications that accumulate in the liver, avoiding sharing toothbrushes or razors, and limiting alcohol consumption. Doc. 35, ¶¶ 28-30. When untreated, the disease causes inflammation and scarring of the liver, resulting in physical and mental pain, and progresses to diminished liver function, liver cancer, or

---

[1] Dr. Linthicum is also a member of the CMHCC. Doc. 35, ¶ 7. Plaintiffs have also sued TDCJ and UTMB under the ADA and Rehabilitation Act, as the agencies themselves are the proper parties to an ADA/Rehabilitation Act suit.

3

ultimately liver failure – as well as damage to other organ systems. Doc. 35, ¶ 32. Over 18,000 TDCJ inmates suffer from Hepatitis C infection. Doc. 35, ¶ 49.[2]

Unlike many chronic diseases, Hepatitis C can be cured in well over 90% of patients with the use of direct acting antiviral (DAA) drugs. *See* Doc. 35, ¶ 42 & 53. Approved by the FDA in 2011, DAA drugs rapidly became the universally-accepted – and only – treatment for Hepatitis C. The drugs have little-to-no side effects, virtually no contraindications, and are highly effective. Doc. 35, ¶¶ 53-57. TDCJ has even stopped treating HCV patients with the old, ineffective, ribavirin and interferon treatments, which suffered from very low cure rates and side effects that many patients could not tolerate. Doc. 35, ¶ 55.[3] Today, DAA drug therapies are the *only* treatment utilized to treat Hepatitis C – there is no good-faith dispute between doctors that all Hepatitis C patients should be treated with DAA medications. Doc. 35, ¶¶ 59-60. As soon as a patient's infection becomes chronic – when two blood tests over a six-month period confirm the infection – DAA treatment should begin immediately to cure the disease. *See* Doc. 35, ¶¶ 73-74.

Indeed, every day treatment with DAA drugs is delayed increases a patient's likelihood of damaging the liver, developing cirrhosis, fibrosis, liver cancer, and dying from liver failure. Doc. 35, ¶ 39.

Members of the CMHCC have regularly confirmed, for years, that they know DAA drugs are now the only appropriate treatment for Hepatitis C. Doc. 35, ¶ 66. As early as 2013, Dr. Harold Berenzweig, a former CMHCC member, told the committee that DAA therapies were "the

---

[2] In reality, the number of patients is likely far higher, as TDCJ does not test every prisoner. Doc. 35, ¶¶ 80-81. Dr. Murray has estimated TDCJ imprisons approximately 29,000 patients with Hepatitis C (*id*. at ¶ 48), and if TDCJ has the same percentage of patients as other prison systems, it may have as many as 59,000 patients. *Id*. at ¶ 50.

[3] Indeed, no competent, good-faith physician would treat patients with interferon and ribavirin today. Doc. 35, ¶ 55.

standard of care for treatment of patients." Doc. 35, ¶ 67. Another former member, Dr. Denise DeShields, agreed at the same meeting. Doc. 35, ¶ 68. In 2014, Dr. Murray testified before the Texas legislature that DAA treatments were "excellent drugs" that "have become the standard of care." Doc. 35, ¶ 64. Dr. Linthicum later told the committee that "if there is a national guideline that sets the standard of care" – as there now plainly is for treatment of Hepatitis C – "that's what we do. We have to, as physicians, do the right thing." Doc. 35, ¶ 69. To do otherwise, in Dr. Linthicum's words, is practicing "substandard medicine," and risks the wrath of "a federal judge." Doc. 35, ¶¶ 70-71.

Despite the Defendants' knowledge of the universal agreement amongst physicians that DAA treatment is the only appropriate treatment for Hepatitis C, Defendants still cruelly ration this necessary medication exclusively due to the cost of the treatment, and deny it to the vast majority of the thousands of infected patients in TDCJ custody solely due to the medications' cost. Doc. 35, ¶¶ 74-75 & 93. Instead of following the universally-accepted standard of care, Defendants require patients to actually suffer significant liver damage before patients are even considered for DAA treatment. *See* Doc. 35, ¶¶ 84-89. Instead of actually treating the patients, Defendants' policy and practice is to "wait and see" if the patient will be released from custody, suffer significant liver damage, or die before treatment can no longer be delayed. Doc. 35, ¶ 90. When a cure with virtually no side effects is available, no competent physician would choose to deny the treatment to patients and instead simply chart the patient's decline while the patient suffers through the progression of a potentially deadly disease, waiting until the patient's liver significantly deteriorates before starting treatment. *See* Doc. 35, ¶ 92. But that is what Defendants' policies and practices require. Indeed, Defendants' policy is not made for medical reasons, but simply to control costs – even though TDCJ has an annual budget exceeding $3,000,000,000. Doc. 35, ¶ 93. Each member of the

CMHCC voted to approve this dangerous policy, which they all know denies patients necessary medical treatment (that would likely cure the disease). Doc. 35, ¶ 94.

Moreover, even after patients have already suffered substantial enough liver damage for TDCJ and UTMB to be consider them for treatment under the terms of the policy, Defendants still do not require the treatment be provided to even all the patients with substantially damaged livers. *See* Doc. 35, ¶ 89. Instead, patients are only referred for additional evaluations, where they are again still routinely denied treatment. *Id*. Due to Defendants' cost-based rationing of care, even patients with significant liver damage – that could have been prevented with early treatment – continue to suffer for years. *See* Doc. 35, ¶ 93.[4]

Plaintiffs have filed a putative class action seeking to represent over 18,000 people imprisoned by the State of Texas who the prison system refuses to provide the sole, universally-accepted, treatment for chronic Hepatitis C.

### III.   STANDARD OF REVIEW

""[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Thus, motions to dismiss are "viewed with disfavor and are rarely granted." *Ballard v. Jackson St. Univ.*, 62 F.Supp.3d 549, 551 (S.D. Miss. 2014) (citing *Test Master Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570 (5th Cir. 2005)).

A claim is correctly pleaded when the facts go beyond "threadbare recital of the elements of a cause of action, supported by mere conclusory statements." *Patrick v. Wal-Mart, Inc.-Store*

---

[4] In this way, the policy is particularly disingenuous, as it not only bars thousands of patients from even being considered for treatment, it provides a smoke screen that falsely implies that patients with sufficiently damaged livers will receive the care they require. In reality, this is not true for thousands of very sick patients.

*No. 155*, 681 F.3d 614, 622 (5th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"Specific facts are not necessary; the statement need only give the defendant fair notice of what

the claim is and the grounds upon which is rests." *Erickson*, 551 U.S. at 93. Thus, "the pleading

standard Rule 8 announces does not require detailed factual allegations," it only "demands more

than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.

Indeed, the Supreme Court reversed decisions by district and appellate courts granting a

motion to dismiss where a *pro se* prisoner had alleged far less in his suit seeking treatment for his

Hepatitis C.

> The complaint stated that [the doctor's] decision to remove [the prisoner] from his
> prescribed hepatitis C medication was 'endangering his life.' It alleged this
> medication was withheld 'shortly after' [the prisoner] had commenced a treatment
> program … that he was 'still in need of treatment for [the] disease,' and that prison
> officials were in the meantime refusing to provide treatment. This alone was enough
> to satisfy Rule 8(a)(2).

*Erickson*, 551 U.S. at 94.

In addition to a Rule 12(b)(6) motion for failure to state a claim, Defendants also urge

dismissal under Rule 12(b)(1) for lack of subject matter jurisdiction. To the extent the Rule

12(b)(1) arguments attack Plaintiffs' factual allegations "on the existence of a federal cause of

action," they should be considered identical to a Rule 12(b)(6) standard. *Morrison v. Walker*, 704

Fed. Appx. 369, 372 n.5 (5th Cir. 2017) (citing *Daniel v. Ferguson*, 839 F.2d 124, 1127 (5th Cir.

1988)). To the extent the Rule 12(b)(1) allegations solely contest Mr. Roppolo's standing to bring

these claims, and to the extent the court needs to resolve disputed facts (as it will here, *see infra* at

pp. 35–38), Plaintiffs must be provided the opportunity conduct discovery to present evidence

regarding their continued standing. *See Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)

(when considering disputed facts under a Rule 12(b)(1) motion, a court may hear "conflicting written and oral evidence").[5]

To the extent the motion to dismiss relies on materials outside the complaint, the motion must be converted to one for summary judgment, and the Plaintiffs given the opportunity to conduct discovery and respond. *See* FED. R. CIV. PROC. 12(d).

As Plaintiffs' detailed complaint contains far more descriptive allegations than those the Supreme Court found satisfactory in *Erickson*, the Court should follow this binding Supreme Court precedent and deny the motion to dismiss.

## IV. ARGUMENT AND AUTHORITIES

### A. Plaintiffs State a Claim for Violations of the Eighth Amendment.

Plaintiffs' complaint alleges Defendants purposefully violate the Eighth Amendment by denying patients medication they know is necessary to treat their Hepatitis C.

"[P]unishments which are incompatible with the evolving standards of decency that mark the progress of a maturing society" are "repugnant to the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (citing *Trop v. Dulles*, 356 U.S. 86, 101 (1958)). Thus, Eighth Amendment principles "establish the government's obligation to provide medical care for those whom it is punishing by incarceration."

> An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce torture or a lingering death, the evils of most immediate concern to the drafters of the Amendment. In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose.

---

[5] Plaintiffs have already requested a Rule 30(b)(6) deposition on this topic.

*Estelle*, 429 U.S. at 103 (internal citations omitted). Therefore, the Eighth Amendment requires "prison officials to ensure that inmates receive adequate medical care." *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006). If a treatment is a "medical necessity," it must be provided. *Carlucci v. Chapa*, 884 F.3d 534, 538 (5th Cir. 2018) (reversing grant of motion to dismiss).

To prove a prison official denies them appropriate medical care, inmate-patients must show the official acted with "deliberate indifference." *Easter*, 467 F.3d at 463. "Deliberate indifference" requires (1) the patient to suffer from an objectively serious medical need, and (2) that the prison official was subjectively aware of a risk of serious harm from denying treatment to the patient. *Id.*

Here, there is no dispute that chronic Hepatitis C infection is a sufficiently serious medical need. Nor could there be, as numerous federal courts, including the Fifth Circuit, have recognized the objective severity of the disease. *See*, *e.g.*, *Trigo v. Tex. Dep't of Crim. Justice-Institutional Div. Officials*, 225 Fed. Appx. 211 (5th Cir. 2007) (per curiam); *Roe v. Elyea*, 631 F.3d 843, 861-62 (7th Cir. 2011) ("HCV infection is a serious medical condition that can lead to irreversible physical damage and even life-threatening situations"); *Hoffer v. Inch*, 382 F.Supp.3d 1288, 1296 (N.D. Fla. 2019); *Postawko v. Mo. Dep't of Corr.*, 2:16-cv-04219, 2017 WL 1968317, *5 (W.D. Mo. May 11, 2017) (citing *Bender v. Regier*, 385 F.3d 1133, 1137 (8th Cir. 2004)); *Stafford v. Carter*, No. 1:17-cv-00289, 2018 WL 4361639, *12 (S.D. Ind. 2018) (granting plaintiffs' motion for summary judgment); *Workman v. Atencio*, No. 1:16-cv-00309, 2018 WL 4496628, *4 (D. Idaho, Sept. 19, 2018); *Mann v. Ohio Dep't of Rehab. & Corr.*, 2:18-cv-01565, 2019 WL 2617471, *7 (S.D. Ohio June 26, 2019) (Deavers, Mag. J.) (recommending denial of motion to dismiss); *Abu-Jamal v. Wetzel*, 3:16-CV-2000, 2017 WL 34700, *11 (M.D. Pa. Jan. 3, 2017); *Lovelace v.*

9

*Clarke*, No. 2:19cv75, 2019 WL 3728265, *4 (E.D. Va. Aug. 7, 2019); *Moore v. Wetzel*, 1:18-cv-1523, 2019 WL 1397405, *5 (M.D. Pa. March 6, 2019) (HCV a "grave medical concern").[6]

Likewise, under controlling Fifth Circuit law, Defendants are subjectively aware of the serious risk of their conduct because they knowingly refuse to provide necessary care and, intentionally maintain policies that actually prohibit necessary medical treatment. Where the plaintiff "assert[s] the denial of medical treatment for hepatitis C based on policy, rather than on medical reasons, and that he was substantially harmed by the denial of treatment," he states a claim for a violation of the Eighth Amendment. *Trigo*, 225 Fed. Appx. 211 (reversing grant of motion to dismiss, discussing pre-DAA Hepatitis C treatment regimens). Here, the universally-accepted standard of care requires *all* patients diagnosed with chronic Hepatitis C be treated with DAA medications, as it is the only medically accepted treatment for the disease. Doc. 35, ¶¶ 83, 87 & 89. Defendants' policies and practices, not any "medical reason," deny the necessary treatments (an actual cure) to Plaintiffs and the putative class. Doc. 35, ¶¶ 91 & 93. *See also Lovelace v. Clarke*, No. 2:19cv75, 2019 WL 3728265. *4 (E.D. Va. Aug. 7, 2019) (allegation that "the accepted standard in the medical community was DAA treatment for everyone due to advancements of drug therapy" is sufficient to state a claim) (emphasis in original). A "blanket, categorical denial of medically indicated [treatment] solely on the basis of an administrative policy … is the paradigm of deliberate indifference." *Colwell v. Bannister*, 763 F.3d 1060, 1063 (9th Cir. 2014) (prison's "one good eye" policy unconstitutional: policy denied treatment for cataracts in

---

[6] Even patients whose disease has not significantly progressed "face substantial suffering and harm" in violation of the Eighth Amendment. *Hoffer v. Inch*, 382 F.Supp.3d 1288, 1302 (N.D. Fla. 2019) (patients with "F0 or F1" fibrosis scores still entitled to injunctive relief); *Stafford v. Carter*, No. 1:17-cv-00289, 2018 WL 4361639, *20 (S.D. Ind. 2018) (same). *See also Davis v. Wetzel*, No. 1:18-CV-00804, 2018 WL 2978025, *4-5 (M.D. Pa. June 13, 2018) (failure to treat prisoner's HCV is an "imminent danger" to health).

10

one eye for non-medical reason that prisoner still had another "good eye"). *See also De'Lonta v. Angelone*, 330 F.3d 630 (4th Cir. 2003) (reversing grant of summary judgment in case challenging policy prohibiting use of certain medically-indicated drugs).

Faced with this inescapable conclusion, Defendants instead choose to mischaracterize Plaintiffs' claims. *See* Doc. 48, pp. 17-18. This case is not, as Defendants wrongly contend, about a good-faith dispute between medical professionals or "mere malpractice." Rather, here the Plaintiffs allege the Defendants are "intentionally treat[ing] [patients] incorrectly" by essentially not treating them at all – "evinc[ing] a wanton disregard for … serious medical needs." *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). *See* Doc. 35, ¶¶ 74, 79, 81, 83, 87, 110. By denying patients treatment until after significant liver damage occurs, Defendants are literally requiring many patients to suffer the "torture or lingering death" that *Estelle* condemns. *Estelle*, 429 U.S. at 103. Here, Plaintiffs allege that there is only one treatment doctors would ever recognize for Hepatitis C (DAA drugs), that all doctors (including the Defendants) know that all chronically infected patients require it, and that Defendants deny the drugs to them for reasons that have nothing to do with medicine or the health and well-being of the patient.

Contrary to Defendants' motion, Plaintiffs do allege "Defendants are refusing to provide class members with DAA medication." *Compare* Doc. 48, pp. 17-18 (Defendants' motion) *with* Doc. 35, ¶ 83 (Third Amended Complaint: "Though the universally-accepted standard of care for Hepatitis C requires treatment of all patients with DAA drugs, [Defendants'] policies intentionally deny this safe and extremely effective treatment to TDCJ prisoners"). Nowhere do Plaintiffs allege, as Defendants' motion falsely contends, that all class members will eventually be treated, and that this dispute is just a matter of timing. Because this is not true. In fact, Plaintiffs allege that *zero* patients will receive treatment until after they have suffered liver damage (Doc. 35, ¶ 84), and that

11

many hundreds of patients will inexplicably (but intentionally) still be denied treatment even when their livers are sufficiently damaged to qualify under the Defendants' policies (*id*. at ¶ 89).[7]

The Fifth Circuit recently explained this distinction in *Gibson v. Collier*, 920 F.3d 212 (5th Cir. 2019), where a transgender inmate-patient sought gender confirmation ("sex reassignment") surgery. "There is no intentional or wanton deprivation of care if a genuine debate exists within the medical community about the necessity or efficacy of that care." *Gibson*, 920 F.3d at 221. Unlike DAA treatment for Hepatitis C, "sex reassignment" surgery is one of several treatment options for gender dysphoria that good-faith, competent doctors might prescribe (such as the alternatives of "counseling and hormone therapy"). *Id*. at 216. Thus, providing the patient the treatment of "sex reassignment surgery" was "medically controversial" and just "one of two [treatment] alternatives – both of which are reasonably commensurate with the medical standards of prudent professionals," in "one of the most hotly debates topics within the medical community today." *Gibson*, 920 F.3d at 224. Simply put, the Eighth Amendment does not "take sides" in an "on-going medical debate" where there is "deep division among medical experts." *Gibson*, 920 F.3d at 225.

But here the medical debate is entirely settled. Doc. 35, ¶ 57. Thus, this case is the polar opposite of *Gibson* – prison officials are denying inmate-patients the treatment that the universally-accepted standard of care requires.[8] Instead, Texas prison officials have chosen to replace

---

[7] Limited discovery has revealed why – the written policy is not merely a hurdle patients must clear. It is also a smoke screen to create the illusion that treatment actually occurs, though for the vast majority of patients it does not. The informal, unwritten practices of Defendants' actually prohibit treatment until most patients have developed cirrhosis. And even then, hundreds of patients with cirrhosis are still denied treatment.

[8] Judge Ho's opinion explains that, "a single dissenting expert [does not] automatically defeat[] medical consensus about whether a particular treatment is necessary in the abstract. 'Universal acceptance' does not necessarily require unanimity." *Gibson*, 920 F.3d at 220. For example, a

treatment with DAA drugs that cure the disease with absolutely *no treatment*, for reasons having nothing to do with medicine, and instead just callously monitor patients' developing liver damage. Doc. 35, ¶ 90. For Hepatitis C, unlike gender identity disorder, there is no alternative treatment available, and, indeed, prior HCV treatments were ineffective and caused intolerable side-effects in most patients – such that no reasonable doctor (and not even TDCJ) still provides them. *See* Doc. 35, ¶ 55. There is no "robust and substantial good faith disagreement dividing respected members of the expert medical community" on the effectiveness and necessity of DAA drugs – instead, there is robust and substantial *consensus* that DAA drug therapy is the only appropriate treatment, as even the CMHCC members and Defendants acknowledge. *Compare Gibson*, 920 F.3d at 220 *with* Doc. 35, ¶¶ 57-71. Here, Defendants' policies are not made due to the conflicting opinions of good-faith doctors, but for reasons that have nothing to do with patient care, and everything to do with money. Doc. 35, ¶ 75. Thus, unlike in *Gibson*, the Plaintiffs do allege "officials acted with malicious intent – that is, with knowledge that they were withholding medically necessary care." *Gibson*, 920 F.3d at 220 & Doc. 35, ¶ 64-74.

Likewise, Defendants' decision to deny the entire class of patients access to DAA therapies is not "mere malpractice." Medical malpractice is a "bad diagnosis or erroneous calculus of risks and costs, or a mistaken decision not to treat based on an erroneous view that the condition is benign or trivial or hopeless, or that treatment is unreliable, or that the cure is as risky or painful or bad as the malady." *Harrison v. Barkley*, 219 F.3d 132, 139 (2nd Cir. 2000). *See also Gobert v. Caldwell*, 463 F.3d 339, 348-49 (5th Cir. 2006) (no deliberate indifference where patient received

---

rogue pediatrician who refused to vaccinate non-immunocompromised children would not defeat the "universally accepted" medical consensus that children should be vaccinated. A similarly strong consensus exists that all HCV patients should be treated with DAA drugs. *See* Doc. 35, ¶ 56-74.

"multiple examinations and administered medications" and received "medical treatment for his injury throughout his imprisonment," but wound nonetheless became infected). That is not the case here, where even the Defendants admit DAA drug therapies are the only appropriate treatment. Doc. 35, ¶¶ 64-74. This case is an "adamant refus[al]" to treat "a properly diagnosed condition that was progressively degenerative, potentially dangerous and painful, and that could be treated easily and without risk." *Harrison*, 219 F.3d at 139. Plaintiffs allege Defendants are "[c]onsciously disregarding an inmate's legitimate medical needs [and thus] not [committing] 'mere medical malpractice.'" *Id. See also Postawko v. Mo. Dep't of Corr.*, 2:16-cv-04219, 2017 WL 1968317, *5 (W.D. Mo. May 11, 2017) (citing *Harrison*, inmate-patients denied DAA drugs); *Barfield v. Semple*, 3:18-cv-1198, 2019 WL 3680331, *10-11 (D. Ct. Aug. 6, 2019) (same). When the treatment decisions "so deviate from the applicable standard of care as to evidence a physician's deliberate indifference" – as the complaint alleges Defendants' policy and practices do here – prison officials violate the Eighth Amendment. *Postawko v. Mo. Dep't of Corr.*, 2:16-cv-04219, 2017 WL 1968317, *5 (W.D. Mo. May 11, 2017) (citing *Allard v. Baldwin*, 779 F.3d 768, 772 (8th Cir. 2015)).[9]

This case is also not about a mere disagreement between a treatment option that patients would prefer, and another good-faith treatment option their doctors prescribed. *Compare Blayne v. Flattery*, 180 Fed. Appx. 510 (5th Cir. 2006) (policy denying patient cosmetic surgery did not violate Eighth Amendment) *with Jones v. Tex. Dep't of Crim. Justice*, 880 F.3d 756, 759-60 (5th Cir. 2018) (patient denied diabetic diet substantially likely to succeed on merits of claim) & *Abu-Jamal v. Wetzel*, 3:16-CV-2000, 2017 WL 34700, *10 (M.D. Pa. Jan. 3, 2017) (standard of care

---

[9] Otherwise, prisons could solve budget shortfalls by simply withholding psychiatric medications from patients with mental illnesses, antiretrovirals from HIV patients, blood pressure medicines from hypertensives, etc.

14

required treatment of Hepatitis C with DAA drugs). To the contrary, for such a disagreement to be beyond Eighth Amendment scrutiny, there must be a "medical basis" for the doctors' treatment decisions. *Stafford v. Carter*, No. 1:17-cv-00289, 2018 WL 4361639, *13 (S.D. Ind. 2018) (granting plaintiffs seeking DAA drugs summary judgment, citing *Johnson v. Doughty*, 433 F.3d 1001, 1013-14 (7th Cir. 2006)). Here, there is no "medical basis" for the delay. Defendants simply have chosen to save money by *denying all actual treatment* to patients until after they have suffered preventable liver damage. Doc. 35, ¶ 90. Thus, "the [Plaintiffs] allege[] more than a disagreement about plaintiffs' medical treatment, or dissatisfaction with [prison officials'] denial of plaintiffs' requests for treatment in favor of a different treatment with a possibility of success." *Chimenti v. Pa. Dep't of Corr.*, No. 15-3333, 2017 WL 3394605, *9 (E.D. Pa. Aug. 8, 2017) (denying motion to dismiss inmate-patients seeking DAA therapies). Plaintiffs allege Defendants purposefully deny them the medical care they need that Defendants know will cure their disease. Doc. 35, ¶¶ 92-93.

Likewise, "a successful plaintiff need not show that he was literally ignored in his demands for medical treatment, and a defendant's showing that a plaintiff received *some* treatment does not resolve this issue if the treatment was blatantly inappropriate." *Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011) (affirming jury verdict in favor of patients denied treatment for Hepatitis C). An inmate-patient can prevail where, as here, "the course of treatment the doctors chose was medically unacceptable under the circumstances." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citing *Williams v. Vincent*, 508 F.2d 5412, 543-44 (2nd Cir. 1974)). That is what Plaintiffs allege here: Defendants deny patients treatment and instead just watch their condition get worse – these prison doctors are "intentionally treat[ing] [patients] incorrectly" and showing "a wanton disregard for … serious medical needs" in violation of the Eighth Amendment by purposefully denying patients the sole, universally-accepted treatment they acknowledge is necessary until after they

have already suffered liver damage. *See Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 755 (5th Cir. 2001) (citing *Johnson*) & Doc. 35, ¶¶ 74, 79, 81, 83, 87, 110.[10]

Simply "monitoring" patients' decline – as Defendants' policies require here (Doc. 35, ¶ 90 & Doc. 20, pp. 16-18) – is not a good-faith alternative "treatment" decision free from Eighth Amendment scrutiny. *Lovelace v. Clarke*, No. 2:19cv75, 2019 WL 3728265, *4 (E.D. Va. Aug. 7, 2019) (allegation that doctors "monitored" the patient's condition but the patient "received no 'treatment' even after the standard of care changed" is sufficient to defeat a motion to dismiss); *Barfield v. Semple*, 3:18-cv-1198, 2019 WL 3680331, *12 (D. Ct. Aug. 6, 2019) ("where … [prison officials] knew that delay in treatment would cause harm yet still chose merely to monitor the condition or provide only supportive care, it has exhibited deliberate indifference"). Defendants' alleged "monitoring" is simply not actual "treatment."

> [M]onitoring an individual's condition does not constitute medical treatment – on its own, it does nothing to alleviate symptoms or improve health. The purpose of monitoring is to determine when different or additional medical treatment is needed. Indeed, monitoring an individual's condition is a pointless exercise if no medical treatment would occur as a result of it.

*Estate of Henson v. Krajca*, 440 Fed. Appx. 341, 350 (5th Cir. 2011) (Dennis, J., dissenting). Thus, when there is a course of treatment "required by the applicable standard of care," such as DAA treatment for all patients with chronic HCV, "opting for the easier and less efficacious treatment

---

[10] Compare *Johnson*, 759 F.2d at 1237 (no deliberate indifference where patient "received treatment for a variety of complaints, including continual treatment and medication for diabetes, hypertension, and hemorrhoids") *with Easter*, 467 F.3d at 463 (affirming denial of summary judgment where medical provider had knowledge of the inmate's medical condition, knew he was experiencing symptoms, and knew he was not provided available and appropriate medication). When prison medical providers "offer[] no *treatment* options to a patient with a history of [serious medical] problems" they violate the Eighth Amendment. *Easter*, 467 F.3d at 465 (emphasis added). *See also Harris v. Hegmann*, 198 F.3d 153, 159-60 (5th Cir. 1999) (allegation medical providers knew jaw repair surgery failed "before he even left the surgery clinic" but instead "made an appointment for [the patient] to see a dentist on a non-emergency basis" and failed to provide additional treatment states a claim for deliberate indifference).

of the inmate's condition by adopting a monitoring policy instead of treatment and waiting to see just how much the inmate's health may deteriorate is not permissible." *Barfield v. Semple*, 3:18-cv-1198, 2019 WL 3680331, *12 (D. Ct. Aug. 6, 2019) (denying motion to dismiss) (citing *Postawko v. Mo. Dep't of Corr.*, No. 2:16-cv-04219, 2017 WL 1968317 (W.D. Mo. May 11, 2017)). "[M]onitoring labs, genotypic testing for the HCV infection, counseling, pain medication, and vitamins" – the "treatment" Defendants policies allegedly provide here (Doc. 35, ¶ 90)[11] – does not constitute "effective treatment for HCV," or really any treatment at all. *Stafford v. Carter*, No. 1:17-cv-00289, 2018 WL 4361639, *16 (S.D. Ind. 2018). Rather, Defendants are making a choice to provide "non-treatment over treatment." *Id*. & Doc. 35, ¶ 90.[12]

Indeed, Defendants deny their inmate-patients DAA therapies not due to any dispute about the efficacy of the treatment, but because of the medications' cost. Doc. 35, ¶ 93. But the Eighth Amendment does not permit prison officials to deny prisoners constitutional requirements due to costs alone. "Constitutional rights are not, of course, confined to those available at modest cost." *Ruiz v. Estelle*, 679 F.2d 115, 1146 (5th Cir. 1982) (subsequent history omitted). Cost is simply an impermissible consideration "when it is considered *to the exclusion of reasonable medical judgment* about inmate health." *Roe v. Elyea*, 631 F.3d at 863 (emphasis in original). "[U]se of [a] Hepatitis C [p]rotocol to ration medical treatment with [DAAs] solely based on cost, even though there is no other recommended medical treatment for Chronic Hepatitis C, disregards an excessive risk to the health of the infected inmates and thus constitutes deliberate indifference to a serious medical need." *Chimenti v. Pa. Dep't of Corr.*, No. 15-3333, 2017 WL 3394605, *7 (E.D. Pa. Aug.

---

[11] Notably, the Court would need to look beyond Plaintiffs' complaint to consider the "treatment" Defendants allege they are providing.

[12] *Contra Hood v. Collier*, No. 3:18-0295, 2019 WL 3412440 (S.D. Tex. July 29, 2019).

8, 2017). "Medical personnel cannot simply resort to an easier course of treatment that they know is ineffective" due to cost concerns. *Lovelace v. Clarke*, No. 2:19cv75, 2019 WL 3728265, *3 (E.D. Va. Aug. 7, 2019) (citing *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006).

The dissimilar, *pro se* cases the Defendants rely on are unpersuasive and easily distinguishable. These cases all suffered from either fatal procedural defects, or the inmate-plaintiff's inability to support his claims with expert medical testimony. In *Crow v. Mbugua*, No. H-17-1923, 2018 WL 5847410, *4 (S.D. Tex. Nov. 8, 2018), the *pro se* plaintiff sued the wrong doctor – his treating physician at the prison instead of the hepatologist who actually made the decision not to treat his HCV (much less the Defendants, who wrote the policy that the hepatologist followed). In *Rivera v. Lawson*, No. 2:18-cv-19, 2019 WL 4602957, *3-4 & 6 (S.D. Tex. Apr. 12, 2019), the court granted summary judgment because the *pro se* plaintiff (who refused treatment for his HCV sixty-four times) failed to submit any evidence – "[the patient's] failure to attend several medical appointments and refusal to adhere to various medical recommendations demonstrates his own neglect regarding his medical treatment and fails to support any claim that [the physician's assistant] acted with deliberate indifference." Unlike in this case, the *pro se* plaintiff in *Hendrix v. Aschberger*, 689 Fed. Appx. 250 (5th Cir. 2017), alleged only a disagreement with his treatment – not a policy decision made for cost reasons that resulted in denial of his Hepatitis C treatment. *See also Vasquez v. Morgan*, No. H-18-3978, 2019 WL 2393428 (S.D. Tex. June 6, 2019) (facts alleged mere disagreement with treatment decisions) & *Hood v. Collier*, No. 3:18-0295, 2019 WL 3412440 (S.D. Tex. July 29, 2019) (same). In *Roy v. Lawson*, No. 2:17-cv-9, 2018 WL 1054198 (S.D. Tex. Feb. 26, 2018), the *pro se* plaintiff also did not challenge the prison system's policies, but instead the individual treatment decisions of his own medical providers. His case was dismissed not on a Rule 12 motion, but at summary judgment because he

18

"offered no competent summary-judgment evidence" supporting his allegations that he was denied DAA medications due to costs – which Plaintiffs' complaint alleges here, and must be taken as true. *Id*. at *7. *Cf. Chimenti*, 2017 WL 3394605, *7 and *supra* at pp. 13–14. In *Marshall v. LeBlanc*, No. 18-13569, 2019 WL 2090844, *1 (E.D. La. Mar. 6, 2019), the *pro se* plaintiff was denied the "extraordinary remedy" of a preliminary injunction because he *did not have chronic HCV* – "repeat testing … reflects that HCV is not detected, which indicates no need for treatment." And in *Grumbles v. Livingston*, 706 Fed. Appx. 818 (5th Cir. 2017), it is not clear the *pro se* plaintiff was even seeking the DAA drug treatments, as opposed to the prior, ineffective interferon/ribavirin treatments where good-faith doctors could dispute the costs and benefits of treatment. *See Grumbles v. Livingston*, No. 4:14-cv-03610, Doc. 10, p. 13 (S.D. Tex.) (complaining he was denied treatment on dates before DAA therapies were approved by the FDA) & *id.*, Doc. 65, pp. 16-18 (explaining plaintiff was a poor candidate for interferon treatment due to psychiatric side-effects and his lengthy history of non-compliance with previous psychiatric treatment).[13]

In TDCJ, patients are denied DAA drugs "not because it wasn't medically indicated, not because [their] condition was misdiagnosed, not because the [treatment] wouldn't have helped [them], but because the *policy* of the [prison] is to require an inmate to endure" the serious medical condition – "This is the very definition of deliberate indifference." *Colwell v. Bannister*, 763 F.3d

---

[13] *Burling v. Jones*, No. H-16-0868, 2017 WL 384364 (S.D. Tex. Jan. 24, 2017), also litigated by a *pro se* inmate, wrongly relied on cases finding there was no deliberate indifference in denying plaintiffs pre-DAA treatment to deny the inmate's claim for DAA treatments. *See id*., citing *Whiting v. Kelly*, 255 Fed. Appx. 896 (5th Cir. 2007); *McCarty v. Zapata Cnty., Tex.*, 243 Fed. Appx. 792 (5th Cir. 2007). The order also cites his treatment with interferon and ribavirin – the old, ineffective HCV treatments – as evidence that he was receiving constitutionally adequate care. *Id*. at *3. Other cases Defendants rely upon, like *Allen v. Johnson*, 194 Fed. Appx. 204 (5th Cir. 2006) have the same defect – in the pre-DAA world, there was a legitimate debate between physicians about appropriate treatment, but the new "breakthrough" drugs have eliminated that controversy, as Defendants themselves acknowledge. *See* Doc. 35, ¶¶ 52 & 64-71.

1060, 1068 (9th Cir. 2014) (emphasis added). Thus, this court should follow the numerous other federal courts that have denied similar motions to dismiss at the pleading stage.[14]

### B. Plaintiffs State a Claim for Violations of the Americans with Disabilities Act and Rehabilitation Act.

#### 1. The ADA and Rehabilitation Act Abrogate TDCJ and UTMB's Sovereign Immunity.

Notably, Plaintiffs only sued TDCJ and UTMB under the ADA and Rehabilitation Act – *not* under § 1983. *Compare* Doc. 35, pp. 22-23 (ADA and Rehabilitation Act claims) *with id.* at pp. 21-22 (§ 1983 claims). There can be no dispute here that both the ADA and the Rehabilitation Act abrogate the agencies' sovereign immunity, making the agencies themselves proper parties to this suit.[15] The ADA abrogates a state agency's immunity through the Fourteenth Amendment's enforcement provisions when the claim is related to a deprivation of a constitutional right – such

---

[14] *See*, *e.g.*, *Allah v. Thomas*, 679 Fed. Appx. 216, 220-21 (3rd Cir. 2017) (reversing denial of motion to dismiss); *Chimenti v. Pa. Dep't of Corr.*, No. 15-3333, 2017 WL 3394605 (E.D. Pa. Aug. 8, 2017) (denying motion to dismiss); *Postawko v. Mo. Dep't of Corr.*, 2:16-cv-04219, 2017 WL 1968317 (W.D. Mo. May 11, 2017) (same); *Lovelace v. Clarke*, No. 2:19cv75, 2019 WL 3728265 (E.D. Va. Aug. 7, 2019) (same); *Henderson v. Tanner*, No. 15-0804, 2017 WL 1017927 (M.D. La. Feb. 16, 2017) (Wilder-Doomes, Mag. J., *adopted at* 2017 WL 1015321, same); *Bernier v. Trump*, 242 F.Supp.3d 31, 41 (D. D.C. 2017) (same) *vacated in irrelevant part at* 299 F.Supp.3d 150 (D. D.C. 2018); *Cunningham v. Sessions*, No. 9:16-cv-1292, 2017 WL 2377838 (D. S.C. May 31, 2017) (same); *Riggleman v. Clarke*, No. 5:17-cv-00063, 2019 WL 1867451, *7 (W.D. Va. Apr. 25, 2019) (same); *Moore v. Wetzel*, 1:18-cv-1523, 2019 WL 1397405 (M.D. Pa. March 6, 2019) (same); *Mann v. Ohio Dep't of Rehab. & Corr.*, 2:18-cv-01565, 2019 WL 2617471, *6 (S.D. Ohio June 26, 2019) (Deavers, Mag. J.) (recommending same); *Washington v. Wash. Dep't of Corr.*, No. 3:17-cv-5728, 2018 WL 1867134 (W.D. Wash. Feb. 2, 2018) *adopted in relevant part at* 2018 WL 1836744 (Apr. 18, 2018) (same). *See also Abu-Jamal v. Wetzel*, 3:16-CV-2000, 2017 WL 34700 (M.D. Pa. Jan. 3, 2017) (granting preliminary injunctive relief); *Buffkin v. Hooks*, 1:18CV502, 2019 WL 1282785 (D. N.C. Mar. 20, 2019) (same); *Hoffer v. Inch*, 382 F.Supp.3d 1288 (N.D. Fla. 2019) (granting plaintiffs' motion for summary judgment, entering permanent injunctive relief); *Roberts v. Wilson*, No. 3:15-cv-1607, 2017 WL 8727155 (M.D. Pa. Sept. 27, 2017) (Arbuckle, Mag. J., recommending denying defendants' motion for summary judgment) *adopted at* 2018 WL 1583543 (Mar. 30, 2018)).

[15] *See* Doc. 48, p. 15 (incorrectly stating that "Plaintiffs name both TDCJ and UTMB as parties to their § 1983 claims").

as the Eighth Amendment right to access medical care in prison. *See*, *e.g.*, *U.S. v. Georgia*, 546 U.S. 151, 157 (2006). Likewise, the Rehabilitation Act abrogates immunities where the offending agency accepts federal funds – as the complaint alleges TDCJ and UTMB do here. Doc. 35, ¶ 158. *See*, *e.g.*, *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 280 (5th Cir. 2005).[16] The argument that TDCJ and UTMB are immune from the Plaintiffs' ADA and Rehabilitation Act claims is frivolous.[17]

### 2.  *Plaintiffs State a Claim for Violations of the ADA and Rehabilitation Act.*

To allege a claim under the ADA and Rehabilitation Act, a plaintiff must show: (1) that he is a qualified individual within the meaning of the acts; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability. *Lightbourn v. County of El Paso, Tex.*, 118 F.3d 421, 428 (5th Cir. 1997).[18]

---

[16] Since 1987, accepting federal funds has been sufficient to waive any entitlement to immunity from Rehabilitation Act suits. 42 U.S.C. § 2000d-7. TDCJ and UTMB cursorily argue that they enjoy sovereign immunity, but they fail to cite to the controlling Fifth Circuit precedent rejecting sovereign immunity under these statutes. *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 451 (5th Cir. 2005); *Pace v. Bogalusa City School Bd.*, 403 F.3d 272, 280–87 (2005) (en banc); *Miller v. Tex. Tech Univ. Health Sci. Ctr.*, 421 F.3d 342, 349 (5th Cir. 2005) (en banc); *Campbell v. Lamar Institute of Technology*, 842 F.3d 375, 379 (5th Cir. 2016); *Espinoza v. Tex. Dep't of Public Safety*, 148 F.App'x 224, 226 (5th Cir. 2005).

[17] In fact, in prior litigation, UTMB argued it was immune, but withdrew that argument when the undersigned threatened to move for sanctions. Yet despite knowing it is utterly meritless, UTMB continues to again urge the frivolous argument here. *See Webb v. Livingston*, No. 4:14-cv-03302, Doc. 464 (UTMB notice of withdrawal of argument).

[18] The Rehabilitation Act follows the same standards, adding only the requirement that the entity also receive federal funding, as the complaint alleges TDCJ and UTMB do. Doc. 35, ¶ 158. Courts thus interpret the ADA and Rehabilitation Act under the same body of law. *See*, *e.g.*, *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 455 (5th Cir. 2005).

a.  <u>Hepatitis C is a Substantially Limiting Disability.</u>

To qualify for protections under the ADA and Rehabilitation Act, a person with a disability must show they suffer from "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). "Major life activities" include "the operation of a major bodily function," such as the "digestive, … and reproductive functions." 42 U.S.C. § 12102(2)(B).

The standard to qualify as a person with a disability under the Acts is expansive. Congress amended the ADA in 2008 specifically to broaden the definition of disability because some courts erroneously "narrowed the broad scope of protection intended to be afforded by the ADA" by "incorrectly f[inding] in individual cases that people with a range of substantially limiting impairments are not people with disabilities" and requiring "an inappropriately high level of limitation necessary to obtain coverage under the ADA." Americans with Disabilities Act Amendments Act of 2008, Pub. L. No. 110-325 (Sept. 25, 2008).[19]

In regulations implementing the ADA amendments, the Department of Justice clarified "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. 'Substantially limits' is not meant to be a demanding standard." 29 C.F.R. § 1630.2 (j)(1).

> The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, **not whether an individual's impairment substantially limits a major life activity**. Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis.

---

[19] Notably, cases the Defendants rely heavily upon to argue that the plaintiffs do not have qualifying disabilities were decided based on the pre-amendments standard, which the amendments were specifically intended to expand. *See*, *e.g.*, *Hale v. King*, 642 F.3d 492, 499-500 (5th Cir. 2011) (noting the court applied pre-amendments standard because the amendments did not apply retroactively).

29 C.F.R. § 1630.2 (j)(1)(iii) (emphasis added). To be "substantially limited" merely requires the person with the disability "be unable to perform a major life activity that the average person in the general population can perform or to be significantly restricted in the ability to perform it." *Weed v. Sidewinder Drilling, Inc.*, 245 F. Supp. 3d 826, 833 (S.D. Tex. 2017) (Harmon, J.) (denying motion for summary judgment); *see also* 29 C.F.R. § 1630.2(j)(1)(ii).

Chronic diseases similar to Hepatitis C – like HIV and diabetes – are "virtually always" substantially limiting disabilities. 28 C.F.R. § 35.108(d)(iii)(H) & (J). Indeed, the Supreme Court concluded that, even under the more restrictive pre-2008 amendments version of the ADA, that HIV is a qualifying disability, even when the plaintiff was not experiencing any symptoms. *See also Bragdon v. Abbott*, 524 U.S. 624, 631 (1998) (Kennedy, J.). Like people with HIV, patients suffering from Hepatitis C live with a potentially-deadly virus in their body that can be asymptomatic for years, but that substantially impairs bodily functions like processing drugs and reproduction. Doc. 35, ¶ 27. Like HIV, Hepatitis C is a retrovirus that "follows a predictable and [without treatment] unalterable course," that "causes immediate abnormalities in a person's blood," constituting a "physiological disorder with a constant and detrimental effect … from the moment of infection." *Bragdon*, 524 U.S. at 685. When the disease inevitably progresses – as HIV does when untreated to AIDS – HCV will cause damage to the liver and other organ systems (and, indeed, TDCJ's policy requires the plaintiffs suffer liver damage before they are even eligible to receive DAA treatments, and in practice are still denied treatment even after they suffer sufficient liver damage). Doc. 35, ¶¶, 32-37. Moreover, here, Plaintiffs, and all HCV patients, cannot take (or should substantially limit) medications like NSAIDs that accelerate liver damage, and should not consume alcohol. Doc. 35, ¶ 28-29.

As such, this Court should follow the numerous other federal courts in Texas and throughout the country that have concluded Hepatitis C is a qualifying disability. *Hardin v. Christus Health Southeast Tex. St. Elizabeth*, No. 1:10-CV-596, 2012 WL 760642, *6 (E.D. Tex. Jan. 6, 2012); *White v. Bank of America Corp.*, No. 99-2329, 2000 WL 1664162, *4 (N.D. Tex. Nov. 2, 2000); *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1142 (10th Cir. 2011); *Hale v. Abangan*, No. 3:15-cv-170, 2017 WL 831249, **2-3 (S.D. Miss. Feb. 10, 2017); *Mitchell v. Williams*, No. 6:15-cv-93, 2016 WL 723038, *3 (S.D. Ga. Feb. 22, 2016) (prisoner denied DAA treatment); *Lewis v. N.C. Dep't of Public Safety*, No. 1:15-CV-284, 2018 WL 310142, **10-11 (W.D. N.C. Jan. 4, 2018) (same); *Miller v. Univ. of Pittsburgh Med. Center*, No. 06-937, 2008 WL 11450427, *7 (W.D. Pa. July 10, 2008); *Wellington v. Lane Cnty., Ore.*, No. 09-6063-AA, 2010 WL 5129707, *6 (D. Ore. Dec. 10, 2010).

> b. <u>Plaintiffs and Putative Class Members are Denied Participation in TDCJ Programs and Services.</u>

Writing for a unanimous Supreme Court, the late Justice Scalia explained confinement in a jail or prison itself is a program or service for ADA/Rehabilitation Act purposes. *Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206, 210 (1998) ("Modern prisons provide inmates with many recreational 'activities,' medical 'services,' and educational and vocational 'programs.'").

Medical care is undoubtedly a "program or service" prisons are required to make accessible under the ADA and Rehabilitation Act. *See*, *e.g.*, *Yeskey*, 524 U.S. at 210 (identifying medical services as program required to be accessible); *U.S. v. Georgia*, 546 U.S. at 157 ("the alleged deliberate refusal of prison officials to accommodate [the prisoner's] disability-related needs in such fundamentals as … medical care, … constituted exclusion from participation in or denial of the benefits of the prison's services, programs, or activities.").

24

Unlike other anti-discrimination statutes, the ADA and Rehabilitation Act create an "affirmative obligation" to accommodate people with disabilities – *not* simply treat people with disabilities the same as able-bodied people. *See*, *e.g.*, *Tennessee v. Lane*, 541 U.S. 509, 533 (2004).

> Recognizing that failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion, Congress required the States to take reasonable measures to remove architectural and other barriers to accessibility.

*Id.*, at 531-532 (discussing affirmative "duty to accommodate); *see* 28 C.F.R. § 35.130 (b)(7) ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability"). As this Court has expressly held, in the prison context, accommodations are required to ensure that prisoners with disabilities do not endure more "pain and punishment" than non-disabled inmates. *Hinojosa v. Livingston*, 994 F.Supp.2d 840, 843 (S.D. Tex. 2014) (Ramos, J.). *See*, *e.g.*, *McCoy v. Tex. Dep't of Crim. Justice*, No. C-05-370, 2006 WL 2331055, *7 (S.D. Tex. Aug. 9, 2006) (Jack, J.); *Wright v. Tex. Dep't of Crim. Justice*, No. 7:13-CV-0116 (N.D. Tex. Dec. 16, 2013) (O'Connor, J.); *McCollum v. Livingston*, No. 4:14-CV-3253, *4 (S.D. Tex. May 19, 2019) (Ellison, J.); *Borum v. Swisher Cnty., Tex.*, No. 2:14-CV-127-J, 2014 WL 4814541, *10 (N.D. Tex. Sept. 29, 2014) (Robinson, J.).

Denying disabled patients medication necessary to treat their disabilities violates the ADA and Rehabilitation Act. In *McNally v. Prison Health Services*, 46 F.Supp.2d 49, 58 (D. Me. 1999), the court found that a jail "prescription service" which did not include HIV medications was a "program or service" of the jail (and denied the jail's medical provider summary judgment). In *McNally*, the patient was "discriminated against … not by providing him with inadequate care, but by denying him immediate access to prescribed medications, a service provided to detainees in need of prescriptions for other illnesses." *Id*. "A jury could infer that [the jail's] policy effectively

denies HIV-positive prisoners access to [the jail's] prescription program and adequate health services because of their particular disability." *Id*. The same is true here. Prisoners suffering from other maladies are provided the prescription medication they require. Due to Defendants' discriminatory policies, prisoners suffering from Hepatitis C are not. Thus, TDCJ and UTMB discriminate against prisoners afflicted with Hepatitis C.

Rather than a case where a patient was provided negligent medical care – such as the cases Defendants rely upon – "the Court can draw a line between situations where an individual is simply unsatisfied with medical decisions made regarding his treatment, which do not support an ADA claim, and situations where a plaintiff is denied access to prescribed medication, which can support an ADA claim." *Payne v. Arizona*, No. CV-09-01195, 2012 WL 1151957, \*\*7-8 (D. Az. Apr. 5, 2012) (denying motion to dismiss claims of inmate with diabetes denied consistent access to insulin). *See also Kiman v. N.H. Dep't of Corr.*, 451 F.3d 274, 287 (1st Cir. 2006) ("the defendants' failure to give [inmate disabled by ALS] access to his medications is not … a medical 'judgment' subject to differing opinion – it is an outright denial of medical services" as "[a]ccess to prescription medications is part of a prison's medical services"); *Smith v. Aroostook Cnty., Me.*, 376 F.Supp.3d 146 (D. Me. 2019) (granting preliminary relief to inmate prescription medication to treat opioid use disorder: "the only form of treatment shown to be effective at managing her disability"); *Dietz v. Allegheny Cnty., Pa.*, No. 10-1674, 2011 WL 3844177, \*5 (W.D. Pa. Aug. 30, 2011) (denying motion to dismiss claims diabetic prisoner was denied insulin); *Montez v. Owens*, No. 92-N-870, 2008 WL 11384026, \*7 (D. Colo. May 2, 2008) (inmate denied glucose tablets needed to control his diabetes stated claim).

This claim is distinct from cases where a disabled prisoner is receiving merely *incorrect* medical treatment – such as in all the cases the Defendants rely upon – for the simple reason that

Defendants are denying treatment altogether. In *Nottingham v. Richardson*, 499 Fed. Appx. 368, 377 (5th Cir. 2012) the relevant *dicta*[20] in the opinion affirmed the district court order granting summary judgment to TDCJ officials who provided different medical treatment to an inmate who alleged he was disabled by "flu" and "thrush" – conditions which are not disabilities.[21] Rather than completely denying him universally-accepted care – like here – the providers treating him simply decreased the dose of his medication, and gave him a "transport wheelchair" instead of a "regular wheelchair." *Id*. In *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1144 (10th Cir. 2005), the only expert evidence established that when the plaintiff fell and broke his hip that "do nothing" was a medically-defensible alternative to the surgery the plaintiff desired. And *Bryant v. Madigan*, 84 F.3d 246 (7th Cir. 1996), where a paraplegic inmate was denied an infirmary bed with guardrails, rests on shaky legal footing. The opinion's core holding – that prisoners are excluded from the ADA's protections – was overruled by the Supreme Court in *Yeskey*. The discussion of prisoners' medical care all flows from that flawed premise. *Compare Bryant*, 84 F.3d at 249 ("incarceration … is not a 'program' or 'activity'" and the act does not require "special accommodation" such as medical treatment) *with Yeskey*, 524 U.S. at 209 (unanimous Supreme Court: "the statute's language unmistakably includes State prisons and prisoners within its coverage"). Indeed, the Seventh Circuit has more recently allowed disabled inmates' claims to proceed. *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012).

---

[20] The *Notthingham* plaintiff failed to exhaust his administrative remedies, as required by the Prison Litigation Reform Act. This barred his claims, making any other analysis by the court unnecessary. 499 Fed. Appx. at 373 ("The overwhelming evidence is that Nottingham did not exhaust, or even attempt to exhaust, the available administrative remedies").

[21] "Transitory and minor" afflictions – such as an illness like the flu – are not disabilities. 29 C.F.R. § 1630.15(f). *See also Valdez v. Minnesota Quarries, Inc.*, 12-CV-0801, 2012 WL 6112846 (D. Minn. Dec. 10, 2012) (granting motion to dismiss case alleging "swine flu" was protected disability).

c. Lack of Reasonable Accommodations Excludes Plaintiffs from TDCJ
and UTMB Services.

Defendants discriminate against Plaintiffs and the putative class because "[t]he discrimination prohibited [by the ADA and Rehabilitation Act] . . . includes the failure to make reasonable accommodations for a [prisoner's] disability." *O'Neil v. Tex. Dep't of Crim. Justice*, 804 F.Supp.2d 532, 538 (N.D. Tex. Apr. 7, 2011); *see also Hinojosa v. Livingston*, 994 F.Supp.2d 840 (S.D. Tex. 2014) (Ramos, J.). When a person has a disability, the ADA/Rehabilitation Act requires public entities to provide a "reasonable accommodation" to assist them in accessing public programs and services – not just treat them like able-bodied people. *Melton*, 391 F.3d at 672. Thus, "failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner." *McCollum*, 2017 WL 608665, at *37; *Martone v. Livingston*, No. 4:13-CV-3369, 2014 WL 3534696, at *16 (S.D. Tex. July 16, 2014) *quoting McCoy*, 2006 WL 2331055, at *22 (citing *Melton*, 391 F.3d at 672 and *Georgia*, 546 U.S. at 156.

Under well-settled law, as this Court has recognized, a factfinder should be given the opportunity to decide if failing to provide these accommodations was unreasonable. "A reasonable jury could find that these kinds of accommodations were reasonable and that the failure to utilize any of them led to the denial of safe confinement" for the putative class in TDCJ prisons. *McCollum*, 2017 WL 608665, at *38. *See also McCoy,* 2006 WL 2331055, at *9.

To be clear, Plaintiffs' claims are not about "medical treatment decisions" made in good-faith by treating physicians – which Plaintiffs' concede would be beyond the ADA to address. Instead, Plaintiffs complain that Defendants' policies and practices purposefully deny them care necessary for their disabilities. Plaintiffs are complaining that Defendants have a policy akin to one that would deny insulin to all diabetic prisoners, or anti-retrovirals to all HIV-positive prisoners – not about individual doctors' treatment decisions regarding the proper dosage of

28

insulin, or which of several HIV medications to actually prescribe. Instead, patients with Hepatitis C are excluded from accessing the entire class of drugs that are the only recognized medical treatment for their disability. This case is more akin to a policy denying canes to all prisoners with mobility impairments, or glasses to patients with visual impairments. Thus, other federal courts have found that plaintiffs who were denied DAA medication to treat their Hepatitis C state a claim for relief under the ADA and Rehabilitation Act. *Mitchell v. Williams*, No. 6:15-cv-93, 2016 WL 723038, **3-4 (S.D. Ga. Feb. 22, 2016) (HCV-positive inmate-patient denied treatment).

The cases Defendants rely on are easily distinguishable. In *Jin Choi v. University of Texas Health Science Center*, 633 Fed. Appx. 214, 216 (5th Cir. 2015), a dental student only informed the school about his learning disability *after* he had already failed out. The courts held it was necessary for him to disclose this disability to the school in order for his "limitations" to be known and accommodated. Here, in stark contrast, the Defendants know the putative class is infected with Hepatitis C, that the disease limits the function of their digestive and reproductive systems and is progressively damaging their livers, and that only treatment with DAA drugs will reasonably accommodate them – but nonetheless still discriminate against them by denying them the treatment.

Though Defendants also contend that Plaintiffs have failed to allege how the prison system "intentionally discriminates" against the putative class, only plaintiffs seeking compensatory

damages need to allege "intentional discrimination."[22] *See Delano-Pyle v. Victoria Cnty., Tex.*, 302 F.3d 567, 575 (5th Cir. 2002). Here, Plaintiffs only seek equitable relief.[23]

Thus, Plaintiffs state a claim for violations of the ADA and Rehabilitation Act.

### C.  The Members of the Correctional Managed Health Care Committee, in their Official Capacities, Are the Appropriate Parties.

This is an appropriately pleaded *Ex Parte Young* suit for prospective relief to "prevent a continuing violation of federal law." *Green v. Mansour*, 474 U.S. 64, 68 (1985). The *Ex Parte Young* fiction allows suits against state officials in their official capacities "because a sovereign state cannot commit an unconstitutional act, [but] a state official enforcing an unconstitutional act is not acting for the sovereign state and therefore is not protected by the Eleventh Amendment." *See Okpalobi v. Foster*, 244 F.3d 405, 411-12 (5th Cir. 2001). *Ex Parte Young* suits circumvent Eleventh Amendment immunity because such "a suit is not 'against' a state [as] it seeks prospective, injunctive relief from a state actor, in her official capacity, based on an alleged ongoing violation of the federal constitution." *K.P. v. LeBlanc*, 729 F.3d 427, 439 (5th Cir. 2013). In an *Ex Parte Young* claim, an official-capacity defendant must have "some connection with enforcement" of the unconstitutional act to be the appropriate party to be enjoined. *See Okpalobi*, 244 F.3d at 411-12 (citing *Ex Parte Young*, 209 U.S. 123, 157 (1908)). Here, there is undoubtedly

---

[22] Regardless, the Plaintiffs *do* allege intentional discrimination, because in the ADA-context, "intentional discrimination" includes failures to make reasonable accommodations. Doc. 35, ¶ 155. *Borum v. Swisher Cnty., Tex.*, No. 14:CV-127-J, 2014 WL 4814541, *10 (N.D. Tex. Sept. 29, 2014). Moreover, the Complaint repeatedly states that Defendants intentionally cause Plaintiffs to be treated incorrectly.

[23] *Compare* Doc. 35, ¶¶ 167-171 (seeking only equitable relief) *with Back v. Tex. Dep't of Crim. Justice*, 684 Fed. Appx. 356, 357 (5th Cir. 2017) (cited by defendants, plaintiff seeking "compensatory and punitive damages") & *Miraglia v. Bd. of Supervisors of La. State Museum*, 901 F.3d 565 (5th Cir. 2018) (reversing verdict awarding monetary damages where plaintiff failed to prove discriminatory intent).

"some connection" between the State of Texas's decision to deny DAA medications to the putative class and the official capacity Defendants. Plaintiffs have sued the members of the Correctional Managed Healthcare Committee who made the policies that deny DAA treatments to HCV-infected patients. Doc. 35, ¶ 6. This is a prototypical *Ex Parte Young* suit, where the Plaintiffs have sued the correct parties to obtain relief.

Even Defendants admit "the point of the *Ex parte Young* fiction is to permit a plaintiff to identify a person with a causal connection to a claim so that if a court entertains injunctive relief, the court can direct the person responsible for a violation to abide by the court's order." Doc. 48, p. 16. That is exactly what Plaintiffs have done here – the CMHCC members made the policies Plaintiffs complain about, and are empowered to change them. Doc. 35, ¶¶ 6, 79, 83-91; TEX. GOV'T CODE § 501.148 ("The committee may develop statewide policies for the delivery of correctional health care")). This case is completely unlike *Gates v. Cook*, 376 F.3d 323, 338-39 (5th Cir. 2004), where the Fifth Circuit invalidated a district court's order to "reduce a general preventative maintenance schedule to writing." *Gates* involved numerous problems with the prison's physical plant, including toilets that routinely backed up, "extremely filthy" cells, leaking ceilings, and cellblocks "infest[ed]" with pests. Thus, the district court also entered two sets of injunctions: one "to directly remedy each of the complained of" "squalid conditions;" and a second to develop a "maintenance schedule" to prevent the prison from again falling into disrepair. *Id*. The Fifth Circuit concluded the district court overreached by entering the second injunction ordering the creation of a policy to prevent the harm its other orders (all of which the Circuit affirmed) already addressed. *Id*. Due to the other injunctions, the "maintenance schedule" was unnecessary, as the lack of a maintenance schedule "while desirable, is not independently supported by additional conditions that constitute an Eighth Amendment violation." *Id*. Not so

31

here, where it is Defendants' policy that handcuffs the treating physicians and directly causes the harm – but for the policy, the treating physicians would not be required to ration care and deny patients the universally-accepted course of treatment.

The CMHCC, not TDCJ or UTMB, controls the policies regarding inmate health care. *Compare* TEX. GOV'T CODE §§ 501.146 & 501.148 (powers of committee) *with* § 501.147 (powers of TDCJ).  No single member of the CMHCC could change the policy acting by themselves – thus it is entirely appropriate (and even necessary) to sue each of them in their official capacities. As committee members include gubernatorial appointees who are prohibited from being employees of the prison agencies, simply suing the agency heads in their official capacities is insufficient – the agency heads could not control these "independent" members even if the Court were order them to do so. *See* TEX. GOV'T CODE § 501.133 (describing requirements for committee membership, including two members who are "not affiliated with [TDCJ]," and "two members … employed by a medical school other than [UTMB and TTUHSC]").[24] Of course, the complaint is not that "12 separate, apex-level defendants"[25] need to "deliver a specific medical treatment to [patients]," as the Defendants absurdly contend, but that these twelve Defendants created and enforce a policy that prohibits the putative class from receiving medical care that Defendants know the patients need and that will actually cure them. *Compare* Doc. 48, p. 15 *with* Doc. 35, ¶ 89. Defendants' motion even concedes that "CMHCC does have a role in creating written policies

---

[24] Notably, in other litigation, TDCJ has argued that "it has no authority over medical treatment or access to treatment," specifically due to the creation of the CMHCC. *Malley v. TDCJ-ID*, No. 6:06-cv-507, 2007 WL 9747586, *4 (E.D. Tex. Sept. 18, 2007). Likewise, UTMB has argued it is constrained by CMHCC policy. *See, e.g.*, *McCollum v. Livingston*, No. 4:14-cv-03253 (S.D. Tex.), Doc. 285, p. 32 (UTMB Motion for Summary Judgment: "UTMB lacked authorization under CMHC policies to recommend [the patient] be moved to a climate controlled infirmary bed").

[25] Of course, "apex-level" defendants are the prototypical parties to *Ex Parte Young* suits. *See Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 468 (7th Cir. 2001) (Posner, J.).

pertaining to health care," the core issue in this case. Doc. 48, p. 25. Thus, an injunction of this court could require the CMHCC members to change (or eliminate) the offensive policies. Far from an "abuse" of *Ex Parte Young*, to seek relief on these claims it is necessary for the Plaintiffs to sue these Defendants to seek this relief.[26]

The cases Defendants rely on are completely inapposite. *Okpalobi v. Foster*, 244 F.3d 405, 409 (5th Cir. 2001) (en banc) involved an unique Louisiana statute providing "unlimited tort liability for any damages caused by [an] abortion." The plaintiff, a physician who performed abortions, sued the governor and attorney general alleging the statute created an "undue burden" on a woman's right to choose. *Id*. The Fifth Circuit found Eleventh Amendment immunity protected the governor and attorney general from suit, however, because they "are powerless to enforce [the statute] against the plaintiffs (or to prevent any threatened injury from its enforcement)" – the *Ex Parte Young* claim failed because these "impotent defendants" had no "causal role in the plaintiffs' injury" caused by personal injury lawyers, and thus could not "redress [the plaintiffs'] alleged actual or threatened injury." 244 F.3d at 426. *See also K.P. v. LeBlanc*, 729 F.3d 427, 437 (5th Cir. 2013) (in *Okpalobi*, the plaintiffs "sued the wrong defendants"). Not so here. The CMHCC members' make the offensive policy, and could change it (or jettison it) at any time to redress the Plaintiffs' complaints. *See* Doc. 35, ¶¶ 83-90.

Notably, even if the other CMHCC members could not implement policies to provide universally-accepted medical care (though they can and should), then Dr. Linthicum and Dr. Murray – the TDCJ and UTMB medical directors – certainly can. *See* Doc. 35, ¶¶ 7-8. There can be no dispute that the medical directors of the agencies actually denying necessary medical care to

---

[26] Significantly (and tellingly), Defendants have thus far refused to answer an interrogatory requesting who they contend is legally responsible for the conduct alleged in the complaint.

the Plaintiffs can be enjoined from continuing to do so. Thus, even if there were merit to the other CMHCC members' complaints – though there categorically is not – the case should proceed against Linthicum and Murray.

Likewise, Defendants motion confuses the CMHCC *members'* capacity to be sued with CMHCC *as a separate entity's* capacity to be sued. The agencies in the cases Defendants rely on are all true "non jural" entities – subdivisions of other agencies that cannot be separately sued. *See Darby v. Pasadena Police Dept.*, 939 F.3d 311 (5th Cir. 1991) (plaintiff sued police department, a subdivision of the city); *Barrie v. Nueces Cnty. Dist. Attorney's Office*, 753 Fed. Appx. 260 (5th Cir. 2018) (plaintiff sued district attorney's office, a subdivision of the county). In those cases, "*the [defendant] agency* [could] not engage in any litigation except in concert with the government itself." *Barrie*, 753 Fed.Appx. at 264 (emphasis added). But here, Plaintiffs have not sued an "agency" – they sued the members of a statutorily created committee in their official capacities (several of whom are not even employees of the agencies). Even if CMHCC itself lacks capacity to be sued, the members do under *Ex Parte Young*. *See McKinney v. Corr. Managed Health Care Advisory Committee*, No. 2:04-cv-0173, 2005 WL 550347 (N.D. Tex. Mar. 9, 2005) (suggesting *Ex Parte Young* suits appropriate remedy against CMHCC members). Of course, unlike the police department in *Darby* and district attorneys' office in *Barrie*, the CMHCC is a separate, statutorily created entity independent of the control by any other agency. Of course, if the Defendants were correct that the CMHCC is subordinate to TDCJ (though they are not), the official capacity claims against Dr. Linthicum – the TDCJ medical director – still should not be dismissed.

As Plaintiffs more than adequately allege a "colorable constitutional claim" (*see* Doc. 20, pp. 23-24 & *supra* pp. 8–20), they are entitled to proceed against the official capacity defendants under an *Ex Parte Young* theory. To the extent the relief Plaintiffs seek is incompatible with the

CMHCC members' abilities, allowing Plaintiffs to amend the complaint is appropriate after discovery to learn the identities of the appropriate *Ex Parte Young* officials.

### D. Plaintiff Roppolo's Claims are Not Moot.

Plaintiff Roppolo's claims are not moot, or are subject to an exception to the mootness doctrine. "[A] defendant cannot automatically moot a case simply by ending its unlawful conduct. Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where [it] left off, repeating this cycle until [it] achieves all [its] unlawful ends." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (internal citations omitted). To prove a complaint is moot based on its voluntary compliance, a defendant "bears the formidable burden of showing it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Id*. Otherwise, "a defendant is free to return to his old ways." *Id*. at 92.

Roppolo's claims are subject to three exceptions to the mootness doctrine.

First, Roppolo's claims on behalf of the class are not moot because, at the time Defendants ceased their unlawful conduct, Roppolo had already filed a motion to certify the class. *See Fontenot v. McCraw*, 777 F.3d 741, 750 (5th Cir. 2015) (citing *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1051 (5th Cir. 1981)). *See also* Plaintiffs' Class Certification Motion, Doc. 6 (Oct. 4, 2019). Thus, Roppolo can continue to prosecute the case on behalf of the putative class as there is no dispute that a multitude of class members have live claims. Doc. 35, ¶¶ 45-51. In the Fifth Circuit, "[a] defendant's ability to 'pick off' successive plaintiffs' claims" does not moot a putative class action suit. *Cf. Fontenot*, 777 F.3d at 750 (claims moot because class certification motion had not been filed against defendant claiming mootness). *See also Booth v. Galveston Cnty., Tex.*, No. 3:18-CV-00104, 2019 WL 1129492, *8 (S.D. Tex. Mar. 12, 2019) *adopted at* 2019 WL 1411664 (S.D. Tex. Mar. 28, 2019); *Cain v. City of New Orleans*, 281 F.Supp.3d 624,

644-45 (E.D. La. 2017); *Mabry v. Hometown Bank, N.A.*, 276 F.R.D. 196, 201-202 (S.D. Tex. 2011) (Ellison, J.). "[S]o long as a plaintiff timely files and diligently pursues a motion to certify her … class action, that motion will relate back to the date the plaintiff filed her initial class … action complaint, regardless of the … defendant's offer of complete relief" to the individual plaintiff. *Mabry*, 276 F.R.D. at 203. *Contra Yarls v. Bunton*, 905 F.3d 905 (5th Cir. 2018) (class claims mooted because defendant provided complete relief to every class member) & *Murphy v. Hunt*, 455 U.S. 478, 482 (1982) (claims moot when plaintiff "had [not] sought to represent a class"). *See also U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 404 (1980) ("an action brought on behalf of a class does not become moot upon expiration of the named plaintiff's substantive claim, even though class certification" is still pending).

Second, the putative class' claims, brought through Roppolo, are also a classic example of claims that are capable of repetition but evading review. This exception applies when "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation … , and (2) there was a reasonable expectation that the same complaining party would be subject to the same action again." *Murphy v. Hunt*, 455 U.S. 478, 482 (1982). Litigation regarding constitutionally-protected medical treatment is a classic example of claims "capable of repetition, yet evading review." *See*, *e.g.*, *Roe v. Wade*, 410 U.S. 113, 125 (1973). Here, the Third Amended Complaint plainly alleges 18,000 other inmate-patients are also denied DAA treatment. Doc. 35, ¶¶ 45-51. When a plaintiff has proper standing when the suit commences – and there is no dispute that Roppolo did at the time the suit began for himself and the putative class – defendants' later voluntary compliance "will not moot the action." *Friends of the Earth*, 528 U.S. at 191. In *Olmstead v. Zimring*, 527 U.S. 581, 594 n. 6 (1999), the Supreme Court explained that plaintiffs with developmental disabilities who complained they were institutionalized unlawfully could still

complain about these unlawful placements even after they were placed in the community-based housing their suit sought because their situation was "capable for repetition, yet evading review." Indeed, Roppolo's personal standing continues here because courts considering cases regarding DAA treatment of prisoners with Hepatitis C have found inmates who were treated continue to have standing due to the high risk of re-infection in prisons. *Buffkin v. Hooks*, No. 1:18-CV-502, 2019 WL 1282785, *4 (M.D. N.C. Mar. 20, 2019). *See also* Doc. 35, ¶¶ 45-46 (prisoners at grave risk of contracting Hepatitis C).

Third, given Defendants' conduct toward Roppolo – denying him necessary drugs for years, even when he qualified for treatment under the unconstitutional policy, and finally relenting only *after* he filed grievances, *after* he filed a class action lawsuit (Doc. 35, ¶¶ 44), *after* his picture appeared in the *Houston Chronicle* (*id*. at ¶ 106),[27] and *after* he sought to certify the class (*id*.) – the Court could find Defendants conduct is driven by litigation posturing, not a good faith desire to treat Roppolo's HCV. *See*, *e.g.*, Doc. 35, Ex. B (showing Roppolo began treatment on October 30, 2019, less than a month after the class certification motion was filed).[28] Though Defendants may be entitled to a *presumption* they are acting in good-faith as governmental agents, Plaintiffs are just as entitled to rebut that presumption with evidence. *See* Doc. 48, p. 22. The reason there is "no evidence presented that supports the argument that treating Plaintiff Roppolo with DAA drugs

---

[27] G. Banks and K. Blakinger, "Texas inmates sue for hepatitis C drug, alleging lack of treatment is 'cruel and unusual,'" HOUSTON CHRONICLE (Sept. 18, 2019) *available at*: https://www.houstonchronicle.com/news/houston-texas/houston/article/Texas-inmates-sue-for-hepatitis-C-drug-alleging-14453099.php.

[28] This presumption of good faith is stretched even thinner by Defendants' recent decision to also treat Mr. Valdez – whose APRI levels exceeded the values set forth under the policy for years, who requested treatment, suffered symptoms of the disease, and completed grievances requesting treatment, yet only mysteriously was provided the DAA drugs soon after his name was added to the Third Amended Complaint. *See* Doc. 35, ¶¶ 133-147. At this point, Mr. Valdez has not completed treatment, thus his individual claims are not moot.

is litigation posturing" – other than the dramatic and highly suspicious circumstances of Defendants' sudden about-face – is simply because discovery is in its infancy, and Plaintiffs have not had the opportunity to obtain such evidence. *See Thomas v. City of Galveston*, 800 F.Supp.2d 826, 842-43 (S.D. Tex. 2011) (Ellison, J.) (plaintiffs will rarely have access to internal governmental documents at the pleading stage).  As Plaintiffs only recently took a Rule 30(b)(6) deposition regarding why Defendants finally (and belatedly) began treating Mr. Roppolo, the Court should, at a minimum, defer ruling on the mootness of his claims until after further discovery takes place.

For the above reasons, Roppolo's claims are not moot.

## V.    IN THE ALTERNATIVE, LEAVE TO AMEND SHOULD BE GRANTED.

In the alternative, if the Court chooses to grant all or part of Defendants' motion, Plaintiffs seek leave to amend the complaint to cure any deficiencies identified by Defendants or the Court. *United States ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 387 (5th Cir. 2003) (citing FED. R. CIV. PROC. 15(a)). Any amended complaint could cure the purported deficiencies by further clarifying that there is a universal agreement that DAA drugs are the only appropriate treatment for Hepatitis C, that Defendants' policy of simply "monitoring" the decline of Hepatitis C patients is not a treatment choice any competent doctor acting in good faith would make, that all patients with Hepatitis C are substantially impaired in some major life activities, by crafting proposed relief that CMHCC members can provide, and any other facts that may be deficiently pled. *See*, *e.g.*, *Darby*, 939 F.2d at 315 (district court abused its discretion by failing to allow amendments to correct identity of proper parties). Indeed, as if the allegations in the Third Amended Complaint are not shocking enough, the limited discovery conducted so far reveals that Defendants' practices are even stingier with the life-saving drugs than their written policies suggest

– including documents and testimony that show hundreds of inmates whose Hepatitis C has progressed to *cirrhosis* have still not been treated. As these documents were not available when the Third Amended Complaint was filed, Plaintiffs should be allowed to conduct additional discovery should the Court be inclined to grant any portion of the motion. *See Thomas*, 800 F.Supp.2d at 842-43.

## VI.   CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss in its entirety. In the alternative, the Court should grant the Plaintiffs leave to amend to correct any identified deficiencies.

Dated: March 20, 2020.

Respectfully submitted,

EDWARDS LAW GROUP
The Haehnel Building
1101 East 11th Street
Austin, TX 78702
      Tel.   512-623-7727
      Fax.   512-623-7729

By    /s/ Jeff Edwards           
JEFF EDWARDS
State Bar No. 24014406
Attorney-in-Charge
Scott Medlock
State Bar No. 24044783
Michael Singley
State Bar No. 00794642
David James
State Bar No. 24092572
Federal ID No. 2496580

**ATTORNEYS FOR PLAINTIFFS**

39

<u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing has been served on all counsel of record through the Electronic Case Filing System of the Southern District of Texas.

By _____/s/ Jeff Edwards_____
JEFF EDWARDS