UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MATTHEW ROPPOLO, DA-NA ALLEN, JOHNNY COOK, and VICTOR VALDEZ on behalf of themselves and others similarly situated, | § § § § § | |
| *Plaintiffs,* | § § | Civil Action No. |
| v. | § § | 2:19-cv-262 |
| LANNETTE LINTHICUM, in her official capacity as the medical director of the TEXAS DEPARTMENT OF CRIMINAL JUSTICE, and PHILIP KEISER, CYNTHIA JUMPER, RODNEY BURROW, F. PARKER HUDSON III, ERIN WYRICK, JOHN BURRUSS, PRESTON JOHNSON, JR., and DEE BUDGEWATER, in their official capacities as the members of the CORRECTIONAL MANAGED HEALTH CARE COMMITTEE, and OWEN MURRAY, in his official capacity as the director of the UNIVERSITY OF TEXAS MEDICAL BRANCH CORRECTIONAL MANAGED CARE program, | § § § § § § § § § § § § § § § § § | |
| *Defendants.* | § | |

**PLAINTIFFS ROPPOLO, ALLEN, COOK, AND VALDEZ'S UNOPPOSED MOTION
TO CERTIFY SETTLEMENT CLASS AND APPROVE CLASS ACTION SETTLMENT**

Plaintiffs Roppolo, Allen, Cook, and Valdez, in order to resolve this class action litigation,

move to certify a settlement class, approve the settlement entered into by the parties, and enter

judgment pursuant to Federal Rule of Civil Procedure 23(e). While Defendants do not agree to all

the representations made in this Motion, Defendants are unopposed to the relief requested of

approving the Settlement Agreement.

TABLE OF CONTENTS

I.    Procedural History ................................................................................................ 7
    A.    Plaintiffs' Counsels' Investigation and Discovery ........................................ 7
    B.    Class Certification .......................................................................................... 9
    C.    Settlement Negotiations ................................................................................. 9
    D.    Notice to Class Members ............................................................................. 10
II.   Terms of the Settlement .................................................................................... 10
    A.    Certification of Settlement Class ................................................................. 10
    B.    Benefits to Settlement Class ........................................................................ 11
    C.    Notification of Rights ................................................................................... 13
    D.    Opt Out Rights ............................................................................................. 14
    E.    Payment of Attorneys' Fees, Costs, and Expenses ..................................... 15
    F.    Dispute Resolution and Continuing Jurisdiction of this Court .................... 16
III.  Argument and Authorities ................................................................................ 16
    A.    The Court Should Certify the Settlement Class ........................................... 17
        1.    Numerosity: The Class is Sufficiently Numerous ................................. 18
        2.    Commonality: The Class Presents Common Questions of Law or Fact ... 18
        3.    Typicality: The Plaintiffs' Claims are Typical of the Class .................. 20
        4.    Adequacy: Plaintiffs and their Counsel will Adequately Represent the Class ......... 21
    B.    The Court Should Approve the Settlement as Fair ...................................... 26
        1.    No Fraud or Collusion Exists ............................................................... 26
        2.    Plaintiffs' Probability of Success ......................................................... 27
        3.    Range of Possible "Recovery" ............................................................. 28
        4.    The Complexity and Likely Duration of the Litigation ......................... 29
        5.    The Stage of the Proceedings and Discovery ....................................... 29
        6.    The Opinions of Class Counsel and Class Representatives .................... 30
        7.    Attorneys' Fees and Expenses .............................................................. 31
        8.    The Johnson Factors Justify and Confirm the Reasonable Fee. ............ 37
        9.    Attorneys' Fees and Expenses Summary ............................................... 43
    C.    Continuing Jurisdiction and the Prison Litigation Reform Act ................... 44
IV.   Conclusion ......................................................................................................... 45

**Table of Authorities**

**Cases**

*Armstrong v. Davis*, 318 F.3d 965 (9th Cir. 2003) ..................................................... 40, 42

*Atkins v. Parker*, 972 F.3d 734 (6th Cir. 2020) .................................................. 25, 26, 28

*Ayers v. Thompson*, 358 F.3d 356 (5th Cir. 2004) ......................................................... 27

*Beckford v. Irvin*, 60 F.Supp.2d 85 (W.D. N.Y. 1999) ........................................... 40, 42

*Blanchard v. Bergeron*, 489 U.S. 87 (1988) ......................................................... 29, 31

*Blum v. Stenson*, 104 S.Ct. 1541 (1984) ...................................................................... 30

*Buffkin v. Hooks*, No. 1:18-cv-502, 2019 WL 1282785 (M.D. N.C. Mar. 20, 2019) .................. 16

*Bynum v. Dist. of Columbia*, 412 F.Supp.2d 73 (D. D.C. 2006) ................................... 39

*Cerdes v. Cummins Diesel Sales Corp.*, No. 06-922, 2010 WL 2835755 (E.D. La. July 15, 2010) ..................................................................................................... 40, 42

*Cole v. Collier*, No. 4:14-cv-1698, 2016 WL 3258345 (S.D. Tex. June 14, 2016) ..................... 23

*Cole v. Collier*, No. 4:14-cv-1698, 2018 WL 2766028 (S.D. Tex. June 8, 2018) ................ passim

*Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977) .................................................... 26, 28

*Craft v. Cty. of San Bernardino*, 624 F.Supp.2d 1113 (C.D. Cal. 2008) ......................... 39

*DeHoyos v. Allstate Corp.*, 240 F.R.D. 269 (W.D. Tex. 2007) ............................... passim

*Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752 (5th Cir. 2001) .......................... 38

*Evans v. Jeff D.*, 475 U.S. 717 (1986) ......................................................................... 16

*Graham v. Parker*, No. 3-16-cv-01954, 2017 WL 1737871 (M.D. Tenn. May 4, 2017) ............. 17

*Grumbles v. Livingston*, 706 Fed. Appx. 818 (5th Cir. 2017) ....................................... 25

*Guajardo v. Estelle*, 568 F.Supp. 1354 (S.D. Tex. 1983) ............................................. 24

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ............................................ 30

*Hernandez v. Cty. of Monterey*, No. 13-CV-2354-PSG (N.D. Cal. May 11, 2015) .............. 39

*Hilton v. Wright*, 235 F.R.D. 40 (N.D. N.Y. 2006) ....................................................... 17

*Hoffer v. Jones*, 323 F.R.D. 694 (N.D. Fla. 2017) ................................................... 16, 17

*Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263 (11th Cir. 2020) .............................. 25, 27, 28

*Hopwood v. Texas*, 236 F.3d 256 (5th Cir. 2000) ......................................................... 29

*In re Enron Copr. Sec., Deriv. & ERISA Litig.*, 586 F.Supp.2d 732, 745 (S.D. Tex. 2008) .. 29, 30

*In re Heartland Payment Systems, Inc. v. Customer Data Sec. Breach Litigation*, 851 F. Supp. 2d 1040 (S.D. Tex. 2012)......................................................................................... 23

*In re HCV Prison Litigation*, No. 3:19-cv-00577, 2020 WL 806170 (D. Nev. Feb. 18, 2020).... 16

*In re High Sulfur Content Gasoline Liability Litig.*, 517 F.3d 220 (5th Cir. 2008) ..................... 30

*In re Nassau Cty. Strip Search Cases*, 12 F.Supp.3d 485 (E.D. N.Y. 2014) ................................ 39

*In re: Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410 (3d Cir. 2016)..... 29

*In re Rodriguez*, 695 F.3d 360 (5th Cir. 2012)…………………………………………………19

*James v. City of Dallas*, 254 F.3d 551 (5th Cir. 2001) .................................................... 19

*Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)............................ 31, 35

*Jones v. White*, No. H-03-2286, 2007 WL 2427976 (S.D. Tex. Aug. 22, 2007)......................... 41

*Kelly v. Wengler*, 822 F.3d 1085 (9th Cir. 2016).................................................... 40, 42

*Longden v. Sunderman*, 979 F.2d 1095 (5th Cir. 1992) ................................................. 41

*M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832 (5th Cir. 2012) ........................................ 16, 18

*M.D. v. Perry*, 294 F.R.D. 7 (S.D. Tex. Aug. 27, 2013)................................................... 20

*Matter of Continental Illinois Securities Litig.*, 962 F.2d 566 (7th Cir. 1992) ............................ 31

*Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620 (5th Cir. 1999) ........................................ 17

*Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400 (1968) ................................................ 29

*Norris v. Slothouber*, 718 F.2d 1116 (D.C. Cir. 1983) .............................................................. 23

*Nunez v. City of New York*, No. 1:11-cv-05845-LTS-JCF, Doc. 209-1 (S.D. N.Y. July 1, 2015) 39

*Opperman v. Kong Tech., Inc.*, No. 13-CV-00453-JST, Doc. 925 (N.D. Cal. Mar. 27, 2018) .... 23

*Parker v. Anderson*, 667 F.2d 1204 (5th Cir. 1982) ................................................ 16, 25

*Parsons v. Ryan*, No. 2:12-cv-00601-DJH, Doc. 1185 (D. Az. Oct. 14, 2014)........................... 39

*Perdue v. Kenny A.*, 559 U.S. 542 (2010)............................................................ 39

*Piambino v. Bailey*, 610 F.2d 1306 (5th Cir. 1980) .................................................. 15

*Pierce v. Cty. of Orange*, 905 F.Supp.2d 1017 (W.D. Cal. 2012) ...................................... 40, 42

*Postawko v. Missouri Dep't of Corrections*, 910 F.3d 1030 (8th Cir. 2018)................... 16, 17, 18

*Reed v. General Motors Corp.*, 703 F.2d 170 (5th Cir. 1983) ......................................... 24

*Riverside v. Rivera*, 477 U.S. 561 (1986) .......................................................... 38

*Roy v. Lawson*, 739 Fed. Appx. 266 (5th Cir. 2018) ................................................. 25

*Ruiz v. McKaskle,* 724 F.2d 1149, 1152 (5th Cir. 1984)............................................. 24

*Sanchez v. City of Austin*, 774 F.3d 873 (5th Cir. 2014)........................................... 29

*Stafford v. Carter*, No. 1:17-cv-00289, 2018 WL 1140388 (S.D. Ind. Mar. 2, 2018)................ 17

*Stanich v. Travelers Indem. Co.*, 259 F.R.D. 294 (N.D. Ohio 2009)............................... 22

*Stirman v. Exxon Corp.*, 280 F.3d 554, 563 (5th Cir. 2002)........................................ 20

*Tex. State Teachers Assn. v. Garland Indep. Sch. Dist.*, 489 U.S. 782 (1989)........................ 38

*Union Asset Mgmt Holding A.G. v. Dell, Inc.*, 669 F.3d 632 (5th Cir. 2012) ........................ 28

*Wallace v. Powell*, 288 F.R.D. 347 (M.D. Penn. Dec. 14, 2012) .................................... 39

*White v. Gregory Funding LLC*, No. 2017-20800 (270th D. Harris Cnty, Tex. Mar. 10, 2020)... 24

*Woodcock v. Correct Care Sol'ns, LLC*, No. 3:16-cv-00096, 2019 WL 3068447 (E.D. Ky. July 12, 2019) ..................................................................................... 16

*Yates v. Collier*, 868 F.3d 354, 366 (5th Cir. 2017).................................... 16, 18, 19, 23

*Young v. Cty. of Cook*, No. 06 C 552, 2017 WL 4164238 (N.D. Ill. Sept. 20, 2017)................ 40

*Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1038 (5th Cir. Unit A July 1981)........... 17

**Statutes and Regulations**

42 U.S.C. § 12205.................................................................... 29, 40, 41, 42

42 U.S.C. § 1988.................................................................... 29, 40, 41, 42

**Treatises**

Newberg on Class Actions § 11:51 .......................................................................... 24

Wright & Miller, Federal Practice and Procedure ............................................ 38

Wright, Miller & Cooper, Fed. Prac. & Proc. (1981) ......................................... 24

## I.  PROCEDURAL HISTORY

Plaintiffs brought this case to require the Texas Department of Criminal Justice's medical providers to treat inmates diagnosed with chronic Hepatitis C with Direct-Acting Antiviral ("DAA") medications. The parties have reached a Settlement Agreement, attached as Exhibit 1, that sets forth a schedule for Defendants to provide DAA medication to Settlement Class Members. Because this Settlement Agreement represents a fair compromise that provides DAA medication to Settlement Class Members diagnosed with chronic Hepatitis C, Plaintiffs ask the Court to certify the Settlement Class, and approve the proposed class action settlement pursuant to Federal Rule of Civil Procedure 23(e).

### A.  Plaintiffs' Counsels' Investigation and Discovery

Hepatitis C is a viral infection that attacks patients' livers, progressively causing liver damage. Over time, it can cause patients to develop cirrhosis and liver cancer (among other conditions) and can be fatal if untreated. Hepatitis C is transmitted through bodily fluids – most commonly through unprotected sex, sharing needles, and tattooing. It is extremely prevalent in prisons and jails. Ex. 12, Declaration of Dr. S. Trooskin, M.D., pp. 4-5.

In 2013, the Food and Drug Administration approved the first direct acting antiviral (DAA) drug therapy to treat Hepatitis C. Prior to 2013, there was no truly effective treatment for Hepatitis C – treatments like interferon either had very low cure rates (less than 50%), or had side effects so dire that many patients could not complete the course of treatment. In stark contrast, DAA drugs were a "breakthrough" therapy that have very minor side effects and cure rates of over 90%. Quickly, DAA medications became the standard of care for treatment of Hepatitis C, even for patients who were only recently infected and had yet to experience any liver damage. *Id*. at pp. 6-8.

Though TDCJ's medical providers quickly recognized this important change in the standard of care – they testified as much to the Texas legislature in 2014 – by 2018, only very small numbers of TDCJ prisoners were actually receiving treatment. In 2018, only 3.4% of inmate patients with chronic Hepatitis C were treated with DAA medications. *See* Ex. 27, Deposition of M. Roberts, 48:25-49:1 & 60:14-15.

In 2019, Plaintiffs filed suit under 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act seeking DAA treatment for all TDCJ prisoners with chronic Hepatitis C. Prior to filing suit, Plaintiffs, with the assistance of counsel, exhausted their administrative remedies regarding their request for DAA medications as required by the Prison Litigation Reform Act. 42 U.S.C. § 1997e. Ex. 15, Declaration of S. Medlock, p. 4. In preparing the suit, Plaintiffs' counsel spoke to numerous inmates at multiple prisons while reviewing thousands of pages of medical records and ensuring administrative remedies were properly exhausted. *See*, *e.g.*, *id*. Plaintiffs' counsel watched hours of testimony by Defendants to the Texas Legislature on issues related to Hepatitis C, and reviewed dozens of publicly available meeting minutes of the Correctional Managed Health Care Committee (where Hepatitis C was regularly discussed in detail). As part of the investigation, and in preparation for filing suit, Plaintiffs' counsel retained Dr. Stacey Trooskin, M.D., a leading expert in the treatment of viral Hepatitis. Dr. Trooskin reviewed medical records (to ensure potential plaintiffs met medical criteria for treatment) and counseled Plaintiffs' attorneys as they crafted the complaint. *See* Ex. 4, Declaration of J. Edwards, pp. 16–17 & Ex. 12, Declaration of Dr. S. Trooskin, M.D., pp. 21-23.

After filing suit, Plaintiffs' counsel deposed two Rule 30(b)(6) witnesses, Dr. Olugbenga Ojo and Dr. Melanie Roberts (both of The University of Texas Medical Branch at Galveston). The named plaintiffs were also deposed, along with their expert, Dr. Trooskin. Thousands of pages of

documents were produced in discovery and thoroughly reviewed. Ex. 4, Declaration of J. Edwards, p. 17; Ex. 16, Declaration of Mike Singley, pp. 2-3; Ex. 18, Declaration of David James, p. 3.

**B.     Class Certification**

Plaintiffs promptly sought class certification. Docs. 6 & 19. On March 4, 2020, Defendants responded to the class certification motion. Plaintiffs filed a reply (Doc. 71) on April 10, oral argument was held on May 5, 2020, and the motion remains pending.

Plaintiffs sought to certify a class and subclass, defined as follows:

**General Class**: All current and future inmates incarcerated in the Texas Department of Criminal Justice who have been diagnosed, or will be diagnosed, with chronic Hepatitis C, and who are subjected to TDCJ and the Texas Correctional Managed Health Care Committee's policy and practice of failing to provide direct acting antiviral treatment to all inmates diagnosed with chronic Hepatitis C, and who are not receiving treatment with direct acting antiviral drugs.

**Disability Subclass**: All current and future inmates incarcerated in the Texas Department of Criminal Justice who have been diagnosed, or will be diagnosed, with chronic Hepatitis C, and who are subjected to TDCJ and the Texas Correctional Managed Health Care Committee's policy and practice of failing to provide direct acting antiviral treatment to all inmates diagnosed with chronic Hepatitis C, who are not receiving treatment with direct acting antiviral drugs, and who are at increased risk of liver-related illness, injury, or death due to their disability or any medical treatment necessary to treat their disability.

**C.     Settlement Negotiations**

While the class certification motion remained pending, the parties attended a two-day mediation with the Honorable Tom Phillips. After reaching an agreement in principle, the parties thoroughly negotiated the terms of the final Settlement Agreement over several months, attached as Exhibit 1. The last item negotiated was the attorneys' fees, which was only negotiated after all other items were fully resolved. Ex. 4, Declaration of J. Edwards, p. 16.

### D.      Notice to Class Members

Pursuant to Rule 23(c)(2) and 23(e)(1), the Court must "direct appropriate notice to the class" in a Rule 23(b)(2) class. Here, the Court should approve the notice, attached as Exhibit 2, and direct the parties to provide it to all Settlement Class Members, as described below. The parties agree to the form and content of Exhibit 2. A copy of Exhibit 2 will be delivered to all Settlement Class Members by Plaintiffs' counsel providing one list per TDCJ unit containing the names and TDCJ numbers of each inmate to be noticed to Defense counsel via electronic mail with a pdf version of the notice attached. The lists and notices will then be sent to each TDCJ unit for distribution of the notice as "legal mail" by that unit's mailroom. A log will be created showing that each Settlement Class Member received notice, and Plaintiffs' counsel will review the logs to ensure that they demonstrate each Settlement Class Member received notice.

A copy of Exhibit 2 will also be posted in the medical clinics and law libraries at each TDCJ prison. A complete copy of the Settlement Agreement will be available until January 1, 2028 in each of TDCJ's law libraries for Settlement Class Members to review.

## II.      TERMS OF THE SETTLEMENT

The Settlement Agreement (Exhibit 1) resolves the claims of Plaintiffs Roppolo, Allen, Cook, Valdez, and the proposed Settlement Class Members against all the Defendants. The details are contained in the Settlement Agreement, with the key terms described below.

### A.      Certification of Settlement Class

Plaintiffs request the Court certify a settlement class defined as a list of patients in TDCJ custody and diagnosed with Chronic Hepatitis C as of September 3, 2020, who remain in TDCJ custody, and who have not already received DAA treatment. Ex. 1, pp. 7-9, and Exhibit 3, Settlement Class List. The parties have utilized their best efforts to ensure that Exhibit 3 includes

all patients currently in TDCJ custody and known to have a chronic Hepatitis C diagnosis as of September 3, 2020. *See* Ex. 17, Declaration of D. James, pp. 3-4; Ex. 18, Declaration of O. Murray.

The proposed settlement class meets all the requirements of Federal Rule of Civil Procedure 23. The definition is substantially similar to the proposed class Plaintiffs sought to certify,[1] and (1) is so numerous that joinder of all class members is impracticable (9,718 members, *see* Ex. 3); (2) shares common questions of law and fact (such as whether the medical providers refusal to provide DAA medication demonstrates deliberate indifference to inmates' serious medical needs); (3) involves typical claims or defenses (as all chronic Hepatitis C patients denied treatment are similarly situated to Plaintiffs); and (4) has parties and counsel who will fairly and adequately protect the class's interests. Likewise, the class would be appropriately certified under Rule 23(b)(2), as the Defendants "act[] or refuse[] to act on grounds that apply generally to the class, so that final injunctive relief … is appropriate respecting the class as a whole." *See also infra* at 17–20.

## B.     Benefits to Settlement Class

TDCJ and its medical providers will provide DAA medication to all Settlement Class Members in TDCJ custody with chronic Hepatitis C, treating the sickest patients first, over the next several years, subject to limited exceptions as outlined in the Settlement Agreement.[2]

---

[1] Indeed, the settlement class only excludes future patients who enter TDCJ custody, and patients who are diagnosed with chronic Hepatitis C after September 3, 2020. Of course, these patients are not bound by the settlement, and if Defendants should fail to treat them, there is no bar to their potential claims.

[2] For a small number of patients, for example, DAA medications will be medically contraindicated. Likewise, patients must affirmatively participate in examinations before treatment begins to ensure they qualify medically for treatment. Inmates who are released from custody before their treatment is to begin will also be excluded, though their claims will not be released. Ex. 1, p. 9.

Settlement Class Members will receive DAA medication on the following schedule, as determined by a blood test to establish an "APRI" and then additional testing to determine a  "Metavir" score:[3]

| APRI | Metavir | Treatment Schedule |
|------|---------|--------------------|
| 2.0 and above | F-4 | Treatment shall begin no later than December 31, 2020. |
| 1.0 – 1.999 | F-3 | Treatment shall begin no later than January 1, 2022. |
| 0.5-0.999 | F-2 | Treatment shall begin no later than October 1, 2023. |
| Below 0.5 | F0 – F1 | Treatment for patients is expected to begin after October 2023, and to be completed by January 2028. |

*See* Ex. 1, pp. 9-11. The above treatment start dates may be delayed if Settlement Class Members miss medical appointments, refuse treatment, or additional, unanticipated patients develop Metavir scores that require their treatment be prioritized – for example, a patient currently scored at 0.5 has a score that elevates above 1.0, he or she would be treated before another patient whose score remained at 0.5. *Id*.

Importantly, the settlement agreement also ends Defendants' policy of only considering inmates for DAA treatment if their APRI score exceeded 0.5. Ex. 1, p. 14. This policy precluded

---

[2] The Metavir Score indicates the activity or degree of fibrosis or scarring in the liver. APRI, or AST to Platelet Ratio Index, provides a rough measure of the extent of a patient's liver damage. Ex 4, Declaration of Trooskin, pp. 4, & 17-19. APRI scores are determined through a blood test that can be easily administered at the individual TDCJ prisons, and evaluated by the University of Texas Medical Branch's virology group in Galveston. APRI scoring is roughly equivalent to the "Metavir Fibrosis Score," which Defendants will use to determine final sequencing of patient treatment. The fibrosis score is an actual measure of liver damage determined with an ultrasound, rather than a blood test. Fibrosis of F4 is equivalent to an APRI score of 2.0 or greater, and indicates cirrhosis. Fibrosis of F3 is equivalent to an APRI score over 1.0, but less than 2.0 (and indicates severe fibrosis). Fibrosis of F2 is equivalent to an APRI score above 0.5 but less than 1.0 (and indicates an intermediate state of fibrosis). Fibrosis of F1 is or F0 is equivalent to an APRI score below 0.5 (and indicates minimal scarring). *See* Ex. 12, Declaration of S. Trooskin, p. 4.

physicians from making individualized medical decisions about patients who may require DAA treatment, but whose APRI score remained below 0.5. Ex. 1, p. 14.

To ensure that the above treatment schedule is kept, and that all Settlement Class Members and Eligible Inmates receive DAA medication, the Settlement Agreement has extensive reporting requirements. If a patient will not be treated on the above schedule (which is permissible solely to prioritize treatment of sicker patients), Defendants will bi-annually identify the number of sicker patients who are being treated and the number of patients whose care has been delayed, along with the methodology for deciding which patients' care has been delayed. Ex. 1, pp. 26-27. Moreover, Defendants will provide Plaintiffs' counsel with quarterly reports (in Excel format) identifying each Settlement Class Member who is still awaiting treatment, their current APRI/Metavir score, their next scheduled virology appointment, and other information that will assist Plaintiffs' counsel in advising individual Settlement Class Members about when they can expect treatment. Ex. 1, pp. 24-25. For those Settlement Class Members who complete treatment, the reports will also contain the date treatment began, when treatment was completed, and whether treatment was successful. *Id*. Each Settlement Class Member will be provided an address where they can send a confidential letter to Plaintiffs' counsel if they believe Defendants are breaching the settlement or simply need information about when they will receive treatment. Ex. 1, p. 18 & Ex. 2, p. 2. For the work to administer the class, Plaintiffs' counsel will be awarded a lump sum of $200,000 (the total settlement amount is $950,000 -- $750,000 for work performed to date and $200,000 for future class administration). Ex. 1, pp. 23-25.

C.     **Notification of Rights**

The settlement class is a defined list of inmates diagnosed with Chronic Hepatitis C as of September 3, 2020, the date on which the Settlement Agreement in principle was reached, and

who remained in custody on the date the final agreement was signed. Thus, it will be simple to provide each Settlement Class Member a notice of these rights, attached as Exhibit 1. The notice will advise the Settlement Class Members of:

- Their right to receive DAA treatment;

- The treatment schedule;

- Their right to opt out (*see infra*.);

- Their right to object;

- That the suit does not seek money damages, but that Settlement Class Members who wish to sue for damages may bring their own separate lawsuits;

- The amount of the award for attorneys' fees and expense; and,

- An address to send concerns or questions about the availability of DAA treatment under the Settlement Agreement to Plaintiffs' counsel.

In addition to delivering the notice to each Settlement Class Member, the notice will also be posted in every medical clinic, and law library. The complete Settlement Agreement will be available in every prison's law library for Settlement Class Members to review. The notice will be available in the medical clinics and law libraries until January 1, 2028 (and the Settlement Agreement in the law libraries until January 1, 2028), or until the Settlement Agreement otherwise terminates. Ex. 1, p. 18.

### D.     Opt Out Rights

Though a Rule 23(b)(2) class does not need to contain an opt-out requirement because it seeks only declaratory and injunctive relief,[4] the Parties agreed to give Settlement Class Members

---

[4] *See DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 294 (W.D. Tex. 2007) ("When a class falls within the classic Rule 23(b)(2) paradigm as it does here, no opt-out procedure is necessary to protect the interests of the class").

the ability to "opt out" of the class.[5] The Notification contains an explanation of the "opt out" provisions, and allows inmates to "opt out" by submitting the form to Plaintiffs' counsel. *See* Ex. 2, p. 3. The "opt out" form will require inmates to submit their names, TDCJ identification numbers, and a brief reason they wish to "opt out." A prisoner may "opt out" at any time. The "opt out" form explicitly tells inmates they are forever giving up all rights secured by the Settlement Agreement. Plaintiffs' counsel will administer the "opt out" requests.[6] *Id.* at p. 3.

### E.    Payment of Attorneys' Fees, Costs, and Expenses

Defendants have agreed to pay Plaintiffs' counsel attorneys' fees, costs and expenses totaling (and not to exceed) $950,0000 as of the date of the Court's order. Because the Settlement Class seeks only injunctive and declaratory relief, and not damages, there is no common fund and the amount of the fee will not change any benefit to the Settlement Class.

The amount of attorneys' fees, costs, and expenses is agreed to as a material term of the Settlement Agreement. A summary of Class Counsel's hours, reasonable hourly rates, and expenses is attached as Exhibit 9. Detailed time sheets for each attorney and staffer are attached as Exhibit 10. The amount of attorneys' fees, costs, and expenses were negotiated separately after agreement was reached on the other material terms of the Settlement Agreement. Significantly, Defendants stipulate that this is a fair and reasonable amount of fees, costs, and expenses, and

---

[5] The decision to opt out will not affect any TDCJ inmate's ability to receive treatment, including DAA medication, for Hepatitis C while in TDCJ custody. The opt out provision only applies insomuch as inmates will not be entitled to treatment that complies with the deadlines provided for in the Settlement Agreement, and will not have remedies available to them as other class members will have in resolving any disputes or claims of noncompliance with the agreement.

[6] The Plaintiffs anticipate the only reason why a prisoner may rationally want to "opt out" is if they are dissatisfied with the treatment schedule and wish to file their own suit to seek treatment faster. Thus, the Plaintiffs anticipate that very few prisoners will opt out.

waive their right to appeal an award of attorneys' fees, costs and expenses at the amount agreed upon by the Parties. *See* Ex. 1, pp. 23-25.

### F.       Dispute Resolution and Continuing Jurisdiction of this Court

The Settlement Agreement provides the Court will have continuing jurisdiction over this case. Prior to seeking relief from the Court, the Parties have agreed to an extensive dispute resolution and mediation process, which is intended to minimize the need for judicial intervention. Ex. 1, pp. 15-17. The Parties agree that the relief afforded by the Settlement Agreement extends no further than necessary to correct the alleged violation of the Settlement Class Members' federal rights and that the relief will not cause any adverse impact on public safety or operation of the criminal justice system. *See* 18 U.S.C. § 3626(a)(1). *Id.* at pp. 30-31.

Defendants have agreed they will not appeal any of the relief, and the Parties request the Court to approve the Settlement Agreement as it has been entered into by the Parties. Ex. 1, p. 28.

### III.   ARGUMENT AND AUTHORITIES

A class action may not be settled without the approval of the Court. FED. R. CIV. PROC. 23(e); *Piambino v. Bailey*, 610 F.2d 1306, 1327-28 (5th Cir. 1980). The Court must ensure the settlement is "fair, reasonable, and adequate" to protect the rights of absent class members. *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 285 (W.D. Tex. 2007) (citing FED. R. CIV. PROC. 23(e)(1)(C)). "The purpose of this salutary requirement is to protect the nonparty members of the class from unjust or unfair settlements affecting their rights." *Piambino*, 610 F.2d at 1327-28. "[T]he court cannot modify the terms of the proposed settlement; rather, the Court must approve or disapprove of the proposed settlement as a whole." *DeHoyos*, 240 F.R.D. at 286. "[T]he power to approve or reject a settlement negotiated by the parties before trial does not authorize the court to require the parties to accept a settlement to which they have not agreed." *Id.* (citing *Evans v. Jeff D.*, 475 U.S. 717, 726-27 (1986)). Appellate review is only for "clear[] abuse of discretion" as

16

"a product of the strong judicial policy favoring the resolution of disputes through settlement." *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982).

## A.     The Court Should Certify the Settlement Class

Rule 23 of the Federal Rules of Civil Procedure governs motions for class certification and sets forth four prerequisites for class certification. A party must show that: 1) the class is so numerous that joinder of all members is impracticable; 2) there are questions of law or fact that are common to the class; 3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and 4) the representative parties and their counsel will fairly and adequately protect the interests of the class. FED. R. CIV. PROC. 23(a). Once all four prerequisites are met, the party must additionally satisfy one of the requirements set forth in Rule 23(b). *Yates v. Collier*, 868 F.3d 354, 366 (5th Cir. 2017). The burden of proof to establish that the proposed class satisfies Rule 23 falls on the party seeking class certification. *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832 (5th Cir. 2012). Plaintiffs assert that this case satisfies Rule 23(b)(2) and therefore must show that the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. PROC. 23(b)(2).

Numerous other federal courts have certified similar classes (or affirmed certification on appeal).[7]

---

[7] *Postawko v. Missouri Dep't of Corrections*, 910 F.3d 1030 (8th Cir. 2018) (affirming class certification for inmates with chronic Hepatitis C); *In re HCV Prison Litigation*, No. 3:19-cv-00577, 2020 WL 806170, *9 (D. Nev. Feb. 18, 2020) (certifying class of inmates with chronic Hepatitis C); *Buffkin v. Hooks*, No. 1:18-cv-502, 2019 WL 1282785, *12 (M.D. N.C. Mar. 20, 2019) (same); *Stafford v. Carter*, No. 1:17-cv-00289, 2018 WL 1140388, *9 (S.D. Ind. Mar. 2, 2018); *Hoffer v. Jones*, 323 F.R.D. 694, 700 (N.D. Fla. 2017) (same); *Woodcock v. Correct Care Sol'ns, LLC*, No. 3:16-cv-00096, 2019 WL 3068447, *11 (E.D. Ky. July 12, 2019) (same); *Graham v. Parker*, No. 3-16-cv-01954, 2017 WL 1737871, *7 (M.D. Tenn. May 4, 2017) (same); *Hilton v. Wright*, 235 F.R.D. 40, 54–55 (N.D. N.Y. 2006) (same).

1. *Numerosity: The Class is Sufficiently Numerous*

Rule 23(a)(1) requires that the proposed class be "so numerous that joinder of all members is impracticable." FED. R. CIV. PROC. 23(a)(1). The key question in this analysis is "whether joinder of all members is practicable in view of the numerosity of the class and all other relevant factors." *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1038 (5th Cir. Unit A July 1981). Although the number of members in a proposed class is not determinative of whether joinder is "impracticable," the Fifth Circuit has held that a class of 100 to 150 members is "within the range that generally satisfies the numerosity requirement." *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999) (suggesting that a class of more than 40 members "should raise a presumption that joinder is impracticable").

Here, the settlement class includes over 9,700 inmate patients. Ex. 3.

The proposed Settlement Class easily satisfies the numerosity requirement.

2. *Commonality: The Class Presents Common Questions of Law or Fact*

Rule 23(a)(2) requires that the proposed class members have at least one factual or legal issue in common. FED. R. CIV. PROC. 23(a)(2). Several federal courts have found commonality in nearly identical cases. *See*, *e.g.*, *Postawko v. Missouri Dep't of Corrections*, 910 F.3d 1030, 1038 (8th Cir. 2018) (affirming class certification for inmates with chronic Hepatitis C); *Hoffer v. Jones*, 323 F.R.D. 694, 700 (N.D. Fla. 2017) (certifying class of inmates with chronic Hepatitis C); *Hilton v. Wright*, 235 F.R.D. 40, 54–55 (N.D. N.Y. 2006) (same). *See also supra* n. 7. Commonality requires that the class members' "claims must depend upon a common contention," and that the common contention "'must be of such a nature that it is capable of classwide resolution' - which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Thus, "what matters to class certification" is the capacity "to generate common *answers* apt to drive the resolution of the litigation." *Yates v. Collier*, 868 F.3d 354, 361 (5th Cir. 2017) (*citing Wal-Mart Stores*, 564 U.S. at 350) (italics in original). "These common answers may indeed relate to the injurious effects experienced by the class members, but they may also relate to the defendant's injurious conduct. 'Even a single common question will do.'" *In re Deepwater Horizon*, 739 F.3d at 811 (citing *M.D. ex rel. Stuckenberg v. Perry*, 675 F.3d 832, 840 (5th Cir. 2012)); *see also Yates v. Collier*, 868 F.3d 354, 365 n. 6 (5th Cir. 2017).

"Commonality requires a common policy or practice, possibly an implicit one, that is the alleged source of the harm to class members, and that there are common questions of law or fact that will be dispositive of the class members' claim." *M.D. v. Perry*, 294 F.R.D. 7, 28–29 (S.D. Tex. 2013). This practice or policy may be action or inaction. *Perry*, 675 F.3d at 847-848.

Here, the class's claims easily satisfy the commonality requirement of Rule 23(a)(2) for the same reasons the Eighth Circuit affirmed in *Postawko*. The class contends that the refusal to provide DAA medication to Settlement Class Members with chronic Hepatitis C amounts to an unconstitutional condition of confinement and an intentional denial of medical care in violation of the Eighth Amendment. *See Postawko*, 910 F.3d at 1038. The class further alleges that Defendants discriminate against inmate patients disabled by their Hepatitis C in violation of the Americans with Disabilities Act and Rehabilitation Act by denying them the reasonable accommodation of DAA treatment. Further, the class contends that Defendants are deliberately indifferent to inmate health and safety because Defendants intentionally treat the class members incorrectly and know of (but fail to adequately remedy) the substantial risk of harm posed by withholding necessary medicine. *Id*. at 1038–1039. As the Fifth Circuit held in *Yates*, the "truth or falsity" of contentions like these "will resolve an issue that is central to the validity of each one of the claims in one

stroke"—whether Defendants' conduct is illegal. 868 F.3d at 361, *quoting Wal-Mart*, 564 U.S. at 350. As in *Yates*, the common answers will drive the resolution of this litigation. *See id*.

Accordingly, this putative class, which is almost identical to those certified in *Postawko* and numerous others, has likewise shown that this case presents common questions subject to class-wide resolution.

### 3. Typicality: The Plaintiffs' Claims are Typical of the Class

Typicality focuses on whether the "class representative's claims have the same essential characteristics of those of the putative class." *James v. City of Dallas, Tex.*, 254 F.3d 551, 571 (5th Cir. 2001), *abrogated on other grounds by M.D. ex rel Stukenberg v. Perry*, 675 F.3d 832 (5th Cir. 2012), *abrogation recognized In re Rodriguez*, 695 F.3d 360, 367 n.9 (5th Cir. 2012). "If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." *Id.* Usually, once a party satisfies the commonality requirement, satisfaction of the typicality requirement "will follow as a matter of course." *M.D. v. Perry*, 294 F.R.D. 7, 29 (S.D. Tex. 2013).

Here, the named plaintiffs' claims share the same essential characteristics as those of the other Settlement Class Members. All claim to suffer the risk of liver-disease-related injury, liver cancer, and extrahepatic health effects because Defendants withhold DAA medication from them, and seek an injunction requiring Defendants provide DAA medication to every Settlement Class Member. *See Postawko*, 910 F.3d at 1039; *Hoffer*, 323 F.R.D. at 697. All seek the same relief, based on the same legal theories. The named Plaintiffs' claims are typical, making this case appropriate for class certification.

4.   *Adequacy: Plaintiffs and their Counsel will Adequately Represent the Class.*

In assessing Rule 23(a)(4)'s adequacy requirement, courts consider "[1] the zeal and competence of the representatives' counsel and … [2] the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of absentee[] [class members]." *Stirman v. Exxon Corp.*, 280 F.3d 554, 563 (5th Cir. 2002) (punctuation omitted). Plaintiffs and their counsel easily satisfy this element.

i)      Adequacy of the Named Plaintiffs

The adequacy of the named plaintiffs is satisfied when they demonstrate "knowledge of and engagement with the litigation." *M.D. v. Perry*, 294 F.R.D. 7, 46 (S.D. Tex. Aug. 27, 2013) *appeal dismissed at* 547 Fed. Appx. 543 (5th Cir. Nov. 19, 2013). Each of the Plaintiffs demonstrated more than adequate "knowledge and engagement" at their depositions.

- **Mr. Roppolo:** Mr. Roppolo had read the Original and Third Amended complaints.[8] He assisted counsel in preparing the complaint through conferring about the claims, "extensively many times": "I don't know how many times I've met [counsel] on the other side of the glass, talking to him."[9] Though he did not draft the complaint, he "helped verbally by putting my input to them and putting this lawsuit into their hands to file and to represent me and others."[10] Before suit was filed, he exhausted his administrative remedies, and when he still did not receive treatment he contacted the undersigned to "see if maybe they might help me."[11] Mr. Roppolo filed a class action lawsuit "to get TDC[J] [and] UTMB to cure everybody."[12] He demonstrated an understanding of the claims by testifying that people in prison do not receive the same treatment as free people "because of money … they tell you you're not going to get cured until you get to a certain [APRI] level. Because all

---

[8] Ex. 5, Deposition of M. Roppolo, pp. 9:9–15 & 39:22–40:5.

[9] *Id.* at pp. 40:25–41:3.

[10] *Id.* at, p. 40:3–7.

[11] *Id.* at, pp. 42:20–43:6.

[12] *Id.* at, p. 45:1–5.

they want to do is monitor you and not cure you … They're refusing to do that because of money. So that's why this whole lawsuit came about."[13]

- **Mr. Allen:** Mr. Allen was "very familiar" with the complaint.[14] He understood it was "a complaint filed on behalf of all of us prisoners about the Hepatitis C, that we are not receiving [treatment] at this time unless we're almost close to death."[15] He understands the suit is challenging the policy requiring a prisoner to have an APRI of ".5 is the standard for you to get [DAA treatment]."[16] Mr. Allen considered bringing a *pro se* suit,[17] but chose instead to pursue a class action because an individual suit is "not going to benefit everybody. It would benefit me … but it wouldn't help anybody else. And so we started talking about doing a class action."[18] "I was concerned about a class because when I seen my three friends pass away [from Hepatitis C-related causes], that stirred up something in me that's just hard to explain."[19] Mr. Allen filed grievances about the issue years ago, and completed additional grievances shortly before the suit was filed.[20] Prior to finding the undersigned counsel, Mr. Allen had contacted other attorneys for years, including the American Civil Liberties Union, for assistance on this claim.[21] He specifically wrote to the undersigned to request help on this matter.[22] When the complaint was being drafted by counsel, Mr. Allen assisted by "sen[ding] lawsuits to [undersigned counsel] about different lawsuits we have seen. Me and some of the members that are in this lawsuit have sent [counsel] stuff from Philadelphia lawsuits, Oklahoma lawsuits, different places where Hepatitis C, where the Courts ruled in favor of the inmates."[23]

---

[13] Ex. 5, Deposition of M. Roppolo, p. 52:5–12.

[14] Ex. 6, Deposition of D. Allen, p. 115:22.

[15] *Id*. at p. 116:2–5.

[16] *Id*. at p. 209:8–9.

[17] *Id*. at p. 117:5–8.

[18] *Id*. at p. 118:9–18.

[19] *Id*. at p. 126:9–13.

[20] *Id*. at pp. 119:12–120:3.

[21] *Id*. at pp. 120:12–24 & 125:8–19.

[22] *Id*. at p. 134:16–25.

[23] *Id*. at p. 132:14–20.

- **Mr. Cook:** Mr. Cook has read multiples versions of the complaint.[24] Prior to becoming a plaintiff, he requested treatment, and when he was denied treatment, exhausted his administrative remedies by completing Step 1 and Step 2 grievances. He joined the lawsuit because "I wanted to get treated."[25] He chose to pursue the class action lawsuit "because [Hepatitis C] not only affects me. … [Y]ou've got [thousands of] people that are diagnosed with it. I want [treatment] not only for myself, but for them too."[26] He explained the lawsuit seeks treatment for everyone: "if I have the virus, they have the medication to give me the cure, they should give me [it], regardless of where I am on the … APRI scale."[27]

- **Mr. Valdez:** Mr. Valdez had seen the complaint, and testified he assisted in drafting the Third Amended version.[28] He brought the lawsuit "because I want to get treated,"[29] and understands the objective of his claims is to "get treated."[30] He also believes that all TDCJ inmates with chronic Hepatitis C should be treated.[31]

Each proposed representative gave a deposition, each was familiar with the claims, and each responded to written discovery. This is more than adequate understanding of the claims and participation in the litigation to satisfy the adequacy requirement. *See Cole v. Livingston*, No. 4:14-CV-1698, 2016 WL 3258345, *9 (S.D. Tex. June 14, 2016) *aff'd sub nom at Yates*, 868 F.3d at 354; *see also Stanich v. Travelers Indem. Co.*, 259 F.R.D. 294, 316 (N.D. Ohio 2009)

---

[24] Ex. 7, Deposition of J. Cook, pp. 11:13–16.

[25] *Id*. at p. 51:1–9.

[26] *Id*. at p. 58:7–11.

[27] *Id*. at p. 63:10–20.

[28] Ex. 8, Deposition of V. Valdez, pp. 37:11–12 & 37:23–38:1.

[29] *Id*. at p. 49:22–23.

[30] *See id*. at pp. 98:3–8 & 99:7–9.

[31] *Id*. at p. 102:15–18.

In analyzing the representatives' role in the litigation, the focus is on whether there are "intraclass conflicts" between the class representatives and others in the class. *In re Heartland Payment Systems, Inc. v. Customer Data Sec. Breach Litigation*, 851 F. Supp. 2d 1040, 1056 (S.D. Tex. 2012) (Rosenthal, J.). A class representative must "possess the same interest and suffer the same injury as the class members." *Id.*

Here, the settlement class has no intra-class conflict. All Settlement Class Members (subject to few exceptions) will receive the same benefit – treatment with DAA medications.[32]

### ii)   Adequacy of Class Counsel

The adequacy of counsel requirement is easily met. Plaintiffs' counsel from Edwards Law Group have significant experience litigating cases against TDCJ, and UTMB, including wrongful death cases in the Northern, Western, Eastern, and Southern Districts of Texas.[33] Counsel from Edwards Law Group were found adequate to represent the class in *Cole v. Collier*, No. 4:14-cv-1698, 2016 WL 3258345 (S.D. Tex. June 14, 2016) *aff'd sub nom at Yates v. Collier*, 868 F.3d 354 (5th Cir. 2017), where they zealously advocated for their clients and achieved "extraordinary results" for a class of prisoners. *Cole v. Collier*, No. 4:14-cv-1698, 2018 WL 2766028, *2–3, 6 & 11 (S.D. Tex. June 8, 2018) (describing settlement achieved, and citing Edwards Law's

---

[32] In opposing class certification prior to the settlement, Defendants argued that the Plaintiffs created an intra-class conflict by declining to seek damages. Though the parties disagreed about whether this created an intra-class conflict (and Plaintiffs believe it did not disqualify the Plaintiffs from being adequate representatives), the settlement agreement nonetheless resolves that purported problem by allowing class members to bring their own claims for damages. Ex. 1, Settlement Agreement, pp. 20-21 & 28. *See also Norris v. Slothouber*, 718 F.2d 1116, 1117 (D.C. Cir. 1983) (citing 18 WRIGHT, MILLER & COOPER, FED. PRAC. & PROC. § 4455 (1981)) ("A suit for damages is not precluded by reason of the plaintiff's membership in a class for which no monetary relief is sought.").

[33] *Hinojosa v. Livingston*, 2:13-CV-319 (S.D. Tex); *Webb v. Livingston*, No. 6:13-cv-711 (E.D. Tex); *McCollum, et al. v. Livingston,* 3:12-cv-02037 (N.D. Tex.); *Martone v. Livingston, et al*, No. 4:13-cv-03369 (S.D. Tex.).

"substantial experience litigating civil rights and other complex cases" and that Edwards Law was "unstinting in their efforts and unsparing in their financial commitments," and "creative and articulate advocates for the rights of Class members"). This court lauded the attorneys at Edwards Law as "highly skilled," and praised their work on behalf of prisoners as "sav[ing] lives, redress[ing] illness, reduc[ing] misery, achiev[ing] constitutionality, and do[ing] justice." *Cole v. Collier*, No. 4:14-cv-1698, 2018 WL 2766028, *16 (S.D. Tex. June 8, 2018).

Subsequently, Edwards law was also appointed class counsel (along with Winston Strawn) to represent another class of TDCJ inmates in *Valentine v. Collier*, No. 4:20-CV-1115, 2020 WL 3491999, *12 (S.D. Tex. June 27, 2020), a suit challenging the prison system's response to the COIVD-19 pandemic at the geriatric prison.

In addition to their work on the *Cole/Yates* and *Valentine* class actions, counsel from Edwards Law extensively litigated related heat stroke wrongful death cases against the Texas prison system,[34] and has been successful class counsel on other non-inmate class actions. *See Opperman v. Kong Tech., Inc.*, No. 13-CV-00453-JST, Doc. 925 (N.D. Cal. Mar. 27, 2018) (entering judgment and awarding attorneys' fees to Edwards Law Group as class counsel in multi-party consumer privacy class action); *White v. Gregory Funding LLC*, No. 2017-20800 (270th D. Harris Cnty, Tex. Mar. 10, 2020) (Ex. 13) (granting class certification and appointing Edward Law Group class counsel).[35]

---

[34] *See*, *e.g.*, *McCollum v. Livingston*, No. 4:14-CV-3253, 2017 WL 608665 (S.D. Tex. Feb. 3, 2017); *Webb v. Livingston*, 618 Fed. Appx. 201 (5th Cir. 2015); *Hinojosa v. Livingston*, 807 F.3d 657 (5th Cir. 2015).

[35] *See generally* Ex. 4, Declaration of J. Edwards.

## B.       The Court Should Approve the Settlement as Fair

The Settlement Agreement is fair and reasonable. It assures that all Settlement Class Members will receive the DAA medication they require. "There is a strong presumption in favor of finding the Settlement Agreement fair." *DeHoyos*, 240 F.R.D. at 286. In evaluating a class action settlement, the Court should consider the following factors: "(1) the existence of fraud or collusion behind the settlement; (2) the probability of plaintiffs' success on the merits; (3) the range of possible recovery; (4) the complexity, expense, and likely duration of the litigation; (5) the stage of the proceedings and the amount of discovery completed; and (6) the opinions of class counsel, class representatives, and absent class members." *Reed v. General Motors Corp.*, 703 F.2d 170 (5th Cir. 1983). *See also Guajardo v. Estelle*, 568 F.Supp. 1354, 1358 (S.D. Tex. 1983) (approving prison class action settlement); *Cole v. Collier*, No. 4:14-cv-1698, 2018 WL 2766028, *4 (S.D. Tex. June 8, 2018) (same).

### 1.   No Fraud or Collusion Exists

The Settlement Agreement provides a substantial benefit to the Settlement Class Members and affords all the relief they sought in the complaint. *See* Doc. 3, p. 20 (praying the Court "require [Defendants] to provide … the class with DAA drug treatments"). Especially in such a case, it is presumed no fraud or collusion exists. 4 NEWBERG ON CLASS ACTIONS § 11:51 (4th Ed. 2002); *see also Ruiz v. McKaskle,* 724 F.2d 1149, 1152 (5th Cir. 1984) (approving prison class action settlement over inmate objections). The Settlement Agreement was the product of extensive arms-length negotiations between able counsel, and attorneys' fees (discussed below) were not negotiated until the parties had resolved all other material terms. Ex. 4, Declaration of J. Edwards, p. 16.

### 2. *Plaintiffs' Probability of Success*

When evaluating a class action settlement, "the most important factor is the probability of plaintiffs' success on the merits." *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982). "[T]he Court must compare the terms of the settlement with the rewards the class would have been likely to receive following a successful trial." *DeHoyos*, 240 F.R.D. at 287 (citing *Reed*, 703 F.2d at 172).

Here, it is far from certain that Plaintiffs would have prevailed on behalf of the entire class. Particularly, Courts have recently denied relief to patients with APRI scores below 0.5, *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1271 (11th Cir. 2020), or rejected plaintiffs' claims entirely, *Atkins v. Parker*, 972 F.3d 734 (6th Cir. 2020).[36]

Thus, while some inmates may wait several years to be treated with DAA medication, the Settlement Agreement provides a similar DAA treatment schedule as required by the district court before the appeal in *Hoffer*, 973 F.3d at 1269, but with the significant additional benefit of requiring that all Settlement Class Members eventually receive DAA medication, regardless of disease progression or APRI score (if they remain in custody and do not have a medical contraindication). Notably, even the district court in *Hoffer* – though its order was reversed in part by the Eleventh Circuit – did not require all patients be treated immediately. The *Hoffer* district court held patients with APRI scores below 0.5 did not need to be treated until two years "after staging," timing similar to the treatment schedule here for the below 0.5 patients. *Id.* at 1269.

Even if the Settlement Class was guaranteed success – far from a certainty – there is still no guarantee that in litigating the case to conclusion that the inmates would receive DAA treatment

---

[36] There is also Fifth Circuit precedent denying relief to inmate patients seeking DAA treatment, albeit entirely in *pro se* cases litigated without the benefit of expert testimony. *See, e.g.*, *Roy v. Lawson*, 739 Fed. Appx. 266 (5th Cir. 2018); *Grumbles v. Livingston*, 706 Fed. Appx. 818 (5th Cir. 2017).

faster than the schedule in the Settlement Agreement. The Settlement Agreement requires that patients with APRI scores above 0.5 receive treatment before the conclusion of 2023, and if the Settlement Agreement is not approved, the parties may still be litigating this case at that time (as it is anticipated that Defendants would seek an interlocutory appeal of class certification, and any relief won after trial will also be subject to an appeal). For those patients – the people most in need of immediate DAA treatment – continuing to litigate the case might actually *delay* treatment rather than *guarantee* treatment on the agreed timeline.

In short, the Settlement Agreement turns great uncertainty into guaranteed DAA treatment for all Settlement Class Members (unless they are released from TDCJ custody or have a medical contraindication).

### 3.   Range of Possible "Recovery"

Treatment for all Settlement Class Members with DAA medication is the best outcome this case could have hoped to achieve. When evaluating a class action settlement, courts should consider "[t]he relief sought in the complaint [as] helpful to establish a benchmark by which to compare the settlement terms." *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977). The Settlement Agreement gives Plaintiffs all the primary relief sought in their complaint. *Compare* Doc. 3, p. 20 (prayer for injunction to "require [Defendants] to provide … the class with DAA drug treatments") *with* Ex. 1, Settlement Agreement, pp. 9-11 (schedule of treatment of all inmate patients).

Of course, should the Parties continue to litigate the case, the Settlement Class Members could receive nothing. *See Atkins v. Parker*, 972 F.3d 734 (6th Cir. 2020). Or the patients with APRI scores above 0.5 could receive DAA medication, while the patients with scores below 0.5 could receive nothing. *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1271 (11th Cir. 2020).

If Plaintiffs were to continue to litigate their claims, their potential recovery of attorneys' fees may increase, but there is only a slim likelihood the Settlement Class Members would win a better resolution.

### 4. The Complexity and Likely Duration of the Litigation

Though this case has been on file for almost a year and a half, it is still in its infancy. The Court has yet to determine whether the class should be certified. The losing party of that decision would likely appeal. Numerous other depositions remain to be taken – including multiple medical providers and prison administrators. Even if Plaintiffs were to seek (and win) preliminary relief, that decision would also likely invite an interlocutory appeal. This case has numerous chapters that still remain to be written, and (absent the settlement) the conclusion is far from around the corner.

The consequence of protracted litigation, of course, is likely delayed treatment. The proposed resolution now is a significant benefit to the class because the lawsuit can end and the necessary medical treatment can begin in earnest.

### 5. The Stage of the Proceedings and Discovery

Plaintiffs' counsel is well-informed about the possibility of ultimate success. The purpose of this element is ensuring "the parties and the district court possess ample information with which to evaluate the merits of the competing positions." *Ayers v. Thompson*, 358 F.3d 356, 369 (5th Cir. 2004). When evaluating a potential settlement, "[t]he Court should consider all information which has been available to the parties." *DeHoyos*, 240 F.R.D. at 292. Though relatively few depositions have been taken here, the facts are relatively simple and undisputed – due to the cost of DAA medication, Defendants are not immediately providing DAA medication to all patients with chronic Hepatitis C inmates. Extensive formal discovery is unnecessary to approve a settlement

when the Parties (and district court) are otherwise well-informed. *Union Asset Mgmt Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 640 (5th Cir. 2012).

Here, the Parties' ability to assess Plaintiffs' position is driven by the law, not the facts. And the law provides great uncertainty about the potential success of these claims (especially for the patients with APRI scores below 0.5). *See Atkins v. Parker*, 972 F.3d 734 (6th Cir. 2020); *see also Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1271 (11th Cir. 2020).

### 6. *The Opinions of Class Counsel and Class Representatives*

Plaintiffs' counsel endorses the Settlement Agreement. All Settlement Class Members will receive the primary relief sought: treatment with DAA medication for their chronic Hepatitis C (unless they are released from TDCJ custody or have a medical contraindication). As described above, there is uncertainty regarding whether securing DAA treatment for all Settlement Class Members – on any schedule – is possible. Thus, Plaintiffs' counsel believes that the settlement class is "able to secure substantially more modifications in the [TDCJ] [policies] than they would have achieved had they prevailed on their request for injunction." *Guajardo*, 568 F.Supp. at 1358 (approving prison class action settlement). *See* Ex. 4, Declaration of J. Edwards, p. 18; Ex. 15, Declaration of S. Medlock, p. 6; Ex. 16, Declaration of M. Singley, p. 3.

The trial court may rely on "the judgment of experienced counsel for the parties." *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977). "The endorsement of class counsel is entitled to deference." *DeHoyos*, 240 F.R.D. at 292.

The named Plaintiffs are similarly pleased with the result. *See* Ex. 20, Declaration of M. Roppolo;[37] Ex. 21, Declaration of D. Allen; Ex. 22, Declaration of V. Valdez; Ex. 23, Declaration of J. Cook.

### 7. *Attorneys' Fees and Expenses*

The Court may award "reasonable attorneys' fees" as part of a class action settlement. FED. R. CIV. PROC. 23(h). Plaintiffs seek fees and expenses under 42 U.S.C. § 1988 and 42 U.S.C. § 12205. "In any action or proceeding to enforce provisions of [42 U.S.C. § 1983] the court … may allow the prevailing party … a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988. Likewise, the ADA provides a prevailing party may recover "a reasonable attorney's fee, litigation expenses, and costs." 42 U.S.C. § 12205. "[T]he judicial gloss on § 1988, and its legislative history, have converted the statute's 'may' into a 'must.'" *Sanchez v. City of Austin*, 774 F.3d 873, 880 (5th Cir. 2014) (reversing district court's denial of attorneys' fees). "The prevailing party [in a § 1983 case] should ordinarily recover an attorney's fee unless special circumstances would render an award unjust." *Blanchard v. Bergeron*, 489 U.S. 87, 89 n. 1 (1988) (citing *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402 (1968)). *See also Hopwood v. Texas*, 236 F.3d 256, 278 (5th Cir. 2000) *cert. denied*, 533 U.S. 929 (2001).

Before an award of fees, "[n]otice of the motion must be served on all parties and … directed to class members in a reasonable manner." *In re Enron Copr. Sec., Deriv. & ERISA Litig.*, 586 F.Supp.2d 732, 745 (S.D. Tex. 2008). Notice will be provided to Settlement Class Members of "the content of the settlement and the scope of the fee." *In re: Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 447 (3d Cir. 2016) (citing NEWBERG ON CLASS ACTIONS

---

[37] Though Mr. Roppolo has yet to sign the settlement agreement, he nonetheless endorses the terms of the settlement and believes it is "fair and reasonable" and asks the Court approve it. Ex. 20, p. 1.

§ 8.22 (5th ed.)). The Class Action Notice and Opt Out Form, Ex. 2, informs the putative class that their attorneys are seeking fees and expenses in the agreed amount of $950,000 ($750,000 for work performed to date, and $200,000 for administering the class for the remainder of the term of the agreement).

Here, the Settlement Agreement provides for an agreed amount of the fees and expenses, which are not part of a common fund available to the settlement class. "[C]ourts have encouraged litigants to resolve fee issues by agreement, if possible." *DeHoyos*, 240 F.R.D. at 321. "[C]ourts are authorized to award attorneys' fees and expenses where all parties have agreed to the amount, subject to court approval, particularly where the amount is in addition and separate from the defendants' settlement with the class." *Id*. This is especially appropriate where the attorneys' fees are "separate and apart from the class settlement – which is not a common monetary fund – and will not in any way diminish the class settlement." *Id.* at 322. Here, "[w]ere the Court to reduce the award of class counsel's fees, this would not confer a greater benefit upon the class, but rather would only benefit [the defendants]." *DeHoyos*, 240 F.R.D. at 323. *See Blum v. Stenson*, 104 S.Ct. 1541 (1984); *In re Enron Corp. Sec., Deriv., & ERISA Litig.*, 586 F.Supp.2d 732, 759-60 (S.D. Tex. 2008) (comparing fee awards in statutory fee shifting and common fund cases).

When the amount of attorneys' fees is agreed upon, reached after all other terms of the settlement, and not the subject of a common fund – all of which is true here – the attorneys' fees are presumed to be reasonable. *See DeHoyos*, 240 F.R.D. at 322-23 (approving total award of $11,720,000). "[W]e will not require the trial court's findings to be so excruciatingly explicit in this area of minutiae that decisions of fee awards consume more paper than the cases from which they arose." *In re High Sulfur Content Gasoline Liability Litig*., 517 F.3d 220, 228-29 (5th Cir. 2008).

i)       The Lodestar Analysis

A reasonable fee is determined using the lodestar method. *See In re High Sulfur Content*, 517 F.3d at 228. Using a lodestar is particularly appropriate in civil rights litigation for injunctive relief because "there is no way to gauge the net value of the settlement or any percentage thereof." *DeHoyos.*, 240 F.R.D. at 324 (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998)).

The amount of attorneys' fees a prevailing party is entitled to recover is determined by calculating "the reasonable number of hours expended on the litigation multiplied by a reasonable hourly rate." *Blanchard*, 489 U.S. at 89. *See also Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974). This amount is then adjusted upward or downward by applying a multiplier to determine a final, reasonable fee. *Id*. The party seeking an award of attorney's fees pursuant to the lodestar method bears the burden of justifying any fee award. *See Saizan v. Delta Concrete Prods. Co., Inc*., 448 F.3d 795, 799 (5th Cir. 2006). As Judge Posner explained, in attorneys' fee litigation, "it is not the function of judges … to determine the equivalent of the medieval just price. It is to determine what the lawyer would receive if he were selling his services in the market rather than being paid by court order." *Matter of Continental Illinois Securities Litig.*, 962 F.2d 566, 568 (7th Cir. 1992).

"The hourly rates to be used in the lodestar calculation are determined by 'the prevailing market rates in the relevant community.'" *Hoffman v. L & M Arts*, No. 3:10-CV-0953-D, 2015 WL 3999171, at *2 (N.D. Tex. July 1, 2015) (quoting *Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs,* 2013 WL 598390, at *5 (N.D.Tex. Feb.15, 2013) (citations omitted)). The "prevailing market rate" is the rate charged "for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum*, 465 U.S. at 895 n.11. When counsel from

"out-of-district" is required, those attorneys should be paid their "home" rates. *McClain v. Lufkin Indus., Inc.*, 649 F.3d 374, 382 (5th Cir. 2011).

> ii)    The Hours Expended were Reasonable and Necessary to Achieve the Result.

First, as outlined above, significant effort was required to reach this result. Plaintiffs' attorneys spent over 1,700 hours (to date) working on their behalf. This is a reasonable amount of hours billed for a case that required seven depositions in four cities, review of over 180,000 pages of documents (which does not include the medical records of over 80 patients who were evaluated as class representatives, or the hundreds of pages of publicly available materials that were reviewed before filing), litigating class certification and a motion to dismiss, and a two-day mediation resulting in a complex, detailed Settlement Agreement that required numerous additional negotiation sessions. Of course, much of Plaintiffs' attorneys' efforts involved interviewing witnesses at multiple remote prisons, requiring significant travel.

A summary accounting of the hours spent working on the case is attached as Exhibit 9, with detailed accounting including spreadsheets for each attorney (or staff member) in Exhibit 10.

Likewise, Plaintiffs' counsel has exercised careful billing judgment, discounting or excluding hours where appropriate. Typically, Plaintiffs' counsel did not even record time spent on short phone calls, responding to brief emails, or other similar tasks that would add up significantly.

> iii)    Plaintiffs' Counsels' Hourly Rates are Reasonable.

Similarly, the hourly rates Plaintiffs' counsel agreed to accept to settle this case are more than reasonable for attorneys of their skill and experience. Reasonable hourly rates for Plaintiffs' counsel (awarded by other courts) vary from $750/hour for lead counsel, to $150/hour for legal assistants assigned to the case. However, in an effort to facilitate settlement and compromise, and

to avoid burdening the Court with a fee dispute, lead counsel has agreed to accept a reduced rate of $600/hour in this case only.[38] Both counsels' actual rates and the compromise rates are reasonable and based on the prevailing market rate for attorneys' hourly rates in the Southern District of Texas, where this case resides, as well as accounting for counsel's significant experience in other civil rights class action litigation. *DeHoyos*, 240 F.R.D. at 322-23  (approving 2007 hourly rates between $550 and $500 for lead counsel, $475 and $350 for associates, and $200 and $130 for legal assistants);[39] *Cole v. Collier*, No. 4:14-cv-1698, 2018 WL 2766028, *13 (S.D. Tex. June 8, 2018). *See also See* Ex. 4, Declaration of Jeff Edwards, pp. 19-21; Ex. 11, Declaration of J. Doyle; Ex. 29, Declaration of J. Flood.

iv)   Plaintiffs' Counsel's Fee is Reasonable

For labor performed to date (which notably does not include other expected work necessary to obtain final approval, such as verifying notice and responding to any objections), under the agreed upon rate structure, Plaintiffs' fees and expenses total $798,337.66 (at the agreed upon rates). Ex. 9(a).[40] Plaintiffs' counsel anticipates that substantial additional labor will be required before the conclusion of the fairness hearing, however, including verifying Settlement Class

---

[38] This compromise rate represents a substantial discount from the rates that Plaintiffs' counsel typically seeks, and has been awarded, in other class action litigation. *See* Ex. 29, Order in *White v. Gregory Funding LLC* (setting lead counsel's reasonably hourly rate at $750/hour as of 2020); *Cole*, 2018 WL 2766028, *13 (S.D. Tex. June 8, 2018) (approving lead counsel's reasonable hourly rate at $650/hour in 2018); *Opperman v. Kong Tech., Inc.*, No. 13-CV-00453-JST, Doc. 925 (N.D. Cal. Mar. 27, 2018) (Ex. 28) (same). The rates agreed to in this case represent a compromise to settle the amount of attorneys' fees in this case, and are not a concession that the lower agreed upon rates are reasonable in any future litigation.

[39] Adjusted for inflation, the 2007 rates become $660-$605 for lead counsel, and $575-$424 for associates – amounts very comparable to the rates sought here. *See* Bureau of Labor Statistics, *CPI Inflation Calculator*, *available at*: https://data.bls.gov/cgi-bin/cpicalc.pl.

[40] At counsel's market-based rates, the fees and expenses to date are $921,610.16. Ex. 9(b).

Members received notice, responding to any objections, preparing for and attending the fairness hearing, and defending any appeals. These duties (among others) are contemplated in the $200,000 lump sum payment for future "Class Administration." *See* Ex. 1, pp. 5 & 24-25. In the *Cole* litigation, counsel labored for almost four hundred additional hours between filing the preliminary approval motion and the fairness hearing, and anticipate a similar amount of additional work here (especially given that the settlement class here is approximately six times larger than the *Cole* class). *See Cole*, 2018 WL 2766028, **6-11 & 13 (addressing class members' objections to a similarly favorable settlement and noting that Plaintiffs' counsel "reported an additional 389.1 hours of work since preparing the motion for preliminary approval"). At a blended rate of $518.75/hour (based on the reduced rates agreed to for this case only), performing an additional 389.1 hours in this case would result in an additional fee of $201,845.63 – an amount that would surpass the total agreed $950,000 in fees and expenses when it is added to the fees as of today ($1,000,183.29, at the agreed rates) and expenses ($42,605.16). Plaintiffs' counsel will supplement additional hours and fee information prior to the final fairness hearing.

The lump-sum payment in the Settlement Agreement for future fees also anticipates that Class Counsel will perform additional labor over the seven-year life of the agreement. *See* Ex. 1, pp. 5 & 24-25. In addition to the work required between filing the approval motion and the fairness hearing, future Class Administration will include review of quarterly and biannual reports by an attorney to ensure that Settlement Class Members are progressing on the intended treatment schedule, and responding to questions from Settlement Class Members who believe they are not being treated on the appropriate schedule. *See* Ex. 1, pp. 25-27. At the agreed blended rates ($518.75), Class Counsel would be compensated for over 385 hours of attorney time over the next seven years in administering the class (if *zero* additional hours were required after this motion is

filed and before final approval). Based on Class Counsel's prior experience administering similar classes, this should allow Class Counsel to fairly perform all the duties contemplated by the agreement. *See* Ex. 15, Declaration of S. Medlock, p. 6.[41]

> 8.   *The Johnson Factors Justify and Confirm the Reasonable Fee.*

Though the lodestar amount alone exceeds the agreed fee award for work already performed (and confirms the award future Class Administration is reasonable), evaluating the *Johnson* factors typically used to calculate a fee multiplier also justifies the result. *See Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974); *In re: Enron Corp. Sec., Deriv. & ERISA Litig.*, 586 F.Supp.2d 732 (S.D. Tex. Sept. 8, 2008) (approving multiplier of 5.2 after evaluation of *Johnson* factors).[42] The *Johnson* factors are:

(1)   the time and labor required for the litigation;
(2)   the novelty and difficulty of the questions presented;
(3)   the skill required to perform the legal services properly;
(4)   the preclusion of other employment by the attorney due to acceptance of the case;
(5)   the customary fee;
(6)   whether the fee is fixed or contingent;
(7)   time limitations imposed by the client or the circumstances;
(8)   the amount involved and the result obtained;
(9)   the experience, reputation and ability of the attorneys;
(10)   the "undesirability" of the case;
(11)   the nature and length of the professional relationship with the client; and,

---

[41] Alternatively, under Plaintiffs' counsels' actual market-based rates, the total amount of fees and expenses incurred to date totals $921,610.16, without accounting for the additional labor likely to be required to secure final approval of the agreement. (Jeff Edwards: 277.7 hours at $750/hour, or $208,275.00; Scott Medlock: 381.5 hours at $550/hour, or $209,825.00; Mike Singley: 404.3 hours at $650/hour, or $262,795.00; David James: 257.9 hours at $400/hour, or $103,160.00; Legal Assistants, 422 hours at $225/hour or $94,950.00.) Thus, even if the Court were to believe that an award for any estimated future labor is problematic (though it is not as there will likely be substantial work over the next several years, and, if anything, Plaintiffs' counsel are taking the risk of being underpaid), the work Plaintiffs' counsel has already performed under the market-based rates results in a sum close to the agreed upon fee.

[42] In approving a class action settlement, the Court is required to evaluate the *Johnson* factors. *Strong v. Bellsouth Telecomm., Inc.*, 137 F.3d 844, 849 (5th Cir. 1998).

(12)   awards in similar cases.

These factors weigh heavily in favor of determining the fee is reasonable.

i)   <u>The Litigation is Extremely Time Consuming.</u>

This case has been extremely time consuming for all involved. Plaintiffs' counsel has spent over 1,700 hours litigating this matter just the year and a half since filing the case. *See*, *e.g.*, Ex. 4, Declaration of J. Edwards, pp. 17-19. *See also* Exs. 9-10.

ii)   <u>The Case Presented Multiple Complex Questions.</u>

Though the core facts of the case were not inherently complex, Plaintiffs' claims involve numerous difficult issues of constitutional and disability law (as well as class action procedures). Plaintiffs' counsel researched and briefed complex legal and medical issues. Developing Plaintiffs' arguments required intricate knowledge of a large body of federal law developed in numerous similar cases from around the country, including several important cases that reached incongruous results. *See*, *e.g.*, *supra* p. 17, n.7, & pp. 27, 30 (discussing *Hoffer* and *Atkins*). Likewise, the case required evaluating complicated concepts in medicine, health care economics, and corrections. *See* Ex. 4, Declaration of J. Edwards, pp. 15-17.

iii)   <u>Highly Skilled Attorneys were Required.</u>

Plaintiffs' counsel are "skilled attorneys" who are "experienced, reputable, and able" in this "specialized area of law." *Cole*, 2018 WL 2766028, at *14. This is a complex case that, like *Cole*, required an ability both to argue complex points of law and understand complicated medicine. As noted above, in similar cases other skilled attorneys have achieved lesser results. *See supra* at pp. 27, 30.

iv)     Other Employment Opportunities Have Been Precluded.

Plaintiffs' counsel at Edwards Law have been precluded from pursuing other matters due to their commitment to this litigation. Devoting significant time to this case required Plaintiffs' counsel to forgo other opportunities to represent clients with meritorious claims. *See*, *e.g.*, Ex. 4, Declaration of J. Edwards, p. 21.

v)     The Proposed Fees are Customary and Market-Based.

As discussed above, the lodestar amount alone would result in a customary, market-based fee.

vi)     The Fee is Entirely Contingent.

The Plaintiffs are indigent inmates, who do not have the ability to pay their counsel. Absent an award of fees, counsel will not receive any compensation for their work on this matter (or recover any of the significant expenses). *See*, *e.g.*, Ex. 4, Declaration of J. Edwards, p. 20; Ex. 20, Declaration of M. Roppolo; Ex. 21, Declaration of D. Allen; Ex. 22, Declaration of V. Valdez; Ex. 23, Declaration of J. Cook.

vii)     The Litigation Imposed Unique Time Limitations.

In addition to the time spent simply litigating the case, there are other severe time limitations imposed by inmate litigation. Simply speaking with the Plaintiffs required a four-to-five-hour round-trip drive from Austin when they were imprisoned at the McConnell Unit in Beeville, and then a nine-hour round trip when Mr. Cook was unexpectedly moved to a prison in Beaumont.

viii)     The Result is Impressive.

Simply put, the relief secured in this litigation will save lives and prevent serious illness. Every Settlement Class Member will be guaranteed DAA treatment (save for those who are

released from custody before their treatment is scheduled to begin, and the very small numbers of patients whose treatment would be medically contraindicated or affirmatively refuse treatment). Attorneys in other, similar cases were unable to secure these results. *See*, *e.g.*, *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263 (11th Cir. 2020); *Atkins v. Parker*, 972 F.3d 734 (6th Cir. 2020).

If anything, but for the agreement of the parties on the amount of fees and expenses, this is a case where the lodestar amount should be adjusted upward because "the case is rare and exceptional" – over 9,700 people will receive potentially life-saving medication. *DeHoyos*, 240 F.R.D. at 326. *See also Cole*, 2018 WL 2766028, *15 (awarding multiplier to Plaintiffs' counsel "to achieve a reasonable fee that reflects the *Johnson* factors").

### ix) The Attorneys' Experience is Impressive and Extensive.

As discussed above, counsel's experience and expertise in civil and disability rights and class action litigation is impressive and extensive. *See* Ex. 4, Declaration of J. Edwards; Ex.15, Declaration of S. Medlock; Ex. 16, Declaration of M. Singley.

### x) The Case is "Undesirable."

Inmate litigation is considered "undesirable" for many reasons. Inmates are not a popular clientele. The standard of proof is very high. *See*, *e.g.*, *Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001) ("Deliberate indifference is an extremely high standard to meet."). This case also required expensive expert testimony – Plaintiffs retained one of the world's leading authorities on viral Hepatitis. Ex. 12, Declaration of Dr. S. Trooskin, M.D. This is precisely the type of litigation where a "reasonable fee" is necessary to attract competent counsel to vindicate federal rights, and the type of "private attorney general" action the fee shifting statutes are meant to encourage—cases that will ensure individuals' fundamental federal rights are protected. *See Tex. State Teachers Assn. v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 793 (1989).

> A civil rights plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms. And Congress has determined that the public as a whole has an interest in the vindication of the rights conferred by the statutes enumerated in § 1988, over and above the value of a civil rights remedy to a particular plaintiff.

*Riverside v. Rivera*, 477 U.S. 561, 574 (1986) (internal citations omitted). Indeed, "attorneys successfully challenging civil rights violations should be rewarded an enhanced customary fee." *DeHoyos*, 240 F.R.D. at 329. "[T]he objective of the award is to create a financial incentive to initiate socially desirable litigation and thereby enhance access to the adjudicative process, taking into account the amount of benefit actually produced and allowing fees to be enhanced accordingly seems particularly appropriate." WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE, § 1803.1.

### xi)   Counsel has Cultivated a Strong Relationship with the Clients.

Counsel interviewed dozens of inmates diagnosed with Hepatitis C at multiple prisons. In addition to the named plaintiffs, who Counsel has spent hours speaking with about intimate matters like their medical conditions (as well as complex litigation strategy), Counsel also interviewed numerous other inmates who were identified as potential witnesses. Ex. 15, Declaration of S. Medlock, p. 4.

### xii)   Similar Awards in Suits Seeking Injunctive Relief.

Courts regularly approve much larger awards in civil rights class actions. The Supreme Court upheld an award of over $6,000,000 in *Perdue v. Kenny A.*, 559 U.S. 542 (2010) (affirming the lodestar amount without any multiplier), a civil rights class action for injunctive relief with no damages component. In *Cole*, this Court approved a $4,500,000 fee. *Cole*, 2018 WL 2766028, at *15. The Western District of Texas affirmed a much larger settlement in *DeHoyos*, 240 F.R.D. at 323 (approving fee of $11,720,000 in suit reforming insurance company's "red lining" practices).

Numerous courts have approved similar larger fees in inmate class actions. *See also Parsons v. Ryan*, No. 2:12-cv-00601-DJH, Doc. 1185, p. 14 (D. Az. Oct. 14, 2014) (stipulation settling prison class action with fee of $4,900,000) (attached as Ex. 24); *Nunez v. City of New York*, No. 1:11-cv-05845-LTS-JCF, Doc. 209-1, p. 59 (S.D. N.Y. July 1, 2015) (settlement agreement in jail class action with agreed attorneys' fee of $6,500,000) (attached as Ex. 25); *Hernandez v. Cty. of Monterey*, No. 13-CV-2354-PSG, p. 21 (N.D. Cal. May 11, 2015) (settlement agreement in jail class action with agreed attorneys' fee of $4,800,000) (attached as Ex. 26); *Craft v. Cty. of San Bernardino*, 624 F.Supp.2d 1113 (C.D. Cal. 2008) (approving $6,375,000 fee); *Wallace v. Powell*, 288 F.R.D. 347 (M.D. Penn. Dec. 14, 2012) (approving $4,335,000 fee); *Bynum v. Dist. of Columbia*, 412 F.Supp.2d 73, 81 (D. D.C. 2006) (approving $4,000,000 fee); *In re Nassau Cty. Strip Search Cases*, 12 F.Supp.3d 485, 502 (E.D. N.Y. 2014) (approving $4,018,030.25 fee); *Young v. Cty. of Cook*, No. 06 C 552, 2017 WL 4164238, *5 (N.D. Ill. Sept. 20, 2017) (approving $10,000,000 fee).[43]

### xiii)    The "Value" of the Injunctive Relief

The fee is also reasonable given the monetary value of the benefits afforded to the class. Of course, it is impossible to reduce the value of improved health to a dollar amount. But the dollar cost of DAA medications can be calculated, and justifies the amount of the attorneys' fee. In pure dollar amounts, a course of DAA treatments currently costs the State of Texas approximately $15,000. Ex. 27, Deposition of M. Roberts, 89:7-21 (under seal). Thus, treating at least 1,200 patients per year – the settlement's requirement – will cost the state approximately $18,000,000

---

[43] *See also* David Chen, "$8 Million Offered to End Attica Inmates' Suit," NEW YORK TIMES, Jan. 5, 2000 (describing class action settlement including $4,000,000 attorneys' fee) *available at*: http://www.nytimes.com/2000/01/05/nyregion/8-million-offered-to-end-attica-inmates-suit.html.

each year. To complete treating all the 9,718 Settlement Class Members by the conclusion of 2028, the State will expend $145,770,000.00 (if they all remain in custody). The fee is a small fraction of this amount, less than one percent. If these costs remain the same for the duration of the settlement period, the sum of attorneys' fees and expenses will be approximately 0.65% of the monetary cost of the benefit the Class eventually receives. If this were a damage award and part of a common fund, the fee would be eminently reasonable. *See Longden v. Sunderman*, 979 F.2d 1095 (5th Cir. 1992) (approving award of 27.5% of $19,200,000 common fund as attorneys' fee).

### xiv)   Costs and Litigation Expenses

The agreed amount for costs and fees is further justified by Plaintiffs' costs and litigation expenses, which they incurred in conjunction with the claims on which they successfully settled, pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 12205. *See also Jones v. White*, No. H-03-2286, 2007 WL 2427976, *8 (S.D. Tex. Aug. 22, 2007) (awarding experts' fees as litigation costs under the ADA). Plaintiffs' counsel paid these expenses with no contribution from the clients.

A detailed breakdown of the costs is attached as Exhibit 17, totaling $42,605.16. *See also* Ex. 4, Declaration of Jeff Edwards, p. 20.

### 9.   *Attorneys' Fees and Expenses Summary*

The total amount of the lodestar attorneys' fees and expenses is $794,132.66 at the agreed-upon rates as of the date this motion was filed. Plaintiffs' counsel anticipates this amount will likely increase significantly before final approval as there will likely be objections filed . *See Cole*, 2018 WL 2766028, **6-11 & 13 (addressing class members' objections to a similarly favorable settlement and noting that Plaintiffs' counsel "reported an additional 389.1 hours of work since preparing the motion for preliminary approval"). Defendants agree these fees and expenses were directly and reasonably incurred in litigating the alleged violation of Plaintiffs' federal rights, the

amount of the fees and expenses are proportionately related to the relief required for the alleged violation, and the fee was directly and reasonably incurred in enforcing the relief ordered for the violation. *See* 42 U.S.C. § 1997e(d).[44]

### C. Continuing Jurisdiction and the Prison Litigation Reform Act

Because all Settlement Class Members are not being provided DAA treatment immediately, Plaintiffs allege the injury to their federal rights will persist. The Court should find the relief agreed to in the Settlement Agreement is necessary to remedy the alleged violations of the Settlement Class Members' federal rights, and, due to the agreement of the parties, extends no further than necessary to correct the alleged violation of the Settlement Class Members' federal rights. The Court should find the relief will not cause any adverse impact on public safety or the operation of the criminal justice system. 18 U.S.C. § 3626. Thus, the Court will retain continuing jurisdiction until the requirements in the Settlement Agreement are suspended or January 1, 2028, whichever is sooner (Ex. 1, pp. 30-31), at which time the parties will notify the Court and the case

---

[44] Although Defendants do not assert the caps on attorneys' fees pursuant to 42 U.S.C. § 1997e(3) apply in this case, Defendants have agreed to an attorneys' fees amount above the cap solely for the purposes of settling this litigation. Defendants agree not to appeal the Court's judgment approving the attorneys' fees award agreed upon, which is above the Section 1997e(3) caps, however, this agreement does not apply in any other future litigation. Likewise, Plaintiffs assert the § 1997e(3) cap only applies to fees sought under 42 U.S.C. § 1988, but not to claims brought under the ADA and Rehabilitation Act's fee provisions (42 U.S.C. § 12205). Thus, Plaintiffs assert the caps do not apply in this case. *See, e.g, Armstrong v. Davis*, 318 F.3d 965, 974 (9th Cir. 2003); *Pierce v. Cty. of Orange*, 905 F.Supp.2d 1017, 1025 (W.D. Cal. 2012); *Beckford v. Irvin*, 60 F.Supp.2d 85, 88 (W.D. N.Y. 1999). Moreover, it is Plaintiffs' position that, even if the Court were obligated to evaluate the caps, it should still award the agreed fee of $907,394.84 (the agreed amount minus expenses, which are uncapped). The amount of the cap is $288.50/hour, which would result in a total capped fee of $476,173.90. The exceptional result in this case, however, justifies a fee multiplier to reach the "reasonable" fee required by 42 U.S.C. § 1988. *See Kelly v. Wengler*, 822 F.3d 1085, 1100-02 (9th Cir. 2016) (affirming use of 2.0 multiplier to reach a "reasonable" fee); *supra* at pp. 37–43 (evaluating *Johnson* factors justifying a multiplier). A multiplier of 1.91 results in the agreed amount of the fee (minus expenses). This multiplier produces a reasonable result. *Cerdes v. Cummins Diesel Sales Corp.*, No. 06-922, 2010 WL 2835755, *5 (E.D. La. July 15, 2010) (approving 2.5 multiplier).

can be dismissed. The Parties will only invoke the Court's jurisdiction, however, after exhausting

the dispute resolution provisions provided in the Settlement Agreement. Ex. 1, pp. 15-16.

## IV.   CONCLUSION

The Court should grant the following relief.

1)   Certify a class for purposes of settlement, as described above;

2)   Approve the notice (Ex. 2) for the Parties to provide to the Class as described above;

3)   Set a fairness hearing to approve the settlement, to hear any objections from the Settlement Class Members, and approve the Settlement Agreement and the associated agreed award of attorneys' fees and costs.

Dated: March 2, 2021.

Respectfully submitted,

Edwards Law
The Haehnel Building
1101 East 11th Street
Austin, Texas 78702
          Tel.     512-623-7727
          Fax.    512-623-7729


By      /s/ Jeff Edwards
JEFF EDWARDS
State Bar No. 24014406
Attorney-in-Charge
Scott Medlock
State Bar No. 24044783
Michael Singley
State Bar No. 00794642
David James
State Bar No. 24092572
Federal ID No. 2496580

**ATTORNEYS FOR PLAINTIFFS**

45

## CERTIFICATE OF SERVICE

By my signature above, I certify that a true and correct copy of the foregoing has been served on all counsel of record through the Court's electronic filing system.

By    /s/ Jeff Edwards
JEFF EDWARDS

## CERTIFICATE OF CONFERENCE

By my signature above, I certify that the Parties have conferred regarding the substance and relief requested in this Motion. Defendants are unopposed to the certification of the Settlement Class and the approval of the Settlement Agreement. Defendants further agree for the purpose of settlement in this case that payment of $950,000 in attorneys' fees is reasonable based on the facts and circumstances of this case and the efforts expended by plaintiffs' counsel. Defendants disagree with the representations made in this Motion that: (1) Defendants' current Hep C policy in any way precludes inmates with below a .5 APRI score from receiving DAA medication or from receiving individualized medical treatment; (2) the *Lodestar* analysis requires counsel to be paid at their "home" rates rather than the general market rates for where the district court sits, *i.e.*, Corpus Christi, Texas; (3) cases that are incomparable or dissimilar in substance and area of law are appropriate to consider in determining reasonable hourly rates; and (4) the *Johnson* factors are necessary to the calculation of attorneys' fees to be paid in this case. As noted in the motion, *see* n. 44, Defendants clarify they reserve the right to assert the PLRA caps on attorneys' fees in other Section 1983 cases brought by TDCJ inmates.

By    /s/ Jeff Edwards
JEFF EDWARDS